## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIBULA MUCHEVHERAT SAN. TIC. A.S.,<br>Nuruosmaniye Cad. Turbedar sok.<br>No: 4-6 Eminonu<br>Istanbul, Turkey,<br><br>   Plaintiff,<br><br>    v.<br><br>FIBULA GLOBAL LLC,<br>3236 Prospect Street, NW<br>Washington, DC 20007,<br><br>IRAKLIS KARABASSIS,<br>4774 Dexter Street, NW<br>Washington, DC,<br><br>MUSTAFA POYRAZ,<br>850 N. Randolph Street<br>Arlington, VA 22203,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT

Plaintiff FIBULA MUCHEVHERAT SAN. TIC. A.S., through undersigned counsel,

complains of and seeks relief from Defendants' unlawful detention of Plaintiff's property, and

for its Verified Complaint alleges as follows:

  1.  Plaintiff brings this action to recover valuable jewelry manufactured and owned

by Plaintiff, which Defendants have unlawfully withheld and detained in violation of Plaintiff's

rights and Defendants' express contractual obligations, despite Plaintiff's repeated demands for

return of the jewelry.  Through this action, Plaintiff seeks immediate return of its property which

has been unlawfully detained by Defendants, and damages resulting from Defendants' unlawful possession and conversion of Plaintiff's jewelry.

## PARTIES

2.     Plaintiff FIBULA MUCHEVHERAT SAN. TIC. A.S., previously known as EFE Kuyumculuk LTD. STI. (hereinafter, "Fibula Turkey") is an entity organized under the laws of the Republic of Turkey, with its principal place of business in Istanbul, Turkey. Plaintiff is a manufacturer of fine jewelry. Mr. Ozturk Serefoglu, a natural person residing in the Republic of Turkey, is the president and principal owner of Fibula Turkey.

3.     Defendant Fibula Global LLC, previously known as EFE Global LLC (hereafter referred to as "Fibula Global") is a Delaware limited liability corporation, with its principal place of business at 3236 Prospect Street, NW, Washington, DC. The Operating Agreement which governs Defendant Fibula Global LLC authorized Defendant Iraklis Karabassis to operate Fibula Global LLC by making decisions with the consent or agreement of either Defendant Mustafa Poyraz or Mr. Serefoglu, both of whom are Members of Fibula Gloabal. A true and correct copy of the Fibula Global LLC Operating Agreement is attached hereto as **Exhibit A**.

4.     Defendant Iraklis Karabassis ("Karabassis") is a natural person residing at 4774 Dexter Street, NW, Washington, DC. Karabassis is a Managing Member of Defendant Fibula Global and is a signatory on behalf of the Consignee Fibula Global under the May 13, 2007 Consignment Agreement with Plaintiff.

5.     Defendant Mustafa Poyraz ("Poyraz") is a natural person residing at 850 N. Randolph Street, Arlington, Virginia. Poyraz is a co-Managing Member of Defendant Fibula Global and is a signatory on behalf of the Consignee Fibula Global under the May 13, 2007 Consignment Agreement with Plaintiff. On information and belief, Defendant Poyraz regularly

- 2 -

and persistently conducts and transacts business in the District of Columbia in fulfilling his duties on behalf of Fibula Global, which maintains its principal place of business in the District of Columbia.  Additionally, Poyraz has unlawfully detained and converted Plaintiff's property in the District of Columbia.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), because this is a civil action wherein the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

7.    This Court has personal jurisdiction over Defendants Fibula Global and Karabassis because they maintain a principal place of business and domicile, respectively in the District of Columbia.  In addition, this Court has personal jurisdiction over all Defendants because they each transact substantial business in the District of Columbia, contract to supply services in the District of Columbia, and have caused tortious injury in the District of Columbia through an act or omission in the District of Columbia.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendants reside in this district, are subject to personal jurisdiction in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

9.    Defendants have contractually selected and consented to jurisdiction in the courts of the District of Columbia to resolve disputes arising out of their contract with Plaintiff.

## MATERIAL FACTS

10.    On or about May 13, 2007, Defendant Fibula Global entered a Consignment Agreement with Plaintiff Fibula Turkey.  Defendants Karabassis and Poyraz were among the

individuals who executed the Consignment Agreement on behalf of Defendant Fibula Global. A true and correct copy of the Consignment Agreement is attached hereto as **Exhibit B**.

11.    The Consignment Agreement generally provides for Defendants Fibula Global, Karabassis, and Poyraz to sell Plaintiff's jewelry at specified retail locations and events in the United States.

12.    At all times, Plaintiff Fibula Turkey has remained the sole owner of the jewelry manufactured and provided to Defendants pursuant to the Consignment Agreement. *See* Exhibit B, Consignment Agreement § 4.3. Defendants have acknowledged in the Agreement that Plaintiff Fibula Turkey is the rightful and sole owner of the jewelry it provided to Defendants under the Consignment Agreement, unless and until sold by Defendants, in accordance with the terms of the Consignment Agreement. *Id.*

13.    Plaintiff Fibula Turkey expressly reserved its rights to re-collect, at its sole discretion, all of the jewelry subject to the Consignment Agreement if sales of the jewelry fell below Plaintiff's expectations. *See* Exhibit B, Consignment Agreement § 3.3.

14.    Beginning as early as May, 2007, Plaintiff Fibula Turkey delivered jewelry it manufactured that is worth in excess of $500,000, including at least 434 individual items, to Defendants pursuant to the terms of the Consignment Agreement. A true and correct photo inventory of all jewelry delivered to Defendants pursuant to the terms of the Consignment Agreement is attached hereto as **Exhibit C**.

15.    In order to support and facilitate Defendant Fibula Global's sales of its jewelry in the United States by Defendants, Plaintiff Fibula Turkey provided in excess of $200,000 (in less than one year) to cover expenses claimed by Defendants in connection with the sale and marketing of Plaintiff's jewelry.

16.     Despite Defendants' claims of experience in the sales and marketing of jewelry and significant contacts and relationships in the United States, and Plaintiff's substantial financial support, the sales of Plaintiffs' jewelry in the United States pursuant to the Consignment Agreement fell below the expectations of Plaintiff Fibula Turkey and failed to reach sales targets.

17.     Plaintiff Fibula Turkey was not satisfied with Defendants' sales of the jewelry in the United States, and as a result, beginning in or about February 2008, Plaintiff made several verbal requests and demands for return of its jewelry, each of which was refused by Defendants.

18.     Following the verbal requests and demands, on or about April 12, 2008, Plaintiff Fibula Turkey delivered written notice to Defendant Fibula Global formally terminating the Consignment Agreement and demanding the immediate return of all of Plaintiff's jewelry and proceeds in the possession of Defendants, in accordance with the terms of the Consignment Agreement. *See* Exhibit B, Consignment Agreement §§ 9.2, 9.4. A true and correct copy of Plaintiff's April 12, 2008 notice and demand letter is attached hereto as **Exhibit D**.

19.     Defendants ignored and refused to accede to the demands in Plaintiff's termination letter (Exhibit D) or even acknowledge Plaintiff's termination of the Consignment Agreement.

20.     Even though Mr. Serefoglu is a Member of Fibula Global, Defendants failed to consult Mr. Serefoglu or seek his consent regarding their decision to refuse to return Plaintiff Fibula Turkey's jewelry. Rather, upon information and belief, Defendant Karabassis made the decision jointly with Defendant Poyraz to withhold and detain Plaintiff's jewelry and to refuse Plaintiff's demands for return of the jewelry.

21.     By letter dated May 12, 2008, Plaintiff Fibula Turkey, through legal counsel, repeated its notice of termination of the Consignment Agreement, reiterated Plaintiff's demands for the immediate return of its jewelry and that insisted that Defendants account for any proceeds received for sale of Plaintiff's jewelry under the Consignment Agreement. Plaintiff further demanded an immediate inspection and audit of Defendants' data and records relating to sales of the Plaintiff's jewelry, pursuant to Section 4.8 of the Consignment Agreement. A true and correct copy of Plaintiff's May 12, 2008 written demand letter is attached hereto as **Exhibit E**.

22.     Defendants refused to arrange for or permit the inspection and audit of data and records relating to Defendants' sale of Plaintiff's jewelry, as demanded by Plaintiff and as required under Section 4.8 of the Consignment Agreement.

23.     During the time when Plaintiff Fibula Turkey was demanding that Defendants return its jewelry, Defendant Poyraz brought a collection of Plaintiff's jewelry provided under the Consignment Agreement from Washington, DC to a jewelry dealer in New York City, and without Plaintiff's prior knowledge or consent, Defendant Poyraz deposited the jewelry with the New York dealer as collateral for a personal loan Poyraz obtained from the dealer in the amount of $25,000. Despite Defendant Poyraz's assurances to the New York jewelry dealer, Defendant Poyraz failed to repay the personal loan within the agreed-upon twenty days.

24.     Through its investigation into the whereabouts of its jewelry provided to Defendants pursuant to the Consignment Agreement, Plaintiff Fibula Turkey learned that Defendant Poyraz had defaulted on his personal loan obtained from the New York jewelry dealer for which Defendant Poyraz had used Plaintiff's jewelry as collateral. Fearing that Defendant Poyraz's default on his personal loan would result in the loss of Plaintiff's jewelry, and as a direct result of Defendants' breaches of the Consignment Agreement and refusal to return

- 6 -

Plaintiff's jewelry upon Plaintiff's requests and demands, Plaintiff Fibula Turkey was forced to pay the New York dealer $25,000 to obtain and retrieve the jewelry that Plaintiff rightfully owned. A true and correct Affidavit of the New York jewelry dealer attesting to these occurrences is attached hereto as **Exhibit F.**

25.     On June 24, 2008, Defendants through their counsel provided an inventory description representing and conceding that at least 396 pieces of Fibula Turkey's jewelry, as provided by Plaintiff to Defendants pursuant to the Consignment Agreement, remain in Defendants' possession. A true and correct copy of the inventory description provided by Defendants through their counsel is attached hereto as **Exhibit G**. Through their affirmative representations and those of their agent, Defendants have represented that they retain custody and control of Plaintiff's jewelry in a safe located at Defendant Fibula Global's business at 3236 Prospect Street, NW, Washington, DC 20007.

26.     Following Plaintiff's May 12, 2008 demand letter, however, Defendants' have: (a) repeatedly refused to return Plaintiff's jewelry, and (b) refused to permit an inspection and audit of Defendants' data and records relating to Plaintiff's jewelry. At the request of Plaintiff's counsel, counsel for Defendants did provide a written listing of number of items of Plaintiff's jewelry that Defendants admit remain within their possession.

27.     In addition, Defendants failed to settle Plaintiff's account on a monthly basis by wiring payment, resulting from sales of Plaintiff's jewelry, to Plaintiff's account, as required in Section 4.5 of the Consignment Agreement.

28.     The retail, fair market value of the Plaintiff's jewelry which Defendants have refused to return to Plaintiff, or for which Defendants otherwise have failed to account by providing the cash value or proceeds of sale, is $1,606,737.66 (with a wholesale value of

$521,643.41). A true and correct copy of the summary list of jewelry items which, upon

information and belief, remain within Defendants' possession and reflect a retail, fair market

value of $1,606,737.66, and a wholesale value of $521, 643.41, is attached hereto as **Exhibit H.**

**COUNT I**

**(All Defendants - Replevin – D.C. Code § 16-3701 *et seq.*)**

29.     Plaintiff repeats, re-alleges and incorporates by reference the allegations of all

preceding paragraphs as if fully set forth herein.

30.     Plaintiff Fibula Turkey sues Defendants for wrongfully and unjustly detaining the

Plaintiff's goods and chattels, to wit: all jewelry identified in Exhibit C hereto which has not

been actually sold by Defendants in accordance with the terms of the Consignment Agreement,

with a retail, fair market value of $1,606,737.66 (and a wholesale value of $521,643.41). And

the Plaintiff claims that the same be taken from Defendants and delivered to Plaintiff or its

attorneys or designated agents; or, if they are eloigned, that Plaintiff may have judgment of the

value of the jewelry and all mesne profits and damages. D.C. Code § 16-3702.

31.     Plaintiff Fibula Turkey is the sole, exclusive, and rightful owner of all jewelry

identified in Exhibit C hereto which has not been actually sold by Defendants in accordance with

the terms of the Consignment Agreement. *See* Exhibit B, Consignment Agreement § 4.3.

32.     Defendants have acknowledged and admitted in writing that Plaintiff is the sole

and exclusive owner of the property in Exhibit C which has not be actually sold by Defendants in

accordance with the terms of the Consignment Agreement. *See* Exhibit B, Consignment

Agreement § 4.3.

33.     Plaintiff Fibula Turkey has been rightfully entitled to the immediate return of all

jewelry identified in Exhibit C which has not be actually sold by Defendants in accordance with

- 8 -

the terms of the Consignment Agreement, since at least since: (a) Plaintiff's determination that Defendants' sales of the jewelry fell below expectations; and/or (b) Plaintiff's April 12, 2008 termination of the Consignment Agreement. *See* Exhibit B, Consignment Agreement §§ 3.3, 9.4.

34.    Upon information and belief, based specifically upon the representations of Defendants and/or their agents, Plaintiff's jewelry (as described in Paragraph 30 above) remains in the possession, custody, and/or control of Defendants and is located in a safe at Defendant Fibula Global's business at 3236 Prospect Street NW, Washington, DC.

35.    Despite repeated demands by Plaintiff, and Defendants' obligations under the Consignment Agreement, Defendants continue to refuse to return Plaintiff's jewelry which is identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement.

36.    Defendants have wrongly, unjustly, and unlawfully detained Plaintiff's jewelry, as identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement, which jewelry has a retail, fair market value of $1,606,737.66 (and a wholesale value of $521,643.41).

37.    The Plaintiff's jewelry, identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement, has not been taken for any tax assessment or fine levied by virtue of any law of the District of Columbia or the United States against the Plaintiff's jewelry or against the Plaintiff individually, nor seized under any execution or attachment against the goods and chattels of Plaintiff liable to execution or attachment, nor held by virtue of any writ of replevin against Plaintiff.

38.     The Plaintiff's jewelry, identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement, is property that is mobile and may be readily removed or hidden by the Defendants.

39.     As a result of Defendants' wrongful, unjust, and unlawful detention of Plaintiff's jewelry, Plaintiff is entitled to the return of the jewelry, and the loss sustained by the Plaintiff by reason of the detention.  D.C. Code §§ 16-3710, 16-3712 through 16-3713, & 28:2-716.

40.     Plaintiff is entitled to replevin of its jewelry identified in Exhibit C pursuant to D.C. Code §§ 16-3710, 16-3712 through 16-3713, & 28:2-716.

41.     Plaintiff is entitled to the remedy of replevin in this Court to recover its property from Defendants pursuant to Fed. R. Civ. P. 64.

42.     Therefore, Plaintiff Fibula Turkey is entitled to: (a) judgment for the possession of the jewelry identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement; and (b) a Writ of Replevin directing the United States Marshal of the District of Columbia to recover from the Defendants the jewelry identified in Exhibit C and which has not be actually sold by Defendants in accordance with the terms of the Consignment Agreement.

## COUNT II

### (Defendant Fibula Global LLC – Breach of Contract)

43.     Plaintiff repeats, re-alleges and incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

44.     Defendant Fibula Global executed and entered into a valid and enforceable contract with Plaintiff, in the form of the Consignment Agreement.

45.    Defendant Fibula Global breached the Consignment Agreement by selling and otherwise transferring for value Plaintiff's jewelry to entities other than those specified or permitted in the Consignment Agreement. *See* Exhibit B, Consignment Agreement §§ 3.1, 4.2.

46.    Defendant Fibula Global breached the Consignment Agreement by refusing to return Plaintiff's jewelry upon Plaintiff's repeated requests and demands, including (but not limited to): (a) Plaintiff's discretionary determination that Defendant's sales of the jewelry did not meet Plaintiff's expectations; and (b) Plaintiff's termination of the Consignment Agreement. *See* Exhibit B, Consignment Agreement §§ 3.3, 4.3, 9.4.

47.    Defendant Fibula Global breached the Consignment Agreement by refusing to allow representatives of Plaintiff Fibula Turkey to inspect and audit all data and records of Defendant Fibula Global relating to the sale of Plaintiff's jewelry, despite Plaintiff's reasonable request and notice. *See* Exhibit B, Consignment Agreement § 4.8.

48.    Defendant Fibula Global breached the Consignment Agreement by failing to settle Plaintiff's account on a monthly basis by wiring payment, resulting from sales of Plaintiff's jewelry, to Plaintiff's account, as required in Section 4.5 of the Consignment Agreement.

49.    Plaintiff Fibula Turkey has suffered direct and consequential damages as a result of Defendant Fibula Global's breaches of the Consignment Agreement, including but not limited to: (i) loss of its jewelry identified in Paragraph 30 with a retail, fair market value of $1,606,737.66 (and a wholesale value of $521,643.41); (ii) Plaintiff's share of the proceeds Defendants' received from the sale of Plaintiff's jewelry by Defendants under the Consignment Agreement; (iii) Plaintiff's payment of $25,000 to recover property that rightfully belonged to Plaintiff following Defendant Poyraz's default on the personal loan for which he used Plaintiff's

jewelry as collateral; (iv) reimbursement from Defendants of expenses Plaintiff advanced to Defendants but which were not used by Defendants to market or sell Plaintiff's jewelry under the Consignment Agreement; as well as all other costs incurred in determining the location and whereabouts of Plaintiff's jewelry inventory provided pursuant to the Consignment Agreement.

<b>COUNT III</b>

<b>(All Defendants – Conversion)</b>

50.    Plaintiff repeats, re-alleges and incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

51.    Plaintiff Fibula Turkey is the sole, exclusive, and rightful owner of all jewelry identified in Exhibit C which has not been actually sold by Defendants in accordance with the terms of the Consignment Agreement, and Plaintiff's contractual share of the proceeds of sales by Defendants of any jewelry identified in Exhibit C, which proceeds Defendants have not yet provided and credited to the account of Plaintiff Fibula Turkey. *See* Exhibit B, Consignment Agreement § 4.3.

52.    Plaintiff lawfully delivered to the Defendants the jewelry identified in Exhibit C pursuant to the Consignment Agreement.

53.    Plaintiff repeatedly has demanded the return of its jewelry, of which it is the sole and rightful owner, and Defendants have wrongfully detained and refused to return the jewelry to the Plaintiff.

54.    Defendants have unlawfully and wrongfully detained the Plaintiff's jewelry in violation of the Plaintiff's rights.

55.     Defendants' actions constitute an unlawful exercise of dominion and control of the Plaintiff's personal property (*i.e.*, the jewelry), in denial or repudiation of the Plaintiff's rights.

56.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff Fibula Turkey has suffered damages including the retail, fair market value of its jewelry unlawfully converted by Defendants, in an amount to be determined at trial, but not less than $1,606,737.66.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fibula Turkey prays that this Honorable Court will grant the following relief:

a.     Issuance of a Writ of Replevin directing the United States Marshal for the District of Columbia to recover from the Defendants the jewelry described in Exhibit C remaining within the possession, custody, or control of any one or more of the Defendants, for the benefit of and immediate return to the Plaintiff or its designated agent;

b.     Judgment for the ownership and possession of the jewelry described in Exhibit C in favor of the Plaintiff, or the retail, fair market value of $1,606,737.66 ;

c.     Damages resulting from Defendants' wrongful detention and use of the Plaintiff's jewelry;

d.     Damages resulting from Defendants' breaches of the Consignment Agreement and unlawful conversion, including the retail, fair market value of $1,606,737.66;

e.     The costs of this action and reasonable attorneys' fees; and

f.     Such other and further relief as the Court deems just and appropriate.

Date: July 15, 2008

Respectfully submitted,

REED SMITH LLP

By: _____
Lawrence S. Sher
D.C. Bar No. 430469
Andrew C. Bernasconi
D.C. Bar No. 484614
1301 K Street NW
Suite 1100 – East Tower
Washington, DC 20005
(202) 414-9200
(202) 414-9299 (fax)
lsher@reedsmith.com
abernasconi@reedsmith.com

*Counsel for Plaintiff Fibula Turkey*

## VERIFICATION

I, Ozturk Serefoglu, verify under penalty of perjury of the laws of the United States of America that the allegations contained in the foregoing Verified Complaint are true and accurate, to the best of my knowledge, information, and belief.

Dated:  July 14 , 2008

_____
Ozturk Serefoğlu

# Exhibit A



# LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT

### EFE GLOBAL LLC

A Delaware Limited Liability Company
(Member-Managed)
## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is made and entered into effective April 10, 2007, by and among: Ozturk Serefogiu , Iraklis Karabassis and Mustafa Poyraz (collectively referred to in this agreement as the "Members").

## SECTION 1.   THE LIMITED LIABILITY COMPANY

1.1    *Formation*. Effective April 10, 2007, the Members form a limited liability company under the name **EFE GLOBAL LLC** (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Limited Liability Company Act of the State of Delaware (the "Act"). The Members agree to file with the appropriate agency within the State of Delaware charged with processing and maintaining such records all documentation required for the formation of the Company. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement.

1.2    *Name*. The business of the Company will be conducted under the name EFE GLOBAL LLC, or such other name upon which the Members may unanimously may agree.

1.3    *Purpose*. The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed within the State of Delaware.

1.4    *Office*. The Company will maintain its principal business office within the Commonwealth of Virginia at the following address: 3236 Prospect Street, N.W. , Washington, D.C. 20007 .

1.5    *Registered Agent*. The Company Corporation is the Company's initial registered agent in the State of Delaware, and the registered office is 2711 Centreville Road Suite 400 Wilmington, DE 19808.

1.6    *Term*. The term of the Company commences on April 10, 2007 and shall continue perpetually unless sooner terminated as provided in this Agreement.

1.7    *Names and Addresses of Members*. The Members' names and addresses are attached as Schedule 1 to this Agreement.

1.8    *Admission of Additional Members*. Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

2005/4 sayılı Tebliğ
hükümleri ... tasdik olunur.

T.C. Vaşington ... yükelçiliği
Ticaret Müşaviriliği

18/05/... ...ül BARKÇIN
Ticaret Başmüşaviri

## SECTION 2.  CAPITAL CONTRIBUTIONS

2.1    *Initial Contributions*. The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

2.2    *Additional Contributions*. No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3    *No Interest on Capital Contributions*. Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

## SECTION 3.  ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1    *Profits/Losses*. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation 1.704-1.

3.2    *Distributions*. The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(d).

3.3    *No Right to Demand Return of Capital*. No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## SECTION 4.  INDEMNIFICATION

The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful

## SECTION 5.   POWERS AND DUTIES OF MANAGERS

5.1    *Management of Company.*

5.1.1    The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2    Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed jointly by Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii)  Mustafa Poyraz

5.1.3    Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii) Mustafa Poyraz to manage and operate the business and affairs of the Company.

5.2    *Decisions by Members.* Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall require the joint approval of  Iraklis Karabassis and either  Ozturk Serefoglu ,  Mustafa Poyraz

5.3    *Withdrawal by a Member.* A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6.   SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1    *Organization Expenses.* All expenses incurred in connection with organization of the Company will be paid by the Company.

6.2    *Salary.* No salary will be paid to a Member for the performance of his or her duties under this Agreement unless the salary has been approved in writing by a Majority of the Members.

6.3    *Legal and Accounting Services.* The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## SECTION 7.   BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING

7.1    *Method of Accounting.* The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

7.2    *Fiscal Year; Taxable Year.* The fiscal year and the taxable year of the Company is the calendar year.

7.3    *Capital Accounts.* The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4    *Banking.* All funds of the Company will be deposited in a separate bank account or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an

institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government.

## SECTION 8.   TRANSFER OF MEMBERSHIP INTEREST

8.1    *Sale or Encumbrance Prohibited*. Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other nontransferring Members determined on a per capita basis.

8.2    *Right of First Refusal*. Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1    The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2    For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3    Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4    If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5    Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3    *Substituted Parties*. Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

(1)     The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

(2)     The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4    *Death, Incompetency, or Bankruptcy of Member.* On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1    Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5    *Death Buy Out.* Notwithstanding the foregoing provision of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1    The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2    If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent

would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3    Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4    At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1)    $1,000.00 in cash, bank cashier's check, or certified funds;

(2)    The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5    At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6    On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

SECTION 9.   DISSOLUTION AND WINDING UP OF THE COMPANY

9.1    *Dissolution.* The Company will be dissolved on the happening of any of the following events:

9.1.1    Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2    The agreement of all of the Members;

9.1.3    By operation of law; or

9.1.4    The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2    *Winding Up.* On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 3 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1    To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members;

9.2.2    To the payment and discharge of any Company debts and liabilities owed to Members; and

9.2.3    To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then-outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member pursuant to Section 9.2.3.

SECTION 10.   GENERAL PROVISIONS

10.1    *Amendments.* Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all of the Members.

10.2    *Governing Law.* This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Delaware (without regard to principles of conflicts of law).

10.3    *Entire Agreement; Modification.* This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist

between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4    *Attorney Fees*. In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5    *Further Effect*. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6    *Severability*. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7    *Captions*. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8    *Notices*. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Ozturk Serefoglu
_____
Name

_____
Signature

Iraklis Karabassis
_____
Name

_____
Signature

By: Mustafa Poyraz
_____
Printed/Typed Name
Title: Managing Member

_____
Signature

Listing of Members – Schedule 1

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR EFE GLOBAL LLC**

LISTING OF MEMBERS

As of the _____ day of April , 20007, the following is a list of Members of the Company:

| NAME: | ADDRESS: |
|---|---|
| Ozturk Serefoglu | Istanbul, Turkey |
| Iraklis Karabassis | 3236 Prospect Street, N.W. Washington, DC 20007 |
| Mustafa Poyraz | 3236 Prospect Street, N.W. Washington, DC 20007 |

Authorized by Member(s) to provide Member Listing as of this _____ day of April 20007.

Ozturk Serefoglu
_____
Name

Iraklis Karabassis
_____
Name

Mustafa Poyraz
_____
Printed/Typed Name
Title: Managing Member

Listing of Capital Contributions – Schedule 2

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT
FOR EFE GLOBAL LLC
CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be
$ 300.00. The description and each individual portion of this initial contribution is as follows:

| NAME: | CONTRIBUTION: | % OWNERSHIP: |
|---|---|---|
| Ozturk Serefoglu | $ 100 | 85.0% |
| Iraklis Karabassis | 100 | 10.0% |
| Mustafa Poyraz | 100 | 5.0% |
| | $ 300 | 100   % |

SIGNED AND AGREED this 10 day of April , 20 01 .

By:  Ozrurk Serefoglu                          Signature
        Name

By:  Iraklis Karabassis                         Signature
        Name

Mustafa Poyraz
By: _____               Signature
Name
Title: Member

# Exhibit B

## CONSIGNMENT AGREEMENT

This agreement is entered into by and between;

### CONSIGNEE

TITLE        : EFE GLOBAL LLC

ADDRESS    : 3236 – 3238 Prospect Street, NW Washington DC, 20007 USA

TELEPHONE: +1. 202.333 97 92

FAX          : +1. 202.357 64 07

### CONSIGNOR

TITLE        : EFE KUYUMCULUK LTD. ŞTİ.

ADDRESS    : Nuruosmaniye Cad. Turbedar sok. No:4-6 Eminonu Istanbul Turkey

TELEPHONE: +90.212.5209505

FAX          : +90.212.5280496

### ARTICLE I

### DEFINITIONS

1.1   "Consignee" refers to the customer who receives the Consignment Stock subject to the terms of the Consignment Agreement .

1.2   "Agreement" refers to the CONSIGMENT Agreement which regulates conditions of sale of consignment goods and entered into by and between contractual parties mentioned above.

1.3   "PRODUCTS" refers to the CONSIGNOR'S (manufacturer's) jewelers that are the subject of the "CONSIGNMENT AGREEMENT"

1.4   "Consignor" refers to the manufacturer whose Products are the subject of the "CONSIGNMENT AGREEMENT".

### ARTICLE II

### SUBJECT

CONSIGNOR agrees on to sell Products by consigning the said Products to exclusively CONSIGNEE, due to the rapidly flourished mutual trust between Mr.Karabassis, Mr.Poyraz and Mr.Serefoglu, at all MAX MARA Stores, at Events and Trunk Shows organized by CONSIGNEE, in USA.

The CONSIGNEE will make every attempt to sell the goods with label prices; any discount to be made, from the label prices, will be as per the joint approval of the partners of the CONSIGNEE.

The Parties believe in a mutual goodwill and trust and look forward for this agreement to be the milestone for further joint cooperations and in consideration of the mutual promises, covenants and agreements as set forth herein, the CONSIGNOR and the CONSIGNEE agree as follows:

**ARTICLE III**
**RIGHTS AND OBLIGATIONS OF CONSIGNOR**

3.1    The Consignor hereby grants the CONSIGNEE the right of sale of the Consignor's Products and authorizes the CONSIGNEE to sell the Products by retail sale specifically at Max Mara Stores, Events and Truck Shows under the terms and conditions as set forth herein. The photo and price lists of the Products attached are subject of this agreement.

3.2    The Consignor warrants and represents to the CONSIGNEE that the CONSIGNOR's title to the Products is marketable and insurable, that the CONSIGNOR has the full power and authority to enter into this Agreement, that the CONSIGNOR has the full right and authority to convey title to the Products to any duly authorized CONSIGNEE (buyer). The CONSIGNOR indemnifies the CONSIGNEE for any claims brought by third parties based on the CONSIGNOR's failure to disclose the existence of any security agreements or secured claims against the Products, such indemnity to include reimbursement for any attorney's fees and cost incurred by the CONSIGNEE in defense of any such claim.

3.3    The CONSIGNOR will sell Products to CONSIGNEE by reducing the original market (label) price of Products to 33 % of the original label price. Considering manufacturing costs, general costs and financial costs CONSIGNOR's profit will only be enough to cover his total cost. The CONSIGNOR preserves its rights to recollect Products at its own discretion, if the sales be less than his expectations.

**ARTICLE IV**

**RIGHTS AND OBLIGATIONS OF CONSIGNEE**

4.1   The CONSIGNEE warrants and ensures that it has relevant and adequate connections and profession in the sector to sell Products and pay purchase price to the CONSIGNOR at an agreed time.

4.2   The CONSIGNEE warrants that Products of CONSIGNOR will be sold at all Max Mara Stores, Events and Truck Shows in USA.

4.3   The CONSIGNEE agrees that the CONSIGNOR is the sole owner of all Products and accepts that all rights of Products are reserved by CONSIGNOR. The CONSIGNEE will do its best to protect trademark rights of Products.

4.4   The CONSIGNEE will make every reasonable effort to collect the payment from the purchaser(s) of the Products. The Seller will not release the Property to the purchaser(s) until the CONSIGNEE has complete payment on the Property. The CONSIGNOR agrees that should a purchaser(s) fail to remit payment on Products sold then the CONSIGNOR will collect price for Products directly from CONSIGNEE.

4.5   Initially, but to be revised by the CONSIGNOR depending on the result of the operation, CONSIGNEE will settle the Consignor's account on a monthly basis and will effect the payment to the following bank account of the CONSIGNOR:

Name of the beneficiary company: EFE Kuyumculuk San ve Tic. Ltd. Sti.
Name of the bank  : YAPI KREDI Nuruosmaniye Branch
Address of the bank: Nuruosmaniye Cad. No:82 Cagaloglu Istanbul
Account Number    : 4243458     Swift Code : YAPITRIS
Phone : +90.212.5133388       Fax: +90.212. 5129484

4.6   The CONSIGNEE will provide a relevant insurance policy for the Products and deliver a copy of such insurance policy to the CONSIGNOR.

4.7   The CONSIGNEE has no right to transfer any of its rights or obligations arising from this agreement.

4.8   The CONSIGNEE shall allow representatives of CONSIGNOR to inspect and audit all data and records of CONSIGNEE relating sale of Products.

**ARTICLE V**

**NOTICES**

5.1 The parties hereby confirmed that above mentioned addresses are their registered business addresses and all correspondences and notices delivered to those addresses will be valid and binding.

5.2 Notices and other communication required or permitted hereunder shall be delivered in person or sent by registered or certified mail, confirmed fax messege, to the respective addressee at its address set forth above in the recitals of this Agreement or to such other address or number as shall be furnished in writing by any such Party, provided however, that notices or communications regarding default, termination or rescission shall be sufficiently given only if delivered via Postal Office or a prime courier delivery service , by confirmed fax messege and registered mail, return receipt requested.

**ARTICLE VI**

**AMENDMENTS**

The CONSIGNOR and the CONSIGNEE agree that this contract shall be binding on their heirs, personal representatives, successors and/or assigns and that any amendments to this Agreement, in order to be effective, shall be in writing and mutually signed and approved by parties.

**ARTICLE VII**

**CONFIDENTIALITY**

The representations, warranties, covenants and agreements made in this Agreement or in any certificate or instrument delivered in connection herewith are confidential and shall be in full force and effect notwithstanding any investigation made by or disclosure made to any party hereto, whether before or after the date hereof, shall survive and shall continue to be applicable and binding thereafter.

**ARTICLE VIII**

**APPLICABLE LAW**

Parties hereby warrant and agree that they will do their best to solve all disputes arising out of this agreement in good will by mutual negotiations first. If they fail to do so, this Agreement will be interpreted according to USA Law, and Regulations

and all disputes arising out of this agreement will be solved at Washington D.C.courts and execution offices.

ARTICLE IX

TERM AND TERMINATION

9.1   This Agreement will be in effect from May 15th, 2007 and be in force until the unsold Products send back to the CONGIGNOR's premises.

9.2   Either party may terminate this agreement upon 60 days prior written notice.

9.3   In case of termination, parties preserve their rights to collect due amounts.

9.4   In case of termination by CONSIGNOR, the CONSIGNEE is obliged to re-deliver all Products under its possession immediately.  →

9.5   In case of termination by CONSIGNOR, the CONSIGNEE, if any, preserves its rights to collect due payments from CONSIGNOR regarding sale of Products.  →

IN WITNESS whereof the Parties here to have executed this Agreement in a manner binding upon them on the day as of May 13th, 2007.

This agreement is signed in 2 copies by the parties' lawful representatives as follows:

CONSIGNEE

Representatives of  EFE GLOBAL LLC

Mr.Iraklis Karabassis      Mr.Öztürk Şerefoğlu      M.Mustafa Poyraz

CONSIGNOR

Representative of  EFE KUYUMCULUK LTD. ŞTİ.

Mr.Öztürk Şerefoğlu

# Exhibit C



| | | |
|---|---|---|
| AA00164 1.481 | AA00173 1.546 | AA03628 2.011 | AA03908 1.907 | AA03923 2.142 | AA05808 2.867 |
| AA08341 2.000 | AA08349 1.849 | AA08373 1.951 | AA09223 2.143 | AA09744 1.268 | AA09768 1.470 |
| AA14234 1.590 | AA15250 1.412 | AA15251 1.529 | AA16418 2.022 | AA21201 3.698 | AA21215 4.813 |
| AA22116 2.214 | AA22507 2.304 | AA23404 1.522 | AA23405 1.475 | AA25404 942 | AA25411 972 |
| AA26105 1.430 | AA26109 1.382 | AA26405 2.143 | AA28202 2.782 | AA29401 1.117 | BA01314 3.464 |
| BA01625 2.858 | BA02160 1.805 | BA02214 8.170 | BA02403 2.640 | BA02511 3.160 | BA028119 1.060 |
| BA02897 1.034 | BA06409 8.318 | BA091133 3.038 | BA091162 3.319 | BA091163 3.319 | BA091171 3.446 |
| BA10424 1.987 | BA10433 2.282 | BA11305 3.978 | BA11307 3.541 | BA115125 1.836 | BA115154 2.143 |
| BA115155 2.100 | BA115161 2.164 | BA11631 2.621 | BA11655 2.430 | BA12731 2.056 | BA13121 3.682 |



| | | | | | |
|---|---|---|---|---|---|
| BA13502 2.110 | BA13626 3.638 | BA13628 3.254 | BA13732 1.882 | BA13817 1.273 | BA14937 2.435 |
| BA15409 3.142 | BA15714 2.304 | BA15726 2.558 | BA16112 2.262 | BA165102 2.490 | BA165104 2.351 |
| BA16623 2.897 | BA16628 3.011 | BA16913 2.102 | BA17007 1.644 | BA17117 1.106 | BA17311 4.237 |
| BA17321 3.920 | BA17613 2.916 | BA17714 2.125 | BA18908 2.954 | BA19008 1.819 | BA19129 1.606 |
| BA20358 3.092 | BA21112 3.852 | BA21120 3.961 | BA21939 1.026 | BA22712 2.983 | BA22714 4.336 |
| BA23004 1.070 | BA23110 1.493 | BA23111 1.579 | BA23203 1.606 | BA23216 1.564 | BA23908 2.268 |
| BA24505 1.212 | BA24711 2.010 | BA24809 1.399 | BA24812 1.373 | BA25005 5.377 | BA25008 5.481 |
| BA30801 2.946 | CA23308 1.635 | CA25107 3.394 | CA25108 3.291 | CA26605 1.892 | CA26609 1.894 |
| EA03708 437 | EA08479 1.424 | EA08480 1.424 | EA08482 1.409 | EA08484 1.424 | EA09924 2.003 |



| | | |
|---|---|---|
| EA10125 2.536 | EA10126 2.290 | EA10229 1.428 |
| EA10232 1.367 | EA10261 1.354 | EA13901 2.137 |
| EA14111 1.376 | EA15808 2.173 | EA15820 2.208 |
| EA16319 1.762 | EA18509 2.372 | EA18531 2.522 |
| EA18554 2.502 | EA22205 2.256 | EA22405 2.170 |
| EA23504 1.819 | EA23506 1.704 | EA24611 1.487 |
| EA24908 1.966 | EA24909 1.928 | EA25203 1.346 |
| EA25208 1.289 | EA26001 2.664 | EA26009 2.629 |
| EA26701 2.159 | EA26709 2.102 | EA29901 3.250 |



| | | | | | |
|---|---|---|---|---|---|
| AX08207  2.237 | AX09503  1.722 | AX100104  1.291 | AX100803  1.574 | AX101301  4.393 | AX101402  7.572 |
| AX101601  869 | AX101701  1.140 | AX102004  638 | AX102201  890 | AX102301  1.710 | AX102302  1.710 |
| AX102403  1.420 | AX102501  2.334 | AX102601  3.815 | AX102701  2.227 | AX102702  2.382 | AX103902  936 |
| AX103904  1.223 | AX103906  1.403 | AX104103  619 | AX104501  2.216 | AX104502  2.340 | AX104801  5.974 |
| AX105201  5.162 | AX105401  12.163 | AX106302  3.740 | AX107601  1.993 | AX107801  3.104 | AX108401  3.251 |
| AX108501  3.145 | AX108601  3.271 | AX108602  3.896 | AX108701  841 | AX108702  836 | AX108802  922 |
| AX108902  917 | AX109001  672 | AX109101  900 | AX109201  1.014 | AX109301  3.245 | AX109601  1.385 |
| AX110101  2.896 | AX110201  3.468 | AX110202  3.410 | AX110301  2.948 | AX110303  2.872 | AX110501  2.162 |
| AX110601  2.009 | AX110801  2.876 | AX110902  2.360 | AX111101  3.569 | AX111201  2.809 | AX111402  1.825 |



| | | | | | |
|---|---|---|---|---|---|
| AX111502 1.860 | AX111701 884 | AX111801 824 | AX111901 1.103 | AX111902 1.077 | AX18411 1.139 |
| AX28803 1.897 | AX30207 1.652 | AX44803 1.457 | AX44807 1.633 | AX48404 1.277 | AX48504 1.630 |
| AX50504 1.672 | AX52801 964 | AX54605 780 | AX55907 2.299 | AX56308 807 | AX56906 733 |
| AX56907 730 | AX57102 3.212 | AX60622 1.490 | AX60629 1.593 | AX60630 1.656 | AX60634 3.127 |
| AX60635 3.389 | AX60809 889 | AX61001 438 | AX71201 2.272 | AX73502 871 | AX73602 904 |
| AX74202 4.016 | AX75802 651 | AX75902 847 | AX76102 1.860 | AX76402 1.546 | AX77001 2.182 |
| AX77501 1.616 | AX78019 992 | AX80502 2.843 | AX80603 4.529 | AX81004 2.857 | AX82601 2.227 |
| AX83801 2.761 | AX86603 867 | AX87201 1.632 | AX87306 1.039 | AX89605 1.599 | AX89606 1.705 |
| AX89803 3.178 | AX90802 2.539 | AX92818 2.078 | AX93201 3.342 | AX93203 3.235 | AX93503 1.904 |



| | | | | | |
|---|---|---|---|---|---|
| AX96004 3.341 | AX97903 3.634 | AX98302 1.808 | AX98603 4.036 | AX98902 2.189 | AX99001 3.737 |
| AX99101 4.146 | AX99503 1.121 | AX99602 1.313 | BX05620 3.384 | BX06012 1.717 | BX22408 2.144 |
| BX22501 2.392 | BX23307 1.422 | BX24304 1.632 | BX25009 8.612 | BX25405 1.252 | BX25505 1.490 |
| BX27104 1.544 | BX27803 1.430 | BX30009 2.092 | BX30504 17.434 | BX32533 1.082 | BX32537 1.462 |
| BX32540 1.490 | BX32542 3.334 | BX32543 3.282 | BX32544 2.843 | BX32923 594 | BX36401 2.232 |
| BX37001 3.998 | BX38102 1.488 | BX42602 67.741 | BX43013 458 | BX43110 572 | BX43209 545 |
| BX43210 545 | BX43309 640 | BX43310 640 | BX43312 624 | BX43417 785 | BX43525 769 |
| BX44607 628 | BX44608 628 | BX44609 628 | BX45201 3.832 | BX45303 2.656 | BX45401 2.449 |
| BX45601 1.508 | BX47901 7.856 | BX50421 935 | BX51006 941 | BX51405 7.259 | BX51701 2.216 |



| | | | | | |
|---|---|---|---|---|---|
| BX52302   1.159 | BX52407   2.002 | BX53201   1.867 | BX53503   1.104 | BX53602   1.579 | BX53805   766 |
| BX54224   1.366 | BX54225   1.366 | BX54321   1.316 | BX54705   4.409 | BX56604   692 | BX56702   869 |
| BX56901   4.606 | BX59313   2.636 | BX59504   3.905 | BX62502   2.234 | BX65104   1.592 | BX65105   1.643 |
| BX66402   3.480 | BX66602   3.410 | BX67401   2.512 | BX67501   2.575 | BX67803   3.914 | BX68701   3.115 |
| BX68702   3.226 | BX69812   4.044 | BX70101   7.274 | BX70405   3.827 | BX71001   4.184 | BX71304   5.552 |
| BX71705   4.189 | BX73202   1.993 | BX73601   6.366 | BX73901   4.430 | BX74502   3.775 | BX74603   2.437 |
| BX74702   3.220 | BX74801   3.794 | BX75103   1.086 | BX75202   1.450 | BX75702   2.604 | BX75801   2.783 |
| BX76201   1.891 | BX76301   10.386 | BX76801   1.638 | BX77104   672 | BX77303   1.067 | BX77402   1.759 |
| BX77604   822 | BX77702   1.400 | BX78102   848 | BX78201   3.311 | BX78203   3.446 | BX78701   11.688 |



| | | | | | |
|---|---|---|---|---|---|
| BX79201 5.113 | BX79301 39.443 | BX80601 3.605 | BX81602 994 | BX81701 744 | BX81802 913 |
| BX81902 726 | BX82001 922 | BX82002 920 | BX82502 3.425 | BX83401 991 | BX83402 1.031 |
| BX86601 2.882 | BX87002 2.386 | CX09708 6.172 | CX11001 19.759 | CX15602 7.850 | CX16003 12.664 |
| CX17301 18.004 | CX17701 14.875 | CX18501 10.291 | CX19301 12.733 | CX19901 21.064 | CX22201 20.749 |
| DX00703 3.500 | EX02711 1.004 | EX03502 4.138 | EX04604 1.660 | EX11908 3.868 | EX15205 2.947 |
| EX17508 1.892 | EX18813 866 | EX19311 2.245 | EX19327 2.288 | EX19328 3.713 | EX19329 3.672 |
| EX19331 5.516 | EX24704 1.783 | EX27302 4.964 | EX28208 4.356 | EX28604 3.749 | EX29401 1.967 |
| EX32301 8.120 | EX32601 5.924 | EX33704 2.936 | EX35502 4.182 | EX38404 2.477 | EX38405 2.656 |
| EX40301 3.370 | EX40302 3.412 | EX40801 9.001 | EX40904 6.011 | EX41203 3.790 | EX41801 2.094 |



| | | |
|---|---|---|
| EX42001  5.593 | EX42301  6.318 | EX42402  4.462 |
| EX42603  1.374 | EX42702  1.978 | EX43304  3.743 |
| EX44001  2.578 | EX44304  1.007 | EX44501  1.160 |
| EX44601  2.258 | EX44602  2.258 | EX44702  1.180 |
| EX44802  2.189 | EX45002  1.159 | EX45101  3.850 |
| EX45102  4.042 | EX45801  23.602 | EX46601  6.533 |
| EX47001  1.603 | EX47101  4.278 | EX47202  1.156 |
| EX47301  920 | EX47402  1.064 | EX47502  961 |
| EX47601  1.025 | EX47602  1.024 | EX47902  3.857 |
| EX48101  1.309 | EX48102  1.357 | |

# Exhibit D

EFE GLOBAL LLC
3236-3238 Prospect Street NW
Washington, DC 20007
USA

## LETTER OF NOTICE

### Served By

### *REGISTERED MAIL WITH RETURN RECEIPT and OVERNIGHT COURIER*

*April 12, 2008*

A Consignment Sales Agreement (the Agreement) comprised of nine articles was executed by our company, Fibula Mücevherat Sanayi Ticaret Anonim Şirketi (the Company), and Efe Global LLC (the Consignee) on May 13, 2007. Pursuant to Article 2 thereof, entitled "the Purpose," the Consignee has undertaken to exhibit, display and sell those products shipped to it on consignment in all Max Mara Stores, organizations and fashion shows in Washington and other cities, and to pay the amounts due to the Company on a timely basis. Pursuant to Article 4.1, the Consignee represented that it has sound and adequate experience and know-how as to the sales and marketing of the products and has warranted that it enjoys solid relations with the relevant industry. In reliance upon these representations by the Consignee, the Company marked Max Mara Stores in Washington, D.C. as sale points for the Company's products in its new brochures. However, the Company has learned that since February 2008 the Company's products have been kept in a safe and have not been marketed or sold in accordance with the Agreement. Since the products shipped under the Agreement are precious jewels, they cannot, by their nature, be sold by being kept in a safe. By keeping the products in a safe, the Consignee failed to market them appropriately and has breached its commitments under the Agreement, as the result of which the Company has been caused to suffer harm.

Although ten months have passed since the execution of the Agreement, the Consignee has breached the Agreement's terms and conditions; failed to reach sales targets; set off expenses against the proceeds received from the sale of items; and caused the Company to suffer losses. The Company has attempted to solve this dispute amicably pursuant to article 8 of the Agreement and contacted with authorized person of the Consignee to request consign products to be returned immediately. However, Consignee has refused to return products.

For the reasons detailed above and without waiving the Company's right to claim further sums (including but not limited to attorney fees, travel expenses, court expenses) the Company hereby notifies the Consignee and states that the Agreement dated May 13, 2007 is

# Exhibit E

# ReedSmith

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

Lawrence S. Sher
Direct.Phone: +1 202 414 9209
Email: lsher@reedsmith.com

May 12, 2008

**BY HAND DELIVERY**
FIBULA GLOBAL LLC
3236-3238 Prospect Street, N.W.
Washington, D.C. 20007
Attn: Mr. Iraklis Karabassis

Re:    Notice and Demand Under May 13, 2007 Consignment Agreement

Dear Mr. Karabassis:

This firm represents Fibula Muchevherat San. Tic. A.S. in its current dispute with Fibula Global LLC (previously known as EFE Global LLC) arising out of Fibula Global LLC's breach of the May 13, 2007 Consignment Agreement it entered into with our client, the Consignor (previously known as EFE Kuyumculuk LTD. STI.).

By letter dated April 12, 2008 (copy attached), sent by registered mail and overnight delivery, my client previously: (1) notified Fibula Global LLC of its failure to perform its obligations under the Consignment Agreement, (2) gave written notice of termination of the Consignment Agreement, (3) demanded immediate return of all products my client provided to Fibula Global LLC under the Consignment Agreement, and (4) demanded immediate payment into my client's designated bank account of any proceeds received by Fibula Global LLC as a result of any sales of my client's products, as are my client's express rights pursuant to Article IX of the Consignment Agreement. My client has received no response to its April 12, 2008 letter.

Since we have not received any response to our prior letter, we hereby demand immediate "inspect[ion] and audit of all data and records" of Fibula Global LLC relating to the sale of the products under the Consignment Agreement as is our client's express right granted in the Article IV, Section 4.8 of the Consignment Agreement. Please contact me immediately at the above number to arrange for this inspection and audit.

FIBULA GLOBAL LLC
May 12, 2008
Page 2

**ReedSmith**

If we do not receive a favorable response from you within five (5) business days from today, we will be forced to enforce our client's rights under the Consignment Agreement and seek all available legal and equitable remedies against Fibula Global LLC in Court.

Sincerely,

Lawrence S. Sher

Enclosure

# Exhibit F

CITY OF NEW YORK        )
                        ) ss.:
COUNTY OF New York )

I, Ara Malkasyan, after being first duly sworn, depose and swear as follows:

1. I am [jewelry designer and repair] at 31 West 47th Street, Suite 501, New York, New York, 10010.

2. I am over the age of eighteen and am competent to testify as to the following facts based upon my personal knowledge.

3. On or about [beginning of March 2008], Mr. Mustafa Poyraz first came into my jewelry shop and requested that my business perform some jewelry maintenance job for him.

4. On or about [in April 2008], Mr. Poyraz arrived at my shop and delivered to me twenty one pieces of jewelry [12 pc.18ky.yellow Necklas with stone 4 Ring with color stone on it 3 Braclet 18k with stone 1 pr earing 18k 1 white gold Big Pave setting Necklas] with a Fibula company trade mark on them.

5. Mr. Poyraz told me he wanted to use the twenty one pieces of jewelry as collateral to guarantee a personal loan he requested I provide to him in the amount of $25.000 USD.

6. Mr. Poyraz said that he would repay his personal debt to me within twenty one days, by [in April], and that he would then take the jewelry back.

7. Since [in April], Mr. Poyraz has not repaid any of his $25,000 USD debt owed to me. Although Mr. Poyraz repeatedly assured me that he would repay his personal debt and receive back the jewelry, he still has not paid anything.

8.  On May 27, 2008, I collected $25.000 USD from Fibula Muchevherat San. Tic. A.S.,

   Turkey and then I returned back all of the twenty one pieces of jewelry to Isa Karakas, a

   representative in the United States of Fibula Muchevherat San. Tic. A.S.

Further Affiant sayeth not.

Ara Malkasyan

Sworn to before me, the  6  day of ~~May~~ June 2008

Notary Public

My Commission Expires:

9/29/11

DAMAU ESCOFFERY
Notary Public - State of New York
NO. 01ES6099425
Qualified in Kings County
My Commission Expires  9/29/11

CEM BEYIN. Dikatine ?

# Exhibit G

| | Quantity | Cost Value | | Balance of Total Quantity | Balance of total cost value $USD | |
|---|---|---|---|---|---|---|
| Pieces left-First Period | 3 | $ | 6,217.00 | 3 | $ | 6,217.00 |
| Shipment from Turkey 4/21/07 | 110 | $ | 200,098.00 | 113 | $ | 206,315.00 |
| Shipment from Turkey 10/10/07 | 333 | $ | 238,614.00 | 446 | $ | 444,929.00 |
| Shipment from Turkey 12/5/07 | 52 | $ | 399,999.00 | 498 | $ | 844,928.00 |
| Sales btwn Oct-Dec, 2007 attach. 1 sent to Turkey 1/15/08 | -23 | $ | (18,564.00) | 475 | $ | 826,364.00 |
| Shipment to Turkey 1/15/08 | -52 | $ | (399,999.00) | 423 | $ | 426,365.00 |
| Pieces taken from New York to Istanbul | -21 | $ | (42,000.00) | 402 | $ | 384,365.00 |
| Sales Report 2 Jan 08-present | -6 | $ | (6,105.00) | 396 | $ | 378,260.00 |

# Exhibit H

**EXPORT DETAILS OF SHIPMENTS TO FIBULA GLOBAL LLC UNDER THE CONSIGNMENT AGREEMENT**

| SHIPPING DATE | BUYER | DECLARATION NUMBER | VALUE OF GOODS | COLLECTION | REMAINING EXPORT RECEIVABLE |
|---|---|---|---|---|---|
| 9.MAY.2007 | MAX MARA | 0676155 | USD549.994,93 | USD549.994,93 | USD 0,00 |
| 26.JUNE.2007 | FIBULA GLOBAL LLC | 0953344 | USD190.941,22 | USD134.959,00 | USD55.982,22 |
| 10.JULY.2007 | FIBULA GLOBAL LLC | 0921496 | USD25.068,84 | --- | USD25.069,24 |
| 21.AUGUST.2007 | FIBULA GLOBAL LLC | 0514884 | USD202.118,91 | --- | USD202.118,91 |
| 10.OCTOBER.2007 | FIBULA GLOBAL LLC | 0196419 | USD238.614,44 | --- | USD238.614,44 |
| 05.DECEMBER.2007 | FIBULA GLOBAL LLC | 0780803 | USD399.999,32 | USD399.999,32 | USD 0,00 |
| **TOTAL** | | | *USD 1.606.737,66* | *USD 1.084.953,25* | *USD 521.643,41* |

Separately, funds in the amount of **214.055,00 USD** were dispersed by Mr. Serefoglu to Fibula Global LLC'S Bank account for the expenses of the LLC and marketing goods. We have the bank receipts as well.

**BANK TRANSFERS TO FIBULA GLOBAL LLC**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08.MAY.2007 | FIBULA GLOBAL LLC | USD30.000,00 |
| 22.MAY.2007 | FIBULA GLOBAL LLC | USD5.000,00 |
| 08.JUNE.2007 | FIBULA GLOBAL LLC | USD12.000,00 |
| 03.AUGUST.2008 | FIBULA GLOBAL LLC (this amount inadvertently sent to Mr. Poyraz's bank account and then transferred to Fibula Global LLC account) | USD 23.820,00 |
| 06.AUGUST.2007 | FIBULA GLOBAL LLC | USD30.519,00 |
| 02.OCTOBER.2007 | FIBULA GLOBAL LLC | USD60.000,00 |
| 06.NOVEMBER.2007 | FIBULA GLOBAL LLC | USD27.716,00 |
| 04.DECEMBER.2007 | FIBULA GLOBAL LLC | USD25.000,00 |

**TOTAL**                                              **USD 214.055,00**

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| FIBULA MUCHEVHERAT SAN. TIC. A.S. | FIBULA GLOBAL LLC, IRAKLIS KARABASSIS, and MUSTAFA POYRAZ |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES)     99999 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Lawrence S. Sher, Andrew C. Bernasconi Reed Smith LLP 1301 K Street NW, Ste 1100 - East Tower Washington, DC 20005 (202) 414-9200 | |

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ● 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ⊙ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* | |
|---|---|---|---|
| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☒ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Replevin, D.C. Code 16-3701 et seq.; Breach of Contract; Conversion

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 ☐ | **DEMAND $** 550,000    **JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

**DATE** July 15, 2008    **SIGNATURE OF ATTORNEY OF RECORD** *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.