**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FIBULA MUCHEVHERAT AN. TIC. A.S.,<br>Nuruosmaniye Cad. Turbedar sok.<br>No: 4-6 Eminonu<br>Istanbul, Turkey,<br><br>Plaintiff,<br><br>v.<br><br>FIBULA GLOBAL LLC,<br>3236 Prospect Street, NW<br>Washington, DC  20007,<br><br>IRAKLIS KARABASSIS,<br>4774 Dexter Street, NW<br>Washington, DC,<br><br>MUSTAFA POYRAZ,<br>850 N. Randolph Street<br>Arlington, VA  22203,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:08-CV-01205-RJL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR WRIT OF REPLEVIN</u>**

Defendants, Fibula Global, LLC ("Fibula"), Iraklis Karabassis and Mustafa Poyraz, by

counsel, hereby respond to Plaintiff's, Fibula Muchevherat An. Tic. A.S. ("Fibula/Turkey"),

Motion for Writ of Replevin dated July 15, 2008.

The jewelry at issue in this Action is held by Defendant Fibula as security for

approximately $355,000 in unpaid costs and expenses owed by Plaintiff to Fibula pursuant to the

parties Consignment Agreement and established course of dealing.  Accordingly, Plaintiff is not

entitled to a writ of replevin as sought.  Fibula has a lawful possessory lien over the jewelry.

Plaintiff has posted no bond to protect Fibula's security interest in the jewelry.  Moreover,

Plaintiff is a foreign corporation, based in Istanbul, Turkey. Plaintiff makes no representations in any of the papers it has filed with this Court that it has any assets or other interests in this jurisdiction or in the United States at all beyond the jewelry at issue. Indeed, upon information and belief, Fibula/Turkey's intent is to obtain and then remove the jewelry beyond the United States and the jurisdiction of this Court to Turkey. In these circumstances, the issuance of a writ of replevin as requested by Plaintiff, without any bond being posted by Plaintiff or the jewelry being placed in the custody of the Marshal for the District of Columbia pending the resolution of this litigation is contrary to D.C. law and against the interests of justice. Plaintiff apparently acknowledges this fact and recognizes Fibula's lien rights, as Plaintiff is willing to have the jewelry placed in "deposit with the Court" pending the final determination of this action. (Motion at 2 ¶1). Fibula is amenable to this resolution.

Further, Plaintiff's motion for replevin from Defendants Iraklis Karabassis and Mustafa Poyraz in their individual capacities must be denied as they do not hold the jewelry in their individual capacities and thus replevin against them as such is impermissible.

Accordingly, in these circumstances, Plaintiff's Motion, as made, should be denied and an order entered as proposed by Defendants in the form attached.

## I.    <u>MATERIAL FACTS</u>

Defendant Mustafa Poyraz is a Member and a director for the defendant corporation, Fibula. (*See* Declaration of Mustafa Poyraz ¶ 2.)[1] Fibula is a Delaware corporation with its principle place of business in Washington, D.C. at 3236 Prospect Street, N.W., Washington, D.C. 20007. (*Id.*) In or about July, 2006, Mr. Poyraz met Plaintiff Ozturk Serefoglu, the owner of the

---

[1] The Declaration of Mustafa Poyraz is attached hereto as Exhibit A (hereinafter "Poyraz Decl."). All other exhibits referenced herein are Exhibits attached to the Poyraz Decl., unless otherwise cited, and are hereinafter cited in the form ("Exhibit ___.")

Plaintiff corporation Fibula/Turkey. (Poyraz Decl. ¶ 3.) Fibula/Turkey is based in Istanbul, Turkey. (Poyraz Decl. ¶ 3.) At the time the parties met, Plaintiff's company (the predecessor of Fibula/Turkey) was named Efe Kuyumculuk, Ltd. (Poyraz Decl. ¶ 5.)

Over the course of three months, Plaintiff inquired about the possibility of Mr. Poyraz developing and branding his company in the United States as well as marketing and selling his jewelry products in the United States. (Poyraz Decl. ¶ 4.) These inquiries culminated in the execution of a Letter of Intent on or around October 3, 2006. (Poyraz Decl. ¶ 5; Exhibit 1.)

In the Letter of Intent Mr. Serefoglu, as the owner of the predecessor of Fibula/Turkey, agreed to make an investment of $600,000 to open a jewelry store in order to market and sell Fibula/Turkey jewelry in the United States. (Poyraz Decl. ¶ 6.) Mr. Poyraz's obligations under the Letter of Intent were to research the jewelry market to develop a viable branding strategy and find a local partner of the company to be established in the U.S.A. (*Id.*) He fulfilled those obligations. (Poyraz Decl. ¶ 6.)

On or around February, 2007, Mr. Poyraz introduced Mr. Serefoglu to Mr. Iraklis Karabassis. (Poyraz Decl. ¶ 7.) Mr. Karabassis was known to Mr. Poyraz as a well-known businessman in Washington D.C. who owns, among other things, a number of Max Mara stores as franchises, and restaurants. (Poyraz Decl. ¶ 8.) After the meeting, Plaintiff requested that Mr. Poyraz convince Mr. Karabassis to sell Fibula/Turkey's jewelry in his Max Mara stores, which Mr. Poyraz was able to do. (Poyraz Decl. ¶ 9.)

As a consequence, Fibula/Turkey's predecessor, Efe Kuyumculuk, passed a resolution agreeing to the formation of Fibula. (Poyraz Decl. ¶ 10.) Accordingly, on or around April 10, 2007, Messrs. Karabassis, Serefoglu and Poyraz formed Efe Global LLC, the predecessor of Fibula. (*See* Exhibit 2.)

3

Fibula was formed with the purpose of establishing Fibula/Turkey jewelry's brand recognition and marketing the brand in the United States, initially selling the products at Max Mara stores, and then opening an independent jewelry store. (Poyraz Decl. ¶ 11.) Plaintiff assured Messrs. Karabassis and Poyraz that Fibula/Turkey would cover the costs associated with these purposes. (Poyraz Decl. ¶ 11.) Mr. Serefoglu had committed to financing this endeavor up to $600,000; the parties subsequently decided jointly that the best and most effective way of establishing the Fibula/Turkey brand was not to immediately open a store, with all its attendant costs, as had been contemplated originally. (*Id.*)

Based on the understanding that Fibula/Turkey's jewelry would be sold at Max Mara stores as well as trunk show events at Max Mara stores as well as at a separate store called Event House in Georgetown, Fibula entered into a Consignment Agreement with Fibula/Turkey on or about May 13, 2007. (Poyraz Decl. ¶ 12; Exhibit 3.) The Consignment Agreement was drafted by Fibula/Turkey's representatives. (Poyraz Decl. ¶ 13.)

Fibula/Turkey agreed that it would reimburse Fibula's expenses associated with the sale and marketing of Fibula/Turkey's jewelry and Fibula's efforts in connection with the development of a recognition for the Fibula/Turkey jewelry brand name. (Poyraz Decl. ¶ 14.) The Consignment Agreement recognized that the business would not run at a profit initially for Fibula/Turkey. Clause 3.3 of the Consignment Agreement provides that "[Fibula/Turkey] will sell [the jewelry] to [Fibula] by reducing the original market (label) price of Products to 33% of the original label price. Considering manufacturing costs, general costs and financial costs [Fibula/Turkey's] profit will only be enough to cover his total cost." (Poyraz Decl. ¶ 14.)

Starting on or about May 15, 2007, Fibula began marketing and selling Fibula/Turkey jewelry in various Max Mara stores in the Washington, D.C. area. (Poyraz Decl. ¶ 15.) Fibula

4

continued the marketing and sale of Fibula/Turkey jewelry until on or about July 15, 2007. Fibula's expenses during this period were reimbursed out of its sales of the jewelry as well as from funds remitted by Fibula/Turkey. (Poyraz Decl. ¶ 15.) In this period, Fibula/Turkey remitted $62,000 to Fibula to cover Fibula's expenses. (Poyraz Decl. ¶ 15.) The process for this reimbursement was that Fibula/Turkey wired some of the anticipated expenses up front and then Fibula submitted to Fibula/Turkey details of its expenses incurred in its performance under the Consignment Agreement. (*Id.*) Fibula/Turkey then sent to Fibula via bank wire transfer money for the remaining expenses. (*Id.*; Exhibit 5.)

In this time period (May to July 2007), a meeting occurred in Turkey between Messrs. Serefoglu, Karabassis and Poyraz. (Poyraz Decl. ¶ 16.) At this meeting, consistent with the ultimate goal of the Letter of Intent, Mr. Serefoglu promised Messrs. Karabassis and Poyraz that Fibula/Turkey would finance the opening of a store for Fibula to sell its jewelry under the Consignment Agreement by September 2008 and requested that Max Mara stores continue to sell Fibula/Turkey jewelry until that date, with Fibula/Turkey paying Fibula's expenses incurred. (Poyraz Decl. ¶ 16.)

On or about August 5, 2007, Fibula and Fibula/Turkey agreed to suspend the marketing and sale operation for two months during the summer period in Washington, D.C., it being considered that the summer was a slow buying time with people being away from Washington D.C. on vacation. (Poyraz Decl. ¶ 17.) All of the jewelry in Fibula's possession at this time was temporarily taken back by Fibula /Turkey. (*Id.*.) Fibula did not object to the jewelry being given back to Fibula/Turkey because Fibula/Turkey did not owe any monies to Fibula for Fibula's expenses at that time. (Poyraz Decl. ¶ 17, Exhibit 6.)

On or about September 25, 2007, Mr. Poyraz sent a three-month budget for expected expenses for Fibula between October and December 2007 to Fibula/Turkey. (Poyraz Decl. ¶ 18; Exhibit 7.) The expected expenses for this three-month period were $141,000 plus variable costs. (Poyraz Decl. ¶ 18.) Fibula/Turkey sent a payment to Fibula in advance to cover these costs. (Poyraz Decl. ¶ 18; Exhibit 8.) This three-month budget was approved by Fibula/Turkey on or about September 30, 2007. (Poyraz Decl. ¶ 19; Exhibit 9.)

Fibula/Turkey then sent to Fibula jewelry and Fibula re-commenced marketing and sale efforts of that jewelry. (Poyraz Decl. ¶ 20.) In accordance with Fibula's objective to create a brand name for Fibula/Turkey jewelry in the United States, and to enhance its ability to sell the jewelry, Fibula organized a number of sales events, including such things as, dinners, fashion shows and exhibitions. (Poyraz Decl. ¶ 20; Exhibit 10.) Fibula was successful developing the name of the Fibula/Turkey brand and in selling some jewelry at these events. (Poyraz Decl. ¶ 20.)

At the end of the three-month period to December 2007, Mr. Poyraz sent to Fibula/Turkey an accounting of Fibula's expenses. (Poyraz Decl. ¶ 21; Exhibit 11.) Prior to the transmittal of this accounting, Fibula/Turkey had reimbursed Fibula, in part, for its previous expenses on December 4, 2007 for the amount of $25,000. (Poyraz Decl. ¶ 22.) This was the last time Fibula received any monies from Fibula/Turkey. (Poyraz Decl. ¶ 22.)

Fibula/Turkey approved Fibula's expenses through the end of 2007 (Exhibit 11) by email to Mr. Poyraz. (Poyraz Decl. ¶ 23; Exhibit 12.) In that email (Exhibit 12) Fibula/Turkey also requested that Fibula try to limit its expenses to $7000 per month. (Poyraz Decl. ¶ 23.) The attachment to this e-mail also states that Fibula/Turkey was to recoup a portion of the expenses Fibula had incurred on Fibula/Turkey's behalf as an export credit from the government of

Turkey. (*Id.*)  Prior to Fibula/Turkey's approval of Fibula's expenses through the end of 2007,

Fibula sent half of Fibula/Turkey's inventory back to Fibula/Turkey upon request.  (Poyraz Decl.

¶ 23.)

Given Fibula's obligations with respect to a leasing agreement for Event House, salaries

and other marketing expenses, Mr. Poyraz communicated to Fibula/Turkey that the $7000

expense goal would be difficult to achieve.  (Poyraz Decl. ¶ 24.)  Fibula/Turkey stated that

Mr. Serefoglu would be visiting the United States in March, 2008, and would discuss the issue of

limiting future expenses to $7000 with Fibula representatives.  (Poyraz Decl. ¶ 24.)  In

anticipation of the meeting, and in accordance with the general direction to reduce expenses,

Mr. Poyraz discontinued Fibula's lease with Event House and reduced marketing expenses.

(Poyraz Decl. ¶ 24.)

As of February 2008, Fibula had $51,000 in unpaid expenses for 2007 from

Fibula/Turkey as well as the expenses it continued to incur in 2008.  (Poyraz Decl. ¶ 25; Exhibit

13.)  Between January and the end of February 2008, Mr. Poyraz contacted Fibula/Turkey

numerous times by telephone to request reimbursement for Fibula's outstanding unpaid 2007

expenses.  (Poyraz Decl. ¶ 26.)  In response, a representative of Fibula/Turkey informed

Mr. Poyraz that Fibula/Turkey was not in a financially sound condition at that time, but would be

reimbursing Fibula as soon as its financial situation improved.  (Poyraz Decl. ¶ 26.)  Based on

these conversations, Fibula reduced its expenses significantly. But without funds coming from

Fibula/Turkey, Fibula had to borrow money in order to cover its expenses.  (Poyraz Decl. ¶ 26.)

This borrowing included the $25,000 borrowed in February 2008 from a New York City jeweler

(with Fibula/Turkey jewelry as collateral) to pay for expenses Fibula had and was continuing to

incur.  (Poyraz Decl. ¶¶ 26 and 28.)  This loan was not a personal loan for Mr. Poyraz.  (*Id.*)

In March 2008, Mr. Serefoglu communicated to Messsrs. Karabassis and Poyraz that he wanted to end the Consignment Agreement.  (Poyraz Decl. ¶ 27.)  Upon Mr. Serefoglu's statement, Fibula presented him with an account of its unpaid expenses in the amount of $97,894 in accordance with the termination provisions of the Consignment Agreement which provides that in the event of termination, Fibula "preserves its rights to collect due payments from [Fibula/Turkey] regarding sale of [the jewelry]".  (Poyraz Decl. ¶ 28; Exhibit 13; Exhibit 3 Art. 9.5.)  Mr. Serefoglu agreed that Fibula/Turkey would reimburse Fibula for the entire $97,894, $72,894 of which was for Fibula and $25,000 for the loan Fibula had borrowed from Ara Malkasyan in February, 2008.  (Poyraz Decl. ¶ 28.)  He stated that Fibula/Turkey would remit half of that amount to Fibula immediately and the remaining half in two weeks.  (Poyraz Decl. ¶ 29.)  He also requested that the jewelry be sent back to Turkey.  (Poyraz Decl. ¶ 29.)  Despite Mr. Serefoglu's representations, Fibula/Turkey never reimbursed Fibula for any of the outstanding $97,894.  (Poyraz Decl. ¶ 30.)

Subsequent to Mr. Serefoglu's statement, Fibula continued to incur expenses in the approximate amount of $5,000 for rent, insurance, taxes and jewelry showcases.  (Poyraz Decl. ¶ 31.)  This amount, along with the $97,894 was never remitted to Fibula.  (Poyraz Decl. ¶ 31.)

Fibula held and continues to hold the jewelry as security for its unpaid expenses and due to the fact that Fibula/Turkey is a foreign company with no known assets in the United States. (Poyraz Decl. ¶ 32.)  If Fibula returned the jewelry to Fibula/Turkey, it expected the jewelry would be taken back to Turkey and Fibula would have no recourse against Fibula/Turkey in the United States.  (Poyraz Decl. ¶ 32.)  This decision was also supported by Mr. Poyraz's discovery that Mr. Serefoglu had owned a company that had filed for bankruptcy in the United States.

(Poyraz Decl. ¶ 32; Exhibit 14.) Until the filing of a lawsuit by Fibula/Turkey, Fibula continued to sell the jewelry to pay off the expenses it had incurred. (Poyraz Decl. ¶ 33.)

Between May of 2007 and July of 2008, Fibula engaged in activities and incurred additional expenses that added value to Fibula/Turkey's jewelry brand via marketing and branding efforts as well as by selling. (Poyraz Decl. ¶ 34.) Fibula has not been compensated for any of these expenses it has incurred. (Poyraz Decl. ¶ 34.) These expenses included, but were not limited to, the organization of several marketing events, operating expenses for Fibula, rent for Max Mara space, travel expenses to and from marketing events and in the course of seeking to sell the jewelry as well as compensation for Mr. Poyraz's time and efforts dedicated to marketing and selling Fibula/Turkey jewelry for that time period. (Poyraz Decl. ¶ 34.) This value is approximately in the amount of $280,000. (Poyraz Decl. ¶ 34.) Fibula intends to file a counterclaim for its expenses as well as the value it added to Fibula/Turkey in the amount of approximately $355,000. (Poyraz Decl. ¶ 35.)

Although Fibula/Turkey contends that the value of the jewelry is $1,606,737.66 (with a wholesale value of $521,643.41) (*see* Fibula/Turkey's Verified Complaint, Exhibit H and Mem. at 4), based on Fibula's sales reports from January 2, 2008 until June 24, 2008, the correct wholesale value of the jewelry is $378,260. (*See, id* at ¶ 36; Fibula/Turkey's Verified Complaint, Exhibit G.) Additional pieces of jewelry were sold by Fibula from June 24, 2008 until the filing of the lawsuit by Fibula/Turkey. (Poyraz Decl. ¶ 36.)

## II.   ARGUMENT

### A.   Replevin is Unavailable to Plaintiff as it Does Not Have an Immediate Right to Possession Because Defendant has a Possessory Lien Over the Jewelry; Defendant Has Lawfully Withheld the Property

Under District of Columbia law, replevin lies only where the plaintiff has a right to immediate possession of the property at the commencement of the action. *Smith, Kirkpatrick &*

9

*Co. v. Continental Autos, Ltd.*, 184 F. Supp. 764, 766 (D.D.C. 1960). Plaintiff does not have an immediate right to possession and as such its Motion should be denied as made. Fibula is entitled to hold the property delivered to it by Plaintiff and asserts a possessory lien on the property as security for Plaintiff's debts and obligations. (Poyraz Decl. ¶¶ 28-29 and 32).

By statute, the District of Columbia recognizes the right of merchants and creditors to hold liens against debtors in order to secure payment obligations. *See, e.g.,* D.C. Stat. § 40-307.1 (artisan's lien); D.C. Stat § 40-101 (garagekeepers' lien), D.C. Stat. § 28:7-209-10 (warehouseman's lien); D.C. Stat. § 28:7-210(8) (lien on goods stored by a merchant in the course of his business). District of Columbia law also recognizes common law liens. "A common law lien, in contrast to a statutory lien, arises by implication of law and bestows a privilege to retain property in possession as security for the owner's debt or obligation." *District of Columbia v. Franklin Inv. Co.*, 404 A.2d 536, 540 (D.C. 1979) (attorney's retaining and charging liens). *See also, Lamont v. Washington & G. R. R. Co.*, 2 Mackey 502, 504 (D.C. 1883) ("The very essence of the common law lien is possession."); *Costikyan v. Sloan*, 33 App. D.C. 420 (D.C. 1909); (lien by auctioneer); *Neild v. District of Columbia*, 11 F. 2d 246 (D.C. Cir. 1940) (describing a commission merchant or factor). The U.S. Supreme Court described the common law factor's lien:

> a factor who has made advances upon goods consigned to him, may be regarded, in a limited sense, and to the extent of his advances, as an owner. Yet, in reality, he has but a lien with a right of possession of the goods for its security. He may protect that possession by suit against a trespasser upon it, and he may sell the property to reimburse advances; remaining, however, accountable to his consignor for any surplus. But after all he is not the real owner. He is only an agent of the owner for certain purposes. The owner may, at any time before his factor has sold the goods, reclaim the possession *upon paying the advances made, with interest and expenses.*

*United States v. Villalonga*, 90 U.S. 35, 41-42 (U.S. 1874) (emphasis added).  Under long-established District of Columbia law,

> a person in possession of property under a lien is the owner of it against all the world and even against the actual owner until his claim is paid; and *no one, not even the actual owner, has any right to disturb his possession, without previous payment of such claim.*

*Gordon v. Sullivan*, 88 U.S. App. D.C. 144 (D.C. Cir. 1951) (emphasis added).

The parties agreed that Fibula would act as an agent for Fibula/Turkey in the United States to market and sell jewelry and Plaintiff would cover the associated costs.[2]  (Poyraz Decl. ¶¶ 11, 12, 14.)  Defendant expended labor, resources, and advanced money in its efforts to carry out that plan. (*Id.*, at ¶¶15, 20, 24, 31, 34.)  These efforts and advancements were not undertaken gratis.  In return, Plaintiff agreed to – and for a period did – pay Fibula's expenses incurred in seeking to market and sell Plaintiff's jewelry. (*Id.*, at ¶ 11, 15, 23, 29.)  Plaintiff then recouped at least some of these expense costs of Fibula, upon information and belief, from the Turkish Government as an export credit. (Poyraz Decl. ¶ 23; Exhibit 12).  When Plaintiff communicated that it wanted to terminate the Consignment Agreement and further demanded the return of the jewelry, Fibula had more than $97,000 in expenses outstanding.[3]  (*Id.*, at ¶ 27-29.)  The return of the property without payment for expenses incurred is not in accord with the parties' agreement, District of Columbia law, nor is it reasonable. (*Id*, at ¶ 11; 29; Exhibit 3.)  When payment was not advanced as agreed by Plaintiff, Fibula held the jewelry as security for its unpaid expenses. (*Id*, at ¶ 32.)  Although Fibula had on two previous occasions returned jewelry as requested, at

---

[2] Fibula's agency role for Fibula/Turkey under the Consignment Agreement is effectively that of a factor.  In *Neild v. District of Columbia*, 11 F. 2d 246, 259 (D.C. 1940), the D.C. Circuit reported that a factor is a commercial agent to whom the possession of personal property is entrusted by or for the owner, to be sold, for a compensation, in pursuance of the agent's usual trade or business.  Title to the goods remains in the principal, the factor being merely a bailee for the purposes of the agency."

[3] $25,000 of this includes the loan from Mr. Malkaysan (Poyraz Decl. ¶ 28), which Plaintiff ultimately repaid directly.

those times, payment was either not outstanding or Fibula was willing to accept Fibula/Turkey's

assurances of payment. (*Id*, at ¶ 17, 23.) By March 2008 after numerous requests for payment

and information that Fibula/Turkey was in an unsound financial condition, Fibula determined

that accepting these continued assurances would be imprudent. (*Id*., at ¶ 26, 30, 32.) Moreover,

under the Consignment Agreement, in the event of termination, Fibula preserved its rights to

collect due payments from Fibula/Turkey. (Exhibit 3, Art. 9.5.)

As a lawful possessory lien holder, Defendant is entitled to detain the jewelry until such

time as Plaintiff's debt to Fibula is paid or Plaintiff posts a bond of sufficient amount to satisfy

this obligation. Replevin cannot be maintained where Fibula holds a lien on the jewelry. *See*

*Costikyan v. Sloan*, 33 App. D.C. 420, 429 (D.C. 1909); *see also*, *Wilson v. Highway Service*

*Marineland*, 274 Pa. Super. 391, 396 (Pa. Super. Ct. 1980).[4] In *Sloan*, an auctioneer challenged

a property owner's right to replevin where the auctioneer had incurred expenses for its

auctioneering services. In reversing the lower court which had directed the verdict in favor of

the auctioneer, the Court of Appeals reported

> We are of the opinion that the case should have been submitted to the jury upon a
> charge defining the rights of the parties as hereinabove declared. The jury should,
> in other words, have been charged that the *plaintiffs were entitled to recover*
> *possession of the goods in controversy, unless they should find from the evidence*
> *that there were actual auctioneers' charges, as heretofore defined, against the*
> *particular goods....If there be any such charge, Sloan & Company would be*
> *entitled to retain the possession of the goods as against the plaintiffs. But, when*
> *so ascertained, plaintiffs could reclaim their goods upon its payment or tender.*

---

[4] Pennsylvania Superior Court's decision in *Wilson v. Highway Service Marineland*, is offered as a further
illustration of the common law. In *Wilson,* the court explained that "appellants' retention of the property was not
unlawful since appellants held a common-law lien for the value of their services in repairing appellee's boat and
under general lien principles they were entitled to retain possession pending satisfaction of their claim. While
appellants' continued retention would have become unlawful if appellee had filed a replevin bond and a writ of
seizure [under Pa. statute], appellee did not pursue this procedure, and appellants were therefore justified in refusing
to relinquish possession until completion of the replevin action absent adequate security that their claim would be
satisfied."

*Costikyan v. Sloan*, 33 App. D.C. at 429 (emphasis added).

As in *Sloan*, there is no dispute here as to the ownership of the goods in question, but only as to the right of Plaintiff to recover the jewelry with impunity. Regardless of how the agreement for services between Fibula/Turkey and Fibula is characterized, whether Defendant is a factor, commission agent, or consignee, or a merchant storing the goods in the course of business, Defendant Fibula retains rightful possession of the jewelry which possession perfects its lien against the property and is a viable defense against replevin.

**B.      Plaintiff is Not Entitled to Replevin in Any Event
            Without Providing Security**

Plaintiff appears to recognize Fibula's lien interest, as in its Motion, Plaintiff agrees that the jewelry can be deposited with the Court pending the outcome of this litigation. (Motion at 2 ¶1). This solution is acceptable to Fibula Global. Plaintiff is not entitled to replevin without providing security.

**1.      Plaintiff Has Failed to Post or Offer a Bond Mandated by D.C.
            Law**

Plaintiff seeks a Writ of Replevin from this Court under Fed. R. Civ. P. 64 and D.C. Code §§ 3701 *et seq.* (Mem. at 1, 5). Fed. Rule 64 provides that "every remedy is available that, *under the law of the state where the court is located*, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies." (emphasis added).   Plaintiff has not sought the application of any federal statute.[5] Under District of Columbia law, a plaintiff seeking replevin must file a bond "*At the time of filing a complaint in replevin*." D.C. Stat. § 16-3704 provides:

---

[5] Plaintiff cites *Southland Corp. v. Godette*, 793 F. Supp. 348 (D.D.C. 1992) as additional authority for the Court's action in replevin. (Mem. at 5). Godette does not support Plaintiff's Motion. Notably, in *Godette*, this Court denied a plaintiff's request for injunctive relief because adequate remedies at law were available, specifically a writ of replevin had been issued after a hearing and upon the plaintiff's posting of a bond – there in the amount of $78,000.

> At the time of filing a complaint in replevin, the plaintiff shall enter into an
> undertaking by himself or his agent with surety, approved by the clerk, to abide
> by and perform the judgment of the court.

As the D.C. Court of Appeals has ruled: "D.C. Code § 16-3704 *mandates* the filing of an

undertaking to protect the defendant in a replevin action. Only the defendant can waive such an

undertaking." *Council v. Hogan*, 566 A.2d 1070, 1072 (D.C. 1989) (emphasis added).

Defendant Fibula has not waived a bond here and urges the Court to require one now in

accordance with applicable law in an amount no less than the full value of the jewelry at issue.

(Poyraz Decl. ¶ 36).

    Fibula requests such security because Fibula/Turkey's only asset in the United States is

the jewelry at issue here. (Poyraz Decl. ¶ 32.) Despite Fibula's repeated demands for payment

of expenses incurred by Defendant on behalf of Plaintiff, Plaintiff has failed to remit payment.

(*Id.*, at ¶26, 30.) At the same time, upon information and belief, Fibula/Turkey has been itself

compensated in at least some part for the expenses it has not paid to Fibula under an export credit

granted by the Turkish Government. (Poyraz Decl. ¶ 23; Exhibit 12). Defendant has incurred

approximately $355,000 in expenses and costs that it owes Fibula and which will be the subject

of a counterclaim in this proceeding. (Poyraz Decl. ¶¶ 34-34). If the Court grants Plaintiff's

Motion, there is little doubt that Fibula/Turkey will take the jewelry out of the country, leaving

Fibula without redress. Should Fibula succeed on the merits of its counterclaim and recover its

expenses, it would be required to attempt to enforce its judgment in Turkish courts with all the

cost, uncertainty and delay that entails.

## C.    Security For Costs Is Available Under District of Columbia Law

District of Columbia law is cognizant of this situation. In addition to mandating the

posting of a bond in replevin actions, District of Columbia law expressly affords protection to

parties such as Fibula in circumstances such as these, in the form of pre-judgment attachment

"where a defendant is a foreign corporation" or "is about to remove some or all of his property from the District, so as to defeat just demands against him." D.C. Stat. § 16-501(d)(1), (3).[6] U.S. courts typically require security where the party against whom security is sought is a foreign corporation with limited or no assets in the U.S. *See, e.g., Montserrat Overseas Holdings, S.A. v. Larsen*, 709 F.2d 22, 24-25 (9th Cir. 1983) (affirming requirement of bond); *S.R. Galves Participacao, Importacao & Exportacao Ltda v. Natural Source Int'l, Ltd*, 2007 U.S. Dist. LEXIS 37108, 4-5 (S.D.N.Y. May 21, 2007) (requiring security for costs under Fed. R. Civ. P. 54.2 and 65 from foreign corporation without assets in the jurisdiction and in questionable financial situation); *Cf. A.I. Intl Corporate Holdings, Inc. v. SurgiCare, Inc.*, 2003 U.S. Dist. LEXIS 20561 (S.D.N.Y. Nov. 10, 2003) (not requiring a bond for costs under 54.2 where foreign corporation had significant funds in a U.S. brokerage account in excess of amount claimed). Under D.C. law and in the interests of justice, if the Court grants Plaintiff's Motion, the Court should require a bond of Plaintiff in sufficient amount to secure Defendant's interests.

### D.  As an Alternative to Posting a Bond, the Court Should Require the Jewelry Be Deposited with the Court

As an alternative means of safeguarding Defendants' interests, Defendant Fibula accepts depositing at a time ordered the jewelry with the Court for the duration of this Action. As noted previously, Plaintiff is in accordance with this alternative, as it is offered in Plaintiff's Motion (at 2) and Memorandum (at 8). Depositing the jewelry with the Court is consistent with District of Columbia law. D.C. Stat. § 16-3709.

---

[6] Fibula has not, at this point, filed a writ of attachment because it has a possessory lien over the jewelry. Nevertheless, District of Columbia's attachment law is relevant to requiring a bond from Plaintiff here as it expressly sets out the District of Columbia's law's underlying legal policy in connection with foreign debts to District of Columbia resident businesses.

E.    **Replevin Against Iraklis Karabassis and Mustafa Poyraz
      in their Individual Capacities is Inappropriate.**

Finally, Plaintiff's Memorandum in support of its Motion accepts that under DC law

replevin lies only where property is being wrongfully detained "in the possession of" the

defendant. (*See*, Mem. at 5) (emphasis added). This is consistent with the general law of

replevin. *See, e.g., State v. Wetherbee*, 2004 VT 101, 22 (Vt. 2004) ("It is well settled that a

party demanding possession cannot maintain a replevin action against a defendant who, at the

time the action is instituted, is not in possession of or cannot exercise control over the property

sought."). Here, Plaintiff acknowledges that the jewelry at issue, "is located in a safe at

Defendant Fibula's business at 3236 Prospect Street NW, Washington D.C." (Serefoglu Decl ¶

24)[7]. That is Fibula's safe. Despite this, Plaintiff seeks replevin of the jewelry from Iraklis

Karabassis and Mustafa Poyraz as defendants in their individual capacities. While Messrs.

Karabassis and Poyraz are Members of Fibula, LLC, and in all actions relevant to this action

have acted in their corporate capacity, they neither possess nor exercise control over the jewelry

at issue here in their individual capacities. Nor has Plaintiff shown any such thing. Plaintiff's

Memorandum's use of the plurality "Defendants" in statements that the jewelry is "in

Defendants' possession in their safe" (Mem. at 5); that, "Defendants retain possession" (Mem. at

6); and, "Defendants retention of Plaintiff's jewelry" is belied by the Declaration of

Mr. Serefoglu. Accordingly, Plaintiff's request for Replevin against Messrs. Karabassis and

Poyraz as individuals is unavailable. The Motion should be denied outright as to Messrs.

Karabassis and Poyraz.

## III.    **CONCLUSION**

For the forgoing reasons, the Court should deny Plaintiff's Motion for Writ of Replevin.

Instead, this Court should require either a bond from Plaintiff in the full amount of the value of

---

[7] See also Plaintiff's Mem at 5.

the jewelry in favor of Fibula in return for which Defendant Fibula shall provide the jewelry to Plaintiff or require the jewelry be deposited with the Court for the duration of the litigation. Either of these alternatives will properly safeguard Fibula's interest in the property in this case. The Court should deny Plaintiff's Motion as against Messrs. Karabassis and Poyraz. The Court should further award costs and fees incurred by Defendants in opposing Plaintiff's Motion and provide such further relief as it deems appropriate.

Respectfully submitted,

Dated: August 1, 2008                         By: _____

Ronan J. McHugh (DC Bar No. 468231)
Akin Alcitepe (DC Bar No. 481389)
Thelen Reid Brown Raysman & Steiner LLC
701 Eighth Street, N.W., Suite 800
Washington, D.C. 20001
202-508-4000

*Counsel for Defendants*

17

## CERTIFICATE OF SERVICE

On August 1, 2008, I caused the foregoing, Defendants' Opposition to Plaintiff's Motion

for Writ of Replevin, to be delivered via electronic mail to the following:

> Lawrence S. Sher
> Andrew C. Bernasconi
> Reed Smith LLP
> 1301 K Street, NW
> Suite 1100, East Tower
> Washington, DC 20005
>
> *Counsel for Plaintiff*

_____
Ronan J. McHugh

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FIBULA MUCHEVHERAT AN. TIC. A.S.,         )
Nuruosmaniye Cad. Turbedar sok.           )
No: 4-6 Eminonu                           )
Istanbul, Turkey,                         )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )
                                          )   Civil Action No. 1:08-CV-01205-RJL
FIBULA GLOBAL LLC,                        )
3236 Prospect Street, NW                  )
Washington, DC 20007,                     )
                                          )
IRAKLIS KARABASSIS,                       )
4774 Dexter Street, NW                    )
Washington, DC,                           )
                                          )
MUSTAFA POYRAZ,                           )
850 N. Randolph Street                    )
Arlington, VA 22203,                      )
                                          )
              Defendants.                 )
                                          )

## ORDER

IT IS HEREBY:

ORDERED that Plaintiff's Motion for Writ of Replevin is DENIED; and

IT IS FURTHER ORDERED that Plaintiff shall post a bond in favor of Defendant

Fibula, in the full amount of the jewelry but not less than $355,000 and upon such posting

Defendant shall surrender the jewelry to Plaintiff or its designated agent; or alternatively that at a

date ordered Defendant Fibula shall surrender to the United States Marshal for the District of

Columbia the jewelry at issue and the said Marshal shall retain possession of the jewelry until

this litigation is completed; and

IT IS FURTHER ORDERED that Defendants shall be entitled to recover its costs incurred in this matter, including reasonable attorneys' fees and expenses, the amount of which is to be provided to the Court for approval within 15 days of the entry of this Order.

It is so ORDERED.

_____          _____
DATE                                      UNITED STATES DISTRICT JUDGE

# EXHIBIT A

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FIBULA MUCHEVHERAT AN. TIC. A.S.,<br>Nuruosmaniye Cad. Turbedar sok.<br>No: 4-6 Eminonu<br>Istanbul, Turkey,<br><br>Plaintiff,<br><br>v.<br><br>FIBULA GLOBAL LLC,<br>3236 Prospect Street, NW<br>Washington, DC 20007,<br><br>IRAKLIS KARABASSIS,<br>4774 Dexter Street, NW<br>Washington, DC,<br><br>MUSTAFA POYRAZ,<br>850 N. Randolph Street<br>Arlington, VA 22203,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:08-CV-01205-RJL.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF MUSTAFA POYRAZ IN SUPPORT OF THE DEFENDANTS'**
**OPPOSITION TO PLAINTIFF'S MOTION FOR WRIT OF REPLEVIN**

1.      I, Mustafa Poyraz, am over eighteen years of age and possess personal knowledge

with respect to the statements contained in this Declaration.

2.      I am a member and a director for the defendant corporation, Fibula Global, LLC

("Fibula").  Fibula is a Delaware corporation, but its principal place of business is in Washington,

D.C. at 3236 Prospect Street, N.W., Washington, D.C., 20007.

3.      In or about July, 2006, I first met Mr. Ozturk Serefoglu, the owner of the plaintiff

corporation Fibula Muchevherat An. Tic. A.S. ("Fibula/Turkey") in Turkey.  Fibula/Turkey is

based in Istanbul, Turkey.

4.      Throughout the next three months, Mr. Serefoglu inquired from me about the possibility of developing and branding his company (which at that time was named Efe Kuyumculuk, Ltd.) in the United States as well as marketing and selling his jewelry products in the United States.

5.      My discussions with Mr. Serefoglu culminated in the execution of a Letter of Intent on or around October 3, 2006. The Letter of Intent is attached hereto as Exhibit 1. Efe Kuyumculuk, Ltd. is a predecessor of Fibula/Turkey, a foreign corporation based in Turkey, and P&A America LLC is a company owned, in part, by myself.

6.      Consistent with our prior discussions, Mr. Serefoglu, as the owner of Fibula/Turkey, agreed in the Letter of Intent to make an investment of $600,000 to open a jewelry store in order to market and sell Fibula/Turkey jewelry in the United States. *Id.* My obligation under the Letter of Intent was to research the jewelry market to develop a viable branding strategy and find a local partner for the company to be established in the U.S.A. *Id.* I fulfilled those obligations under the Letter of Intent.

7.      On or around February, 2007, I introduced Mr. Serefoglu to my co-defendant Mr. Iraklis Karabassis.

8.      Mr. Iraklis Karabassis is a well-known businessman in Washington D.C. who owns, among other things, a number of Max Mara stores as franchises. He also owns a number of well-known restaurants such as Café Milano in Georgetown and Formosa.

9.      Mr. Serefoglu was very impressed with Mr. Karabassis' connections in the retail industry as well as his general credentials as a business person. He requested that I convince Mr. Karabassis to sell Fibula/Turkey's jewelry in Max Mara stores owned by Mr. Karabassis, which I was able to do.

10.     On or around April 10, 2007, Mr. Karabassis, Mr. Serefoglu and myself formed
Fibula, a limited liability company incorporated in Delaware. *See*, Operating Agreement
attached hereto as Exhibit 2. Efe Global LLC is the predecessor of Fibula. Prior to the
formation of Fibula, Fibula/Turkey's predecessor, Efe Kuyumculuk, passed a resolution agreeing
to the formation of Fibula. A copy of that resolution is attached hereto as Exhibit 4. The
document is written in Turkish. I am able to read, speak and comprehend Turkish and English
and attest that my translation of the content of Exhibit 4 as well as other Turkish documents in
this Declaration are correct.

11.     Fibula was formed with the purpose of establishing Fibula/Turkey jewelry's brand
recognition and marketing the brand in the United States by initially selling the products at Max
Mara stores, and then opening an independent jewelry store. Mr. Serefoglu assured both myself
and Mr. Karabassis that Fibula/Turkey would cover the costs associated with these purposes. Mr.
Serefoglu had committed to financing this endeavor up to $600,000 USD and it was considered
and decided jointly that the best and most effective way of establishing the Fibula/Turkey brand
was not to immediately open a store, with all its attendant costs, as had been contemplated
originally. But this was the ultimate goal.

12.     Based on the understanding that Fibula/Turkey's jewelry would be sold at Max
Mara stores as well as trunk show events and at a separate store called Event House in
Georgetown in Washington, D.C. Fibula entered into a Consignment Agreement with
Fibula/Turkey on or about May 13, 2007. A copy of the Consignment Agreement is attached
hereto as Exhibit 3.

13.     The Consignment Agreement was drafted by Fibula/Turkey's representatives.

14.     Fibula/Turkey agreed that it would reimburse Fibula's expenses associated with
the sale and marketing of Fibula/Turkey's jewelry and Fibula's efforts in connection with the

3

development, and recognition of, the Fibula/Turkey jewelry brand name and the sale of its jewelry. The Consignment Agreement recognized that the business would not run at a profit initially for Fibula/Turkey. Clause 3.3 of the Consignment Agreement provides that "[Fibula/Turkey] will sell [the jewelry] to [Fibula] by reducing the original market (label) price of Products to 33% of the original label price. Considering manufacturing costs, general costs and financial costs [Fibula/Turkey's] profit will only be enough to cover his total cost." *Id.*

15.    Starting on or about May 15, 2007, Fibula began marketing and selling Fibula/Turkey jewelry in various Max Mara stores in the Washington, D.C. area. Fibula continued the marketing and sale of Fibula/Turkey jewelry until on or about July 15, 2007. Fibula's expenses during this period were reimbursed out of its sales of the jewelry as well as the funds remitted by Fibula/Turkey. In this period, Fibula/Turkey remitted $62,000 to Fibula to cover Fibula's expenses. The process for this was that Fibula/Turkey wired some of the anticipated expenses up front and then Fibula submitted to Fibula/Turkey details of its expenses incurred in its performance under the Consignment Agreement. Fibula/Turkey then sent to Fibula via bank wire transfer money for the remaining expenses. See correspondence between Fibula and Fibula/Turkey attached hereto as Exhibit 5.

16.    In this time period (May to July 2007), a meeting occurred in Turkey between Messrs. Serefoglu, Karabassis and myself. At this meeting, consistent with the ultimate goal established in the Letter of Intent, Mr. Serefoglu promised Messrs. Karabassis and myself that Fibula/Turkey would finance the opening of a store for Fibula to sell its jewelry under the Consignment Agreement by September 2008, and requested that Max Mara stores continue to sell of Fibula/Turkey jewelry until that date,with Fibula/Turkey paying Fibula's expenses incurred. Fibula/Turkey proceeded accordingly.

4

17.    On or about August 5, 2007, Fibula and Fibula/Turkey agreed to suspend the marketing and sale operation for two months during the summer period in Washington, D.C., it being considered that the summer was a slow buying time with people being away from Washington D.C. on vacation. All of the jewelry in Fibula's possession at this time was temporarily taken back by Fibula/Turkey. Fibula did not object to the jewelry being given back to Fibula/Turkey because Fibula/Turkey did not owe any monies to Fibula for Fibula's expenses at that time. *See* correspondence from Fibula/Turkey to Fibula dated September 10, 2007, stating that the jewelry was returned attached hereto as Exhibit 6.

18.    On or about September 25, 2007, I sent a three-month budget for expected expenses for Fibula between October and December 2007 to Fibula/Turkey. The budget is attached hereto as Exhibit 7. The expected expenses for this three-month period was $141,000 plus variable costs. Fibula/Turkey sent a payment to Fibula in advance to cover these costs. *See,* Fibula bank statement, attached hereto as Exhibit 8.

19.    This three-month budget was approved by Fibula/Turkey on or about September 30, 2007. *See,* email from Fibula/Turkey attached hereto as Exhibit 9.

20.    Fibula/Turkey then sent jewelry to Fibula, which was to be sold in Max Mara stores and the Event House and other outlets. Fibula commenced the marketing and sale of that jewelry. In accordance with Fibula's objective to create a brand name for Fibula/Turkey jewelry in the United States, and to enhance its ability to sell the jewelry, Fibula organized a number of sales events, including such things as, dinners, fashion shows and exhibitions. Photographs and articles of these events that appeared in various publications are collectively attached as Exhibit 10. Fibula was successful in publicizing and marketing Fibula/Turkey's jewelry products and selling some jewelry at these events.

5

21.     At the end of the three-month period to December 2007, I sent to Fibula/Turkey an accounting of Fibula's expenses. *See*, Exhibit 11.

22.     Prior to the transmittal of the accounting mentioned above, Fibula/Turkey had reimbursed Fibula in the amount of $25,000, in part, for its previous expenses on December 4, 2007. This was the last time Fibula received any monies from Fibula/Turkey.

23.     Fibula/Turkey approved Fibula's expenses through the end of 2007 (Exhibit 11) in an email communication to me. *See*, email dated January 23, 2008 attached as Exhibit 12. In that email Fibula/Turkey also requested that Fibula try to limit its going forward expenses to $7000 per month. Prior to this approval, Fibula sent half of Fibula/Turkey's inventory back to Fibula/Turkey upon request. The attachment to this e-mail states that Fibula/Turkey was to recoup a portion of the expenses Fibula had incurred on Fibula/Turkey's behalf under the Consignment Agreement as an export credit from the government of Turkey. *Id*. I have no reason to believe that Fibula/Turkey did not obtain these credits.

24.     I communicated to Fibula/Turkey that the $7000 per month expense goal would be difficult to achieve as Fibula had obligations with respect to a leasing agreement for Event House, salaries and other marketing expenses. Fibula/Turkey stated that Mr. Serefoglu would be visiting the United States in March, 2008, and would discuss the issue of limiting future expenses to $7000 per month with Fibula representatives. In anticipation of the meeting, and in accordance with the general direction to reduce expenses, I discontinued Fibula's lease with Event House and reduced marketing expenses.

25.     As of February 2008, Fibula had $51,000 in unpaid expenses for 2007 from Fibula/Turkey as well as continuing to incur expenses in 2008. *See*, accounting sheet for Fibula, attached hereto as Exhibit 13. This information was provided to Fibula/Turkey.

26.    Between January 2008 and end of February 2008, I contacted Fibula/Turkey numerous times by telephone to request reimbursement for Fibula's outstanding unpaid 2007 expenses, but were told by Fibula/Turkey representatives that Fibula/Turkey was not in a financially sound condition at that time, but would be reimbursing Fibula as soon as its financial situation improved.  Based on these conversations, I reduced Fibula's expenses significantly but, without funds coming from Fibula/Turkey, Fibula had to borrow money in order to cover its expenses.  This included borrowing $25,000 from a New York City jeweler in February of 2008, Ara Malkasyan, (with Fibula/Turkey jewelry as collateral) to pay for expenses Fibula had and was continuing to incur.  This loan was not for a personal loan to me.  Mr. Malkasyan was unaware of these Fibula expenses or that this was the reason for the loan.

27.    In March 2008, Mr. Serefoglu communicated to myself and Mr. Karabassis that he wanted to end the Consignment Agreement.  I was disappointed that Mr. Serefoglu wanted to end the Consignment Agreement as Fibula's expectation was that it would continue its business relationship with Fibula/Turkey and because Mr. Karabasssis and I on behalf of Fibula/Turkey had spent monies out-of-pocket above and beyond Fibula's incurred hard costs and expended significant time and provided value to Fibula/Turkey to market Fibula/Turkey's products and develop brand awareness.  This was all done with the expectation of a long term, profitable business developing for Fibula/Turkey jewelry in the USA.

28.    Upon Mr. Serefoglu's statement that he wished to end the Consignment Agreement, Fibula presented him with an account of its unpaid expenses in the amount of $97,894, $72,894 of which was for Fibula and $25,000 for the loan Fibula had borrowed from Ara Malkasyan in February, 2008. *See*, Exhibit 13.

29.    Mr. Serefoglu agreed that Fibula/Turkey would reimburse Fibula for the entire amount due to Fibula, which included the $25,000 to Mr. Malkasyan.  He stated that

Fibula/Turkey would remit half of the amount due to Fibula immediately and the remaining half in two weeks,  He also requested that the jewelry be sent back to Turkey.

30.    Despite Mr. Serefoglu's representations, Fibula/Turkey never reimbursed Fibula for any of the outstanding $97,894.

31.    Subsequent to Mr. Serefoglu's statement, Fibula continued to incur expenses in the approximate amount of $5,000 for rent, insurance, taxes and jewelry showcases. This amount, along with the $97,894 was never remitted to Fibula.

32.    Fibula held and continues to hold the jewelry as security for its unpaid expenses and due to the fact that Fibula/Turkey is a foreign company with no assets in the United States. If Fibula returned the jewelry to Fibula/Turkey, the jewelry would be taken back to Turkey and Fibula would have no recourse against Fibula/Turkey in the United States. This decision was also supported by my discovery that Mr. Serefoglu had owned a company that had filed for bankruptcy in the United States. *See*, Exhibit 14.

33.    Until the filing of a lawsuit by Fibula/Turkey, Fibula continued to sell the jewelry to pay off the expenses it had incurred and for which Fibula had not been reimbursed by Fibula/Turkey.

34.    Between May of 2007 and July of 2008, Fibula engaged in activities and incurred other out-of-pocket expenses that added value to Fibula/Turkey's marketing and branding efforts. Fibula has not been compensated for these expenses it has incurred.  These expenses included, but were not limited to, the organization of several marketing events, operating expenses for Fibula, rent for Max Mara space, travel expenses to and from marketing events and in the course of seeking to sell the jewelry as well as compensation for my time and efforts dedicated to marketing and selling Fibula/Turkey jewelry for that time period. This value is approximately in the amount of $280,000.

35.     Fibula intends to file a counterclaim for its expenses as well as the value it added to Fibula/Turkey in developing and marketing Fibula/Turkey's jewelry brand in the United States and in creating a market for the selling of Fibula/Turkey's jewelry for the amount of approximately $355,000.

36.     While Fibula/Turkey contends that the value of the jewelry is $1,606,737.66 (with a wholesale value of $521,643.41), *see*, Fibula/Turkey's Verified Complaint, Exhibit H, based on Fibula's sales report from January 2, 2008 until June 24, 2008, the correct wholesale value of the jewelry is $378,260. *See, id.* at Exhibit G. Additional pieces of jewelry were sold by Fibula from June 24, 2008 until the filing of the lawsuit by Fibula/Turkey against Fibula, myself and Mr. Karabassis.


FURTHER DECLARANT SAYETH NAUGHT.

I, Mustafa Poyraz, declare under penalty of perjury of the laws of the United States of America that the assertions contained in the foregoing Declaration are true and accurate, to the best of my knowledge, information, and belief.


Dated: August 0 1 , 2008

Mustafa Poyraz

# EXHIBIT 1

October 3rd, 2006

## LETTER OF INTEND

Efe Kuyumculuk Ltd. (Mr.Ozturk Serefoglu) and P&A America LLC., represented by Mr.Mustafa Cemil Poyraz have agreed on the marketing and establishing a "BRAND" by opening a retail shop in the USA market, within the conditions and responsibilities stipulated below.

In this respect, Mr.Mustafa Cemil Poyraz will,

- Investigate the relevant ABD laws and regulations,

- Find out the conditions and necessary applications to establish a company,

- Investigate the format of transfer and formation of capital of the company,

- Look for and find, a shop to rent, with alternatives, at a prestigious area of Washington D.C.,

- Prepare a detailed budget, for the transform of the rented space to a fine jewelry shop, including decoration, security, computer system and etc.,

- Learn all the necessary license(s) and the amount of license fees, if any,

- After the evaluation of the above mentioned information, if it is decided by Mr.Ozturk Serefoglu to open the shop; then a partner competent for Marketing, PR, Media Promotions and who can constitute a Jewelry sales team, be introduced to Mr.Serefoglu and a visit by the Manager of the Jewelry sales team be organized to Turkey to see Efe Jewelry facilities and full product range, in Istanbul,

- Organize the introduction of the competent partner to O.Serefoglu latest by December 15th 2006,

- All the data collected during the project investigation, be faxed or e-mailed to Mr.Serefoglu periodically as a written report,

- During his trip to USA, Mr.Serefoglu be introduced by the relevant politicians and businessman by visits and/or "luncheon meeting" organizations,

Mr.Ozturk Serefoglu will,

- Work on the periodical reports and send his evaluation to Mr.Poyraz ASAP,

- Plan his trip to USA in a reasonable short time, for his own on-site evaluation; if his final evaluation on the reports received, convinces him that the budget and conditions are within the predicted limits,

- Arrange transfer of maximum 600.000.-US$ to USA after the final decision on opening the shop,

- Give 35-40% of the shares of the company to be established, to Mr.Poyraz and to the other partner, to be approved, with the condition of repayment by their annual profit shares,

- After being introduced to the competant partner, provide maximum 60.000.-US$ to Mr.Poyraz, in instalments, when required, apart from the company capital to be transferred, to be used for the period before the opening of the shop, with repayment condition of an agreed due date or from his annual profit share,

Both parties believe in mutual goodwill and fully agree on the benefit of establishing a "BRAND" in USA and to establish similar jewelry retail shops in other states with the profit of this first shop.

Both parties declare their intention of being sincere and clear for the project and as well be quick in their decisions to minimize the project period.

They also agree on making all the reports, demands and requests in written form.

Efe Kuyumculuk Ltd.                           P&A America LLC
represented by                                represented by

# EXHIBIT 2



# LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT

## EFE GLOBAL LLC

### A Delaware Limited Liability Company
### (Member-Managed)
### OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is made and entered into effective April 10, 2007, by and among: Ozturk Serefoglu , Iraklis Karabassis and Mustafa Poyraz (collectively referred to in this agreement as the "Members").

## SECTION 1. THE LIMITED LIABILITY COMPANY

1.1    *Formation.* Effective April 10, 2007, the Members form a limited liability company under the name **EFE GLOBAL LLC** (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Limited Liability Company Act of the State of Delaware (the "Act"). The Members agree to file with the appropriate agency within the State of Delaware charged with processing and maintaining such records all documentation required for the formation of the Company. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement.

1.2    *Name.* The business of the Company will be conducted under the name **EFE GLOBAL LLC**, or such other name upon which the Members may unanimously may agree.

1.3    *Purpose.* The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed within the State of Delaware.

1.4    *Office.* The Company will maintain its principal business office within the Commonwealth of Virginia at the following address: 3236 Prospect Street, N.W. , Washington, D.C. 20007 .

1.5    *Registered Agent.* The Company Corporation is the Company's initial registered agent in the State of Delaware, and the registered office is 2711 Centreville Road Suite 400, Wilmington, DE 19808.

1.6    *Term.* The term of the Company commences on April 10, 2007 and shall continue perpetually unless sooner terminated as provided in this Agreement.

1.7    *Names and Addresses of Members.* The Members' names and addresses are attached as Schedule 1 to this Agreement.

1.8    *Admission of Additional Members.* Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

**SECTION 2.   CAPITAL CONTRIBUTIONS**

2.1   *Initial Contributions.* The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

2.2   *Additional Contributions.* No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3   *No Interest on Capital Contributions.* Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

**SECTION 3.   ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS**

3.1   *Profits/Losses.* For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation 1.704-1.

3.2   *Distributions.* The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(d).

3.3   *No Right to Demand Return of Capital.* No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

**SECTION 4.   INDEMNIFICATION**

The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

## SECTION 5.    POWERS AND DUTIES OF MANAGERS

5.1.    *Management of Company.*

5.1.1    The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2    Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed jointly by Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii)  Mustafa Poyraz

5.1.3    Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii)  Mustafa Poyraz to manage and operate the business and affairs of the Company.

5.2    *Decisions by Members.* Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall require the joint approval of  Iraklis Karabassis and either Ozturk Serefoglu ,  Mustafa Poyraz

5.3    *Withdrawal by a Member.* A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6.    SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1    *Organization Expenses.* All expenses incurred in connection with organization of the Company will be paid by the Company.

6.2    *Salary.* No salary will be paid to a Member for the performance of his or her duties under this Agreement unless the salary has been approved in writing by a Majority of the Members.

6.3    *Legal and Accounting Services.* The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## SECTION 7.    BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING

7.1    *Method of Accounting.* The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

7.2    *Fiscal Year; Taxable Year.* The fiscal year and the taxable year of the Company is the calendar year.

7.3    *Capital Accounts.* The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4    *Banking.* All funds of the Company will be deposited in a separate bank account or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an

institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government.

## SECTION 8. TRANSFER OF MEMBERSHIP INTEREST

8.1 *Sale or Encumbrance Prohibited.* Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other nontransferring Members determined on a per capita basis.

8.2 *Right of First Refusal.* Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1 The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2 For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3 Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4 If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5 Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3 *Substituted Parties.* Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

(1)   The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

(2)   The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4   *Death, Incompetency, or Bankruptcy of Member.* On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1   Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5   *Death Buy Out.* Notwithstanding the foregoing provision of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1   The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2   If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent

would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3    Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4    At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1)    $1,000.00 in cash, bank cashier's check, or certified funds;

(2)    The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5    At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6    On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

1:08-cv-01205-RJL     Document 1-2     Filed 07/15/2008     Page 8 of 11

# SECTION 9.   DISSOLUTION AND WINDING UP OF THE COMPANY

9.1     *Dissolution.* The Company will be dissolved on the happening of any of the following events:

9.1.1     Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2     The agreement of all of the Members;

9.1.3     By operation of law; or.

9.1.4     The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2     *Winding Up.* On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 3 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1     To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members;

9.2.2     To the payment and discharge of any Company debts and liabilities owed to Members; and

9.2.3     To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then-outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member pursuant to Section 9.2.3.

# SECTION 10.   GENERAL PROVISIONS

10.1     *Amendments.* Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all of the Members.

10.2     *Governing Law.* This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Delaware (without regard to principles of conflicts of law).

10.3     *Entire Agreement; Modification.* This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist

between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4  *Attorney Fees.* In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5  *Further Effect.* The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6  *Severability.* If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7  *Captions.* The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8  *Notices.* All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Ozturk Serefoglu
---
Name                                        Signature

Iraklis Karabassis
---
Name                                        Signature

By: Mustafa Poyraz
Printed/Typed Name                          Signature
Title: Managing Member

Listing of Members — Schedule 1

LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR
EFE GLOBAL LLC

LISTING OF MEMBERS

As of the ⸏⸏⸏ day of April, 20007, the following is a list of Members of the Company:

| NAME: | ADDRESS: |
|---|---|
| Ozturk Serefoglu | Istanbul, Turkey |
| Iraklis Karabassis | 3236 Prospect Street, N.W. Washington, DC 20007 |
| Mustafa Poyraz | 3236 Prospect Street, N.W. Washington, DC 20007 |

Authorized by Member(s) to provide Member Listing as of this ⸏⸏ day of April 20007.

Ozturk Serefoglu
_____
Name

Iraklis Karabassis
_____
Name

Mustafa Poyraz
_____
Printed/Typed Name
Title: Managing Member

Listing of Capital Contributions – Schedule 2

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT
FOR  EFE GLOBAL LLC
CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be
$ 300.00.  The description and each individual portion of this initial contribution is as follows:

| NAME: | CONTRIBUTION: | % OWNERSHIP: |
|---|---|---|
| Ozturk Serefoglu | $ 100 | 85.0% |
| Iraklis Karabassis | 100 | 10.0% |
| Mustafa Poyraz | 100 | 5.0% |
| | $ 300 | 100 % |

SIGNED AND AGREED this _____ day of _____, 20___.

By:  Ozturk Serefoglu
    Name                                    Signature

By:  Iraklis Karabassis
    Name                                    Signature

Mustafa Poyraz
By: _____
Name                                        Signature
Title: Member

# EXHIBIT 3

## CONSIGNMENT AGREEMENT

This agreement is entered into by and between;

### CONSIGNEE

TITLE        : EFE GLOBAL LLC
ADDRESS  : 3236 – 3238 Prospect Street, NW Washington DC, 20007 USA
TELEPHONE: +1. 202.333 97 92
FAX         : +1. 202.357 64 07

### CONSIGNOR

TITLE        : EFE KUYUMCULUK LTD. ŞTİ.
ADDRESS  : Nuruosmaniye Cad. Turbedar sok. No:4-6 Eminonu Istanbul Turkey
TELEPHONE: +90.212.5209505
FAX         : +90.212.5280496

### ARTICLE I

### DEFINITIONS

1.1  "Consignee" refers to the customer who receives the Consignment Stock subject to the terms of the Consignment Agreement .

1.2  "Agreement" refers to the CONSIGMENT Agreement which regulates conditions of sale of consignment goods and entered into by and between contractual parties mentioned above.

1.3  "PRODUCTS" refers to the CONSIGNOR'S (manufacturer's) jewelers that are the subject of the "CONSIGNMENT AGREEMENT"

1.4  "Consignor" refers to the manufacturer whose Products are the subject of the "CONSIGNMENT AGREEMENT".

### ARTICLE II

### SUBJECT

CONSIGNOR agrees on to sell Products by consigning the said Products to exclusively CONSIGNEE, due to the rapidly flourished mutual trust between Mr.Karabassis, Mr.Poyraz and Mr.Serefoglu, at all MAX MARA Stores, at Events and Trunk Shows organized by CONSIGNEE, in USA.

The CONSIGNEE will make every attempt to sell the goods with label prices; any discount to be made, from the label prices, will be as per the joint approval of the partners of the CONSIGNEE.

The Parties believe in a mutual goodwill and trust and look forward for this agreement to be the milestone for further joint cooperations and in consideration of the mutual promises, covenants and agreements as set forth herein, the CONSIGNOR and the CONSIGNEE agree as follows:

**ARTICLE III**
**RIGHTS AND OBLIGATIONS OF CONSIGNOR**

3.1  The Consignor hereby grants the CONSIGNEE the right of sale of the Consignor's Products and authorizes the CONSIGNEE to sell the Products by retail sale specifically at Max Mara Stores, Events and Truck Shows under the terms and conditions as set forth herein. The photo and price lists of the Products attached are subject of this agreement.

3.2  The Consignor warrants and represents to the CONSIGNEE that the CONSIGNOR's title to the Products is marketable and insurable, that the CONSIGNOR has the full power and authority to enter into this Agreement, that the CONSIGNOR has the full right and authority to convey title to the Products to any duly authorized CONSIGNEE (buyer). The CONSIGNOR indemnifies the CONSIGNEE for any claims brought by third parties based on the CONSIGNOR's failure to disclose the existence of any security agreements or secured claims against the Products, such indemnity to include reimbursement for any attorney's fees and cost incurred by the CONSIGNEE in defense of any such claim.

3.3  The CONSIGNOR will sell Products to CONSIGNEE by reducing the original market (label) price of Products to 33 % of the original label price. Considering manufacturing costs, general costs and financial costs CONSIGNOR's profit will only be enough to cover his total cost. The CONSIGNOR preserves its rights to recollect Products at its own discretion, if the sales be less than his expectations.

**ARTICLE IV**

**RIGHTS AND OBLIGATIONS OF CONSIGNEE**

4.1 The CONSIGNEE warrants and ensures that it has relevant and adequate connections and profession in the sector to sell Products and pay purchase price to the CONSIGNOR at an agreed time.

4.2 The CONSIGNEE warrants that Products of CONSIGNOR will be sold at all Max Mara Stores, Events and Truck Shows in USA.

4.3 The CONSIGNEE agrees that the CONSIGNOR is the sole owner of all Products and accepts that all rights of Products are reserved by CONSIGNOR. The CONSIGNEE will do its best to protect trademark rights of Products.

4.4 The CONSIGNEE will make every reasonable effort to collect the payment from the purchaser(s) of the Products. The Seller will not release the Property to the purchaser(s) until the CONSIGNEE has complete payment on the Property. The CONSIGNOR agrees that should a purchaser(s) fail to remit payment on Products sold then the CONSIGNOR will collect price for Products directly from CONSIGNEE.

4.5 Initially, but to be revised by the CONSIGNOR depending on the result of the operation, CONSIGNEE will settle the Consignor's account on a monthly basis and will effect the payment to the following bank account of the CONSIGNOR:

Name of the beneficiary company: EFE Kuyumculuk San ve Tic. Ltd. Sti.
Name of the bank  : YAPI KREDI Nuruosmaniye Branch
Address of the bank: Nuruosmaniye Cad. No:82 Cagaloglu Istanbul
Account Number    : 4243458    Swift Code : YAPITRIS
Phone : +90.212.5133388       Fax: +90.212. 5129484

4.6 The CONSIGNEE will provide a relevant insurance policy for the Products and deliver a copy of such insurance policy to the CONSIGNOR.

4.7 The CONSIGNEE has no right to transfer any of its rights or obligations arising from this agreement.

4.8 The CONSIGNEE shall allow representatives of CONSIGNOR to inspect and audit all data and records of CONSIGNEE relating sale of Products.

**ARTICLE V**

**NOTICES**

5.1    The parties hereby confirmed that above mentioned addresses are their registered business addresses and all correspondences and notices delivered to those addresses will be valid and binding.

5.2    Notices and other communication required or permitted hereunder shall be delivered in person or sent by registered or certified mail, confirmed fax message, to the respective addressee at its address set forth above in the recitals of this Agreement or to such other address or number as shall be furnished in writing by any such Party, provided however, that notices or communications regarding default, termination or rescission shall be sufficiently given only if delivered via Postal Office or a prime courier delivery service , by confirmed fax messege and registered mail, return receipt requested.

## ARTICLE VI

## AMENDMENTS

The CONSIGNOR and the CONSIGNEE agree that this contract shall be binding on their heirs, personal representatives, successors and/or assigns and that any amendments to this Agreement, in order to be effective, shall be in writing and mutually signed and approved by parties.

## ARTICLE VII

## CONFIDENTIALITY

The representations, warranties, covenants and agreements made in this Agreement or in any certificate or instrument delivered in connection herewith are confidential and shall be in full force and effect notwithstanding any investigation made by or disclosure made to any party hereto, whether before or after the date hereof, shall survive and shall continue to be applicable and binding thereafter.

## ARTICLE VIII

## APPLICABLE LAW

Parties hereby warrant and agree that they will do their best to solve all disputes arising out of this agreement in good will by mutual negotiations first. If they fail to do so, this Agreement will be interpreted according to USA Law, and Regulations

and all disputes arising out of this agreement will be solved at Washington D.C.courts and execution offices.

**ARTICLE IX**

**TERM AND TERMINATION**

9.1   This Agreement will be in effect from May 15th, 2007 and be in force until the unsold Products send back to the CONGIGNOR's premises.

9.2   Either party may terminate this agreement upon 60 days prior written notice.

9.3   In case of termination, parties preserve their rights to collect due amounts.

9.4   In case of termination by CONSIGNOR, the CONSIGNEE is obliged to re-deliver all Products under its possession immediately.   ⟶

9.5   In case of termination by CONSIGNOR, the CONSIGNEE, if any, preserves its rights to collect due payments from CONSIGNOR regarding sale of Products. ⟶

IN WITNESS whereof the Parties here to have executed this Agreement in a manner binding upon them on the day as of May 13th, 2007.

This agreement is signed in 2 copies by the parties' lawful representatives as follows:

**CONSIGNEE**

Representatives of  EFE GLOBAL LLC

_____      _____      _____
Mr.Iraklis Karabassis            Mr.Öztürk Şerefoğlu            M.Mustafa Poyraz

**CONSIGNOR**

Representative of  EFE KUYUMCULUK LTD. ŞTİ.

_____
Mr.Öztürk Şerefoğlu

# EXHIBIT 4

T. C.
ISTANBUL SEKIZINCI
NOTERLIĞI

**EFE KUYUMCULUK SANAYİ VE TİCARET LİMİTED ŞİRKETİ**
**ORTAKLAR KURUL KARARI**

No 14222

29 KASIM 2007

| KARAR NO | :2007/01 |
| KARAR TARİHİ | : 03 / 04 / 2007 |
| KARAR KONUSU | : AMERİKADA  MAĞAZA AÇILIŞI |

07425

ŞİRKET ORTAKLARI BİRARAYA GELEREK AMERİKA BİRLEŞİK DEVLETLERİ
WASHINGTON  DC ŞEHRİNDE  EFE GLOBAL LLC  ÜNVANLI 3336-3238 PROSPECT
STREET , NW WASHINGTON DC ,20007 USA   İKAHMET ADRESLİ ŞİRKET KURULUŞUNA
KARAR VERİLMİŞTİR.

ÖZTÜRK ŞEREFOĞLU          MUSTAFA GENÇOĞLU          MUSTAFA GÜLEÇ

28 EYL 2007

T. C.
İSTANBUL SEKIZINCI
NOTERLIĞI
Bir örneği dairede saklanan bu örnek
geri verilen aslına uygundur.
İbraz ettiğim                    İSTANBUL 3. NOTERİ
aslının aynıdır                  SAİT KARAARSLAN
ilgilisi

T. C.
İSTANBUL  SEKIZINCI
NOTERLIĞI
Bir örneği dairede saklanan bu örnek
geri verilen aslına uygundur.
İbraz ettiğim   İSTANBUL 8. NOTERİ
aslının aynıdır  SAİT KARAARSLAN
ilgilisi

# EXHIBIT 5


**MAIL**
Classic

**Harcama listesi**

Monday, July 30, 2007 2:41 PM

**From:** "mustafa poyraz" <mcpyrz@yahoo.com>
  **To:** "Cem Akar" <cakar@efegold.com>
      2.liste harcama.pdf (132KB)

-----Inline Attachment Follows-----

Sevgili Cem,
Ekteki listeyi duzenlersen sevinirim.
Yarin,Newyork'a gidiyorum.Sizin saatinizle saat 13 den
itibaren beni arayabilirsin.trende olacagim.
Basarilar ve sevgiler,
M.P.

Park yourself in front of a world of choices in alternative vehicles. Visit the Yahoo! Auto Green Center.
http://autos.yahoo.com/green_center/

I. Dönem 1. Liste toplamı : 55.048.—
I. Dönem 2. Liste toplamı : 64.486.—
                              119.534.—


istanbul'dan gelen travale : 15.000.—
                              30.000.—
                               5.000.—
                              12.000.—
                              62.000.—
Satış hasılatı            :  33.195.—
                              95.195.—

I. Dönem sonu harcama Listesi

I. Dönem 1. Liste toplamı : 55.048.—

I. Dönem 2. Liste :

A. Personel :

Aleta Anderson : 1500.—  çekle
                  700.—  çekle
                  175.—  çekle
                 2.000.—  çekle
                 1.422.  çekle

Anya Miranova : 2400.—  çekle

Rahel Yahanis : 3650.—  çekle
                 300.—  Nakit.

Özlem          : 950.—  Avans nakit.

13.097.—

B. Kasa:

Tysons - Shorthill kasa nakliye : [ 970.— ] Gekle

C. Nakliye:

Showcase nakliyesi : 450.— Nakit
Display N.Y. - Chevychase: 400.— Gekle
Recep Özkan'ın arkadaşı
[ 850.— ]

D. Davetiye + Katalog + Postalama :

3000.— Gekle
3500.— Gekle
[ 6500.— ]

E. Shorthills Event Maliyeti:
5 ad. Gekle Model
Yemek
Çiçek
Fotoğraf.
Müzik.
[ 4910.— ]

F.    SECURITY :

Engles and Engles Security Inc :    4000.- Çekle
                                     2025.- Çekle
                                     3000.- Çekle
                                     3.175 - Çekle

                                     | 12.200. |

G. Alarm Şirketi :

Max Mara'larda bizim için yapılan
alarm değişikliği bedeli olarak
Max Mara'ya kestiğimiz çek bedeli    | 1212.- |

H. Mücevher nakliyesi        :
   2 ad. İst. NY. nakliye
        D.2.D'ye çekle            | 1202 $^{79}$ |

   2 kez. Chevy Chase -Tysons.
   Silahlı Security'e ödenen      250.--
                                  150.—
                                  | 400.— |

I. Otel - Oto kiralama.    :                    1300.95

   Özlem hnm ve Aleta'nın                       1297.95

   Shorthills otel masrafları.                  1363.47

Reservasyon Iraklis tarafından                  1498.68

yapıldı.                                         1500.65

Ödeme direct Banka hesabından                    390.97

yapıldı.                                         327.65
                                                _____

                                                7680.32

Otel - Shorthills Mall gitmek için

oto - kiralandı

     Oto   Kira   bedeli          :              897.94


Georgetownhill inn   Gekle       :             3110.—

Shorthills de

Özlem hnm + Aleta + M.Payraz                    700.—

Yemek bedeli                     :         
                                           ┌─────────────────┐
                                           │   12.388        │
                                           └─────────────────┘


J. Iraklis ile birlikte                         780.—

   yapılan 2 adet N.Y. seyahat                   150.—

bedeli. Tren dönüş biletlerini            ┌─────────────────┐
                                          │   930.—         │
ben aldım + yemek.                        └─────────────────┘

BANKA + KREDİ KARTI Mak.

K - Kredi kartı komisyonu
olarak bankada hesabımızdan
alınan miktar          : 572 -

- Haftalık uyguladıkları
service charge olarak
hesabımızdan direkt kesilen : 408 -
toplam

- V.s masraflar adı altında : 192 -
hesabımızdan kesilen

$$\boxed{1.172}$$


L - MaxMara çalışanları :  $\boxed{1319.}$  Çekle
  Satış komisyonu


M - Los Angeles seyahati :
      Uçak bileti          598
      Otel                 320
      yemek                200 -
                          $\boxed{1.118}$

N. Insurance. Company.     3.500. — Gekle.
~ 6.000 borcumuz kaldı

O. Yemek + temsil giderleri
Network ve Client list oluşturmak
için yaptığım harcamalar ve
verdiğim yemekler bedeli    : 1618 — hesaptan

P. Yapılan v.s. harcamalar.     1.100 —
Otopark, benzin, Özlem hnm.
ve Mustafa Bey'in tel. kontor
CVS'den ve Best buy'dan alınan
fişler.

2. Liste toplamı:     64.486. —

# EXHIBIT 6



**MAIL** Classic

**[ No Subject ]**                                                                          Monday, September 10, 2007 10:29 AM

**From:** "Mustafa Akar" <m.akar@efegold.com>
  **To:** "Mustafa Cemil Poyraz" <mcpyrz@yahoo.com>
  **Cc:** "Cem Akar" <cakar@efegold.com>, "Öztürk Şerefoğlu" <ozt@efegold.com>
       Ilk Donem Mutabakat.xls (83KB), Fibula Global hazırlık 10 09 2007.pdf (506KB)


Mustafa Bey,

A) Ekteki excel dosyasinda bu gune kadar "Fibula Global" 'a gonderilen ve iade
alinan urunlerin detayli olarak listesi yer aliyor,

B) Ekteki PDF dosyasinda ise 116 adet gonderime hazir urun var, ayrica bu hafta
sonuna kadar 50 adet daha mal gonderime hazir olacak.

C) Size Agustos sonu ve Eylul basinda gonderilmis olan ve bu hafta sonuna kadar
hazir olacak mallarin seciminde, Mr.Iraklis ile sizin tercihlerinizinde dikkate alindigini
arkadaslarimdan ögrendim.

D) Ozetleyecek olursak :

| | |
|---|---|
| Yeni gönderilmis urunler | 110 adet |
| Starboard'da geri gelen | 9 |
| Gonderime hazir | 116 |
| Bu hafta sonuna hazir | 50 |
| Satis icin birakilan | 5 |
| **Toplam** | **290 adet** |

E) Bu urunlerin icinde yaklasik 25 adet, sicak satisa uygun yuksek fiyatli urun var.

F) Istemis oldugunuz urun foyleri hazirlaniyor, takip ediyorum. Sizde ki garanti
sertifikalarini gonderdinizmi?

E) Sizin olcunuzle dahi halen 1 gelecek hafta basi ise ikinci 1 mağazada daha satis
duzenine gecebiliriz diye dusunuyorum. Ne dersiniz?

F) Ticaret müsavirliginden onaylanmis faturalari ne zaman gonderebileceksiniz.

G) Tiffany manager ile, transfer konusunu ve urunlerimizin ABD pazarina uygun
olanlarinin tespiti konusunda gelişme var mı?

Selamlar,

Mustafa Akar

**İkinci Dönem Fibula Global LLC.'ye Gönderilen İlk Ürünler Donesi**

| | | | | |
|---|---|---|---|---|
| 8/21/2007 | Esinlenmeler | 30 | 82,725 | 27,301 |
| 5/9/2007 | Ultimate | 63 | 373,378 | 123,213 |
| 5/9/2007 | Lava | 17 | 150,251 | 49,584 |

**İlk Dönem Fibula Global LLC.'ye Gönderilen Toplam Ürün Donesi**

| | | | | |
|---|---|---|---|---|
| 5/9/2007 | Esinlenmeler | 110 | 332,389 | 109,687 |
| 5/9/2007 | Ultimate | 194 | 1,452,360 | 479,281 |
| 5/9/2007 | Lava | 24 | 111,113 | 36,668 |
| 6/26/2007 | Ultimate | 20 | 578,610 | 190,943 |
| 7/10/2007 | Lava | 3 | 75,209 | 24,819 |

**İlk Dönem Fibula Global LLC.'den İade Alınan Toplam Ürün Donesi**

| | | | | |
|---|---|---|---|---|
| 6/6/2007 | Ultimate | 17 | 860,632 | 284,009 |
| 7/19/2007 | Ultimate | 5 | 259,288 | 85,917 |
| 8/13/2007 | Ultimate | 177 | 827,236 | 272,989 |
| 8/14/2007 | Esinlenmeler | 98 | 301,661 | 99,547 |
| 8/14/2007 | Lava | 26 | 198,303 | 65,441 |

**İlk Dönem Fibula Global LLC. Satış Donesi**

| | | | |
|---|---|---|---|
| Toplam Ultimate | 11 | 38,061 | 32,042 |
| Toplam Esinlenmeler | 3 | 9,725 | 8,987 |

**Satış İçin Ayrılan Ürün Donesi**

| | | | |
|---|---|---|---|
| Toplam Ultimate | 4 | 26,502 | 8,746 |
| Toplam Lava | 1 | 7,274 | 2,400 |

**Starboard Ayrılan Ürün Donesi**

| | | | | |
|---|---|---|---|---|
| 7/26/2007 | Esinlenmeler | 9 | 20,999 | 6,930 |

EXHIBIT 7

**MAIL**
Classic

**Fibula Budget**                                                    Tuesday, September 25, 2007 5:57 PM

**From:** "Karina Wilkey" <kwilkey@ikretail.com>
  **To:** mcpyrz@yahoo.com
  **Cc:** m.akar@efegold.com, "Iraklis Karabassis" <iraklis@ikretail.com>
     Fibula Budget.xls (24KB)


Please find attached the 3 month budget commencing October 2007 thru December 2007.

Karina Wilkey
Assistant Controller
*I.K. Enterprises, Inc.*
*3236 Prospect St. NW*
*Washington DC 20007*
(202)333-9792
kwilkey@ikretail.com

Fibula Global LLC

*Budget*
*October- December 2007*

| | Short Hills | Boston | Troy | Chevy Chase | Events House | Total |
|---|---|---|---|---|---|---|
| **Projected Sales** | 200,000 | 150,000 | 115,000 | 115,000 | 200,000 | 780,000 |
| | | | | | | |
| Cost of Goods | 66,000 | 49,500 | 37,950 | 37,950 | 66,000 | 257,400 |
| Gross Profit | 134,000 | 100,500 | 77,050 | 77,050 | 134,000 | 522,600 |
| | | | | | | |
| I.K. Max Commission | 40,000 | 30,000 | 23,000 | 23,000 | | 116,000 |
| Credit Card Commissions | 4,400 | 3,300 | 2,530 | 2,530 | 4,400 | 17,160 |
| Allowance for Repairs | 1,000 | 750 | 575 | 575 | 1,000 | 3,900 |
| *Total Variable Costs* | 111,400 | 83,550 | 64,055 | 64,055 | 71,400 | 394,460 |
| | | | | | | |
| Wages & Salaries | 5,100 | 5,100 | 5,100 | 5,100 | 3,000 | 23,400 |
| Bank Charges | 60 | 60 | 60 | 60 | 60 | 300 |
| Insurance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 5,000 |
| Rent | | | | | 15,300 | 15,300 |
| Advertising & Promotion | 5,000 | 5,000 | 5,000 | 7,500 | 7,500 | 30,000 |
| Event Costs | | | | | 5,000 | 5,000 |
| Customs & Freight | 1,900 | 3,300 | 1,900 | 1,900 | 1,900 | 10,900 |
| Travel | 3,000 | 4,500 | 3,000 | 750 | | 11,250 |
| Telephone | 150 | 150 | 150 | 150 | 150 | 750 |
| Security | | | | | | 0 |
| Professional Fees | 420 | 420 | 420 | 420 | 420 | 2,100 |
| Entertainment & Business Promotion | 600 | 600 | 600 | 600 | 600 | 3,000 |
| Miscellaneous Expenses | 600 | 600 | 600 | 600 | 600 | 3,000 |
| *Total Fixed Costs* | 17,830 | 20,730 | 17,830 | 18,080 | 34,330 | 110,000 |
| | | | | | | |
| **Total Profit/Loss** | 76,170 | 49,770 | 36,220 | 35,970 | 99,670 | 275,540 |

**Additional Costs**
| | |
|---|---|
| Deposit - Event House | 5,150 |
| Safes | 6,000 |
| Showcases | 20,000 |
| *Total Asset Investment* | 31,150 |

# EXHIBIT 8

*CARDINAL BANK*                 *FUNDS TRANSFER NOTIFICATION*                 *10-02-2007*

EFE GLOBAL LLC
1360 BEVERLY RD STE 103

MCLEAN , VA 22101-

======================================================================

To: EFE GLOBAL LLC

The following wire transfer was received on 10/02/2007, for $59966.20.  The funds
have been CREDITED to account # **********5598. If you have any questions regarding
this wire transfer, please feel free to call the Wire Department at (703) 584-3413.
Thank You.  Visit our website at www.cardinalbank.com

Sender:
    Bank Name          :  BK OF NYC
    ABA #              :  021000018
    Sender Reference #  :  FTS0710023425500
    Received from      :  YAPI VE KREDI BANKASI A.S.
    By Order Of        :  FIBULA MUCEVHER SANAYI VE TICARET A

OMAD Reference #      :  20071002E6B74J1C00000410020831FT01

Additional Funds Transfer Information:

Beneficiary: EFE GLOBAL LLC

Beneficiary Bank:

Originator Info: FIBULA MUCEVHER SANAYI VE TICARET A

Originator Bank: YAPI VE KREDI BANKASI A.S.

Originator Bank Info:


Bank to Bank and all other FRB info fields:

======================================================================

*CARDINAL BANK*                         *FUNDS TRANSFER NOTIFICATION*                         *07-03-2007*

EFE GLOBAL LLC
1360 BEVERLY RD STE 103

MCLEAN , VA 22101-

=================================================================================

To: EFE GLOBAL LLC

The following wire transfer was received on 07/03/2007, for $8820.00.  The funds
have been CREDITED to account # **********5598. If you have any questions regarding
this wire transfer, please feel free to call the Wire Department at (703) 584-3413.
Thank You.  Visit our website at www.cardinalbank.com

Sender:
    Bank Name          : DBTCO AMERICAS NYC
    ABA #          : 021001033
    Sender Reference #     : 0702465859024475
    Received from     : YAPI VE KREDI BANKASI CLEARING ACCT
    By Order Of     : FIBULA MUCEVHER SANAYI VE TICARET A

OMAD Reference #     : 20070702E6B74J1C00007107021744FT01

Additional Funds Transfer Information:

Beneficiary: FIBULA

Beneficiary Bank:

Originator Info: FIBULA MUCEVHER SANAYI VE TICARET A

Originator Bank: YAPI VE KREDI BANKASI CLEARING ACCT

Originator Bank Info:

Bank to Bank and all other FRB info fields:

=================================================================================

*CARDINAL BANK*                    *FUNDS TRANSFER NOTIFICATION*                    *05-23-2007*

EFE GLOBAL LLC
1360 BEVERLY RD STE 103

MCLEAN , VA 22101-

To: EFE GLOBAL LLC

The following wire transfer was received on 05/23/2007, for $4970.00.  The funds
have been CREDITED to account # **********5598. If you have any questions regarding
this wire transfer, please feel free to call the Wire Department at (703) 584-3413.
Thank You.  Visit our website at www.cardinalbank.com

Sender:
    Bank Name        :  AMEX CNTRN BK MIDV
    ABA #         :  124071889
    Sender Reference #     :  070522042849
    Received from     :  YAPI KREDI TREASURY & CLEARING A/C
    By Order Of     :  EFE KUYUMCULUK SANAYI VE TICARET LI

OMAD Reference #     :  20070523E6B74J1C00000205230302FT01

Additional Funds Transfer Information:

Beneficiary: EFE GLOBAL LLC

Beneficiary Bank:

Originator Info: EFE KUYUMCULUK SANAYI VE TICARET LI

Originator Bank: YAPI KREDI TREASURY & CLEARING A/C

Originator Bank Info:

Bank to Bank and all other FRB info fields:

*CARDINAL BANK*        *FUNDS TRANSFER NOTIFICATION*        *06-08-2007*

EFE GLOBAL LLC
1360 BEVERLY RD STE 103

MCLEAN , VA 22101-

================================================================

To: EFE GLOBAL LLC

The following wire transfer was received on 06/08/2007, for $12000.00. The funds
have been CREDITED to account # **********5598. If you have any questions regarding
this wire transfer, please feel free to call the Wire Department at (703) 584-3413.
Thank You. Visit our website at www.cardinalbank.com

Sender:
     Bank Name       : BK OF NYC
     ABA #          : 021000018
     Sender Reference #    : FTS0706082596000
     Received from     : YAPI VE KREDI BANKASI A.S.
     By Order Of       : EFE KUYUMCULUK SANAYI VE TICARET LI

OMAD Reference #     : 20070608E6B74J1C00002206081147FT01

Additional Funds Transfer Information:

Beneficiary: EFE GLOBAL LLC

Beneficiary Bank:

Originator Info: EFE KUYUMCULUK SANAYI VE TICARET LI

Originator Bank: YAPI VE KREDI BANKASI A.S.

Originator Bank Info:

Bank to Bank and all other FRB info fields:

================================================================

# EXHIBIT 9

Case 1:08-cv-01209-RJL   Document 15-3   Filed 08/01/2008   Page 58 of 104

 **MAIL** Classic

## 3 Aylık (Ekim-Aralık) & 5 Aylık (Ekim 07-Şubat 08) Fibula Global Bütçe Ve Aylık Bütçe Tahmini Öngörüleri

Sunday, September 30, 2007 11:12 AM

**From:** "Cem Akar" <cakar@fibuladiamond.com>

**To:** "Mustafa Poyraz" <mpoyraz@fibuladiamond.com>, "'mustafa poyraz'" <mcpyrz@yahoo.com>

**Cc:** "Mustafa Akar" <m.akar@efegold.com>

Fibula Global Budget Est.xls (106KB)

Sevgili Mustafa Bey (Abi)

Ekte dikkatinize Fibula Global 2 İnci Dönem 3 Aylık (Ekim-Aralık) & 5 Aylık (Ekim 07-Şubat 08) Fibula Global Bütçe Ve Aylık Bütçe Tahmini Öngörülerisunulmuştur. Onaylarınızı rica ederim.

En içten Saygı ve Sevgilerimle,

Cem Akar

# Fibula Global LLC

### Budget
### October- December 2007

|  | Short Hills | Boston | Troy |
|---|---|---|---|
| **Projected Sales** | 200,000 | 150,000 | 115,000 |
| **Cost of Goods** | 66,000 | 49,500 | 37,950 |
| **Gross Profit** | 134,000 | 100,500 | 77,050 |
| **I.K. Max Commission** | 40,000 | 30,000 | 23,000 |
| **Credit Card Commissions** | 4,400 | 3,300 | 2,530 |
| **Allowance for Repairs** | 1,000 | 750 | 575 |
| *Total Variable Costs* | 111,400 | 83,550 | 64,055 |
| **Wages & Salaries** | 8,500 | 8,500 | 8,500 |
| **Bank Charges** | 100 | 100 | 100 |
| **Insurance** | 1,667 | 1,667 | 1,667 |
| **Rent** | 0 | 0 | 0 |
| **Advertising & Promotion** | 8,333 | 8,333 | 8,333 |
| **Event Costs** | 0 | 0 | 0 |
| **Customs & Freight** | 3,167 | 5,500 | 3,167 |
| **Travel** | 5,000 | 7,500 | 5,000 |
| **Telephone** | 250 | 250 | 250 |
| **Security** | 0 | 0 | 0 |
| **Professional Fees** | 700 | 700 | 700 |
| **Entertainment & Business Promotion** | 1,000 | 1,000 | 1,000 |
| **Miscellaneous Expenses** | 1,000 | 1,000 | 1,000 |
| *Total Fixed Costs* | 29,717 | 34,550 | 29,717 |
| **Total Profit/Loss** | 64,283 | 35,950 | 24,333 |

**Additional Costs**
 **Deposit - Event House**
 **Safes**
 **Showcases**
  *Total Asset Investment*

| Chevy Chase | Events House | Total | | |
|---|---|---|---|---|
| 115,000 | 200,000 | 780,000 | 400 | |
| 37,950 | 66,000 | 257,400 | | |
| 77,050 | 134,000 | 522,600 | | |
| | | | | |
| 23,000 | | 116,000 | | |
| 2,530 | 4,400 | 17,160 | | |
| 575 | 1,000 | 3,900 | 137,060 | |
| 64,055 | 71,400 | 394,460 | | |
| | | | | |
| 8,500 | 5,000 | 39,000 | | 14166.67 |
| 100 | 100 | 500 | | 166.6667 |
| 1,667 | 1,667 | 8,333 | | 2777.778 |
| 0 | 25,500 | 25,500 | | 0 |
| 12,500 | 12,500 | 50,000 | | 13888.89 |
| 0 | 8,333 | 8,333 | Catering, Wait Staff, & Valet Service | 0 |
| 3,167 | 3,167 | 18,167 | | 5277.778 |
| 1,250 | 0 | 18,750 | | 8333.333 |
| 250 | 250 | 1,250 | | 416.6667 |
| 0 | 0 | 0 | ???? | 0 |
| 700 | 700 | 3,500 | | 1166.667 |
| 1,000 | 1,000 | 5,000 | | 1666.667 |
| 1,000 | 1,000 | 5,000 | | 1666.667 |
| 30,133 | 57,217 | 183,333 | 181,333 | |
| | | | | |
| 23,917 | 76,783 | 202,207 | | |

| | | | |
|---|---|---|---|
| | | 5,150 | |
| | | 6,000 | |
| | | 20,000 | |
| | | 31,150 | |

| | | | |
|---|---|---|---|
| 14166.67 | 14166.67 | 14166.67 | 8333.333 |
| 166.6667 | 166.6667 | 166.6667 | 166.6667 |
| 2777.778 | 2777.778 | 2777.778 | 2777.778 |
| 0 | 0 | 0 | 42500 |
| 13888.89 | 13888.89 | 20833.33 | 20833.33 |
| 0 | 0 | 0 | 13888.89 |
| 9166.667 | 5277.778 | 5277.778 | 5277.778 |
| 12500 | 8333.333 | 2083.333 | 0 |
| 416.6667 | 416.6667 | 416.6667 | 416.6667 |
| 0 | 0 | 0 | 0 |
| 1166.667 | 1166.667 | 1166.667 | 1166.667 |
| 1666.667 | 1666.667 | 1666.667 | 1666.667 |
| 1666.667 | 1666.667 | 1666.667 | 1666.667 |

EXHIBIT 10

# SCENE
# IN
# DC

TIST



Kim Luk, Puning Villanueyer, Avi Kichel and Amal Zaari



Aba Kwawu, Mustafa Peyraz and Nuri Yurt



Model on the runway

## FIBULA JEWELRY LAUNCH

**THE PARTY:** The Fibula launch party at the Halcyon House in Georgetown brought out big names and big bling. Models in Max Mara made for a stunning display of the diamond collection as they walked the runway. **THE PLAYERS:** Cem Akar, the global vice president of Fibula, and Iraklis Karabassis, President of Max Mara, hosted the soiree. Shirley Gordon, Nuri Yurt and Lynda Erkiletian were on hand to see the stylings, as were Rachel Cothran and Adra Williams. **THE VENUE:** Guests sipped champagne



Iraklis Karabassis

Christopher Reiter and Lynda Erkiletian

PHOTOGRAPHY BY ABBY GREENAWALT

**LIFESTYL**



Francesca Krieg, Silvia Carlorosi, and Chiara Melucci



Mert Bakan and Alev Ertek



Danielle May, Britt Szpesy, Ezra Dvong Van, and Maria Tracocchi

Mary Elie

# FIBULA JEWELRY U.S. LAUNCH

### Halcyon House

#### PHOTOS BY JONAH KOCH

**THE EVENT:** European fine jeweler Fibula hosted local fashion and style mavens at a private cocktail reception and runway show to mark their U.S. debut and an exclusive charity partnership with The Creative Coalition. **THE SCENE:** Stylists, models, retailers, artists, and shoppers mingled in the dramatic mansion, dining (fashionably lightly) on heavy hors d'oeuvres and cocktails as two guitarists took charge of the music. The downstairs was transformed into a runway worthy of Bryant Park, and MaxMara models hit the catwalk in the Spring 2008 collection, accented by Fibula diamonds, of course. The final spectacle was a theatrical march by models covered in white chalk and dressed as Grecian muses.



Model in MaxMara Spring 2008 collection and Fibula jewels at Halcyon House.





# THE RADAR

# FASHION

BY KATE ROSENBLATT



1.    2.    3.    4.    5.

## WHO WHAT WEAR: A ONE-OFF

If you traveled to any one of the rivieras this winter, you may already be rocking the Athena gown. Launched as the trend of the moment in Oscar de la Renta's resort collection, glam girls are going Greek for spring, too. Versace does it LBD-style, while Lanvin's cold shoulder may ruffle a few feathers. Both Hermés, designed by Jean Paul Gaultier, and Erin Fetherston went a little more literal with slate-colored togas. Diane Von Furstenberg's goddess is on cloud nine in her full-on white out.

**1. Lanvin, available at Saks Fifth Avenue, Chevy Chase 2. Erin Fetherston, available at Barneys New York, NYC 3. Hermés, available at Hermés, Fairfax Square 4. Diane Von Furstenberg, available at Neiman Marcus, Mazza Galleria, Tysons Galleria 5. Versace, available at Versace, Tysons Galleria.**



**THE LONG AND SHORT OF IT: Fibula**

## BLOW A WAD: AND THE WINNER IS

Even if Keira Knightley manages to walk off with an Oscar this month, that little gold statue will be sitting on the shelf in a week. However, if you're able to snag the necklace that won De Beers' diamond competition, you'll take home an award you can actually wear. The $385,000 creation from Turkish design company Fibula recently took top nod in the Diamond Trading Company's jewelry design contest. Currently traveling the world on display, the 100-carat necklace won for its circular design inspired by the meeting of Adam and Eve. To show off the acclaimed adornment, you'll have to choose a suitably plunging gown —the y-styled sparkler stops just below your sternum. Good thing you have to go to Max Mara to get the gem. The hot shop is the exclusive home to Fibula in DC until the brand opens its own store here in the spring. By that time, Oscar buzz will have quieted, but you'll still be seen with a winner.

## SHOP TALK ... with Sotshi's Jessica Del Pilar

Not to knock a muppet, but it's easy being green, pa ecoboutique is sustaining your style. As fashionist environmentally, the Georgetown store has Ciel fr Sienna Miller and Cate Blanchett, hanging alongside and Charmoné shoes, the choices of starlet Natalie Po by to ask owner Jessica Del Pilar about getting kitte free, sustainable fabrics and how hot it is to be eco-ch

*How is green the new black?* Environmentally-friendly fas everything that you're seeing in Paris and Milan—ever runway that's wearable. Because I do think it needs to b also an exclusivity associated with how small the labels attractive. It's a way to express yourself in a unique way, style and all the while staying true to the environment. brainer. *How do you stock sustainable?* The first requirement was Then I set four criteria for buying, and my requirement met one, and it's turned out that everything meets at lea are first, organic, second, fair trade and third, reclaimed. reclaimed, but it's difficult for designers, no two pieces are the same, so it requires a tremendous amount of work on their end, but because of that I think it makes every piece more unique and a little more valuable. And the fourth criterion is local. We have a couple items that fit, the one that does it the best is our jewelry designer, Moonrise. It's fun when people come in and want to talk more about pieces, and it's fun when people come in and don't even realize it's an ecoboutique, because then you're really doing something right!

Case 1:05-cv-01205-RJL    Document 15-2    Filed 08/01/2006    Page 81 of 104

# Hillary Clinton'a kolye takmaya çalışan Türk



Geçen hafta sonu Washington'da oldukça görkemli bir defile yapan Fibula, Manhattan'daki Türk Kültür Merkezi'nde de mücevherlerin görücüye çıkarılı...

BİRİNCİ SAYFADAN DEVAM

Sadece Amerika pazarına yönelik olarak ürettikleri ürünlerin koleksiyonlarında yer tuttuğunu belirten Akın, ABD'de en çok renkli taşların tercih edildiğini bilgisini verdi. Türkiye'nin hâlâ dünya çapında bir markaya sahip olamadığını belirten Akın, "Yakın zamanda bunu başaracağımıza inanıyorum. Türkiye çok kısa süre içinde dünya çapında bir markaya sahip olacak ve bu da büyük ih-

dığını belirten Akın, Türkiye'de bu alana yönelik bir yatırım olmamasından yakındı. Akın, "Dünya pırlanta ticaretinin yüzde 70'e yakının elinde bulunduran Diamond Trade Center'ın (DTC) yaptığı son yarışmada biz birincilik kazandık. Bu da bizim bu işte ciddiyetimizi gösteren bir delildir." dedi.

## Mücevherler Türk Kültür Merkezi'nde sergileniyor

Kırk yıllık bir mazive sahip olan Fibu-

tural Center TCC sergiliyor. Kimi mücevherlerin fiyatı 5 milyon dolardan fazla olan Fibula'nın koleksiyonu göz kamaştırırken bu ürünleri sergide görmek mümkün değil. Son derece az sayıdaki müşteri için üretilen server değerindeki ürünlerin sergide olmama gerekçesi güvenlik ve çok az sayda talebin olması. Washington'da düzenledikleri defileye dahi getirmedikleri pahalı ürünlerinin İstanbul'da bulunduğunu kaydeden Akın, "Burada en pahalı mü-

lantısına katılan Bush. "Elbette ekonominin üzerinde bazı kara bulutlar ve endişeler dolayısıyla kanunu, tö...  soktu. Eya... imazın gerçekinkti ha... yanlış oldu...  Corzine, New ın kaldırılmasının yüreği ve ...zbütün yürek...  kaydetti. New ...ki Mahkemesi'nin steni içtihadında ...ırteri, bu cezayı ...lından kurtulan ...yhapis yedecek- sey, Zaman

cattaki artışa göndermede bulunarak. "Ekonomi iyi yolda" mesajı verdi. Bush'un açıklamasına ise, "Başkan Bush, ailelerin ve pıyasaların yüz... lesiği ekonomik realitelerin dışında nerede ya-  siyor?" diye sordu. Virginia, Zaman

... var." dedi. Kongre Ortak Ekonomi Komitesi rum 1 pay... ra uğrad...  cücukta... taya çıktı. ...rn üzerine ...lunan Nava ...dirmede bu ...turması açı ...kar grupları, ...rı düzenley ...nı iddia etm



## Hillary Cl... ankette b...

"En fazla ha ...masını iste ...ruldugu ank ...oyu alan ad ...gazetesi-Ra ...yapılan ank ...talikia yüzd ...yaz Saray'da ...yetcilerin yi ...42'si ve Der ...lary Clinton ...Cumhuriyet ...en çok iste ...Amerikalılar ...uludaki Bey ...yor. Barack ...oylarıyla ba ...dan, ankete ...Iowa ve Nev ...önsecim son ...belirtiler. Ne

## Müstakil e 16 yılın en seviyesind

Ticaret Bakan ...ayında  da

## 1. BÖLÜM:

## FİBULA MÜCEVHER FİRMASI İLE İLGİLİ OLARAK WASHINGTON DC. ve NEW YORK TÜRK KÜLTÜR MERKEZİNDE YAPILAN TANITIMLAR

http://www.projectbeltway.com/?p=557

http://www.dcstylemag.com/blog_main.cfm?P=%24%23M%3FI*%40!)%0A

http://www.washingtonlife.com/issues/march-2008/washingtonlife-takes-sundance/page41.php

http://www.thecreativecoalition.org/press/index.html

http://www.projectbeltway.com/?p=556

http://www.youtube.com/watch?v=79iLiuiJbg4

http://turkcc.org/alt/jewelery_show.htm

## 2. BÖLÜM:

## AMERİKA'DAKİ TANITIMIN TÜRKİYEDEKİ YANSIMALARI

http://www.klassmagazin.com/index.php?page=rprt&data=roku&rid=100

http://www.haberler.com/amerika-da-bir-turk-mucevher-firmasi-hillary-haberi/

http://www.milliyet.com.tr/2008/02/10/ekonomi/eko02.html

**1. BÖLÜM:**

# <u>Fibula Launch & MaxMara Show</u>

Wednesday, December 12, 2007



*One of my favorites. I.want.it.*

My friend Sarah has this parking protocol: drive right up to the front of your destination and then fan out to scout for parking from there. I know that it sounds obvious, but it has worked on several unlikely occasions, including last night when I spotted a Georgetown

undergrad getting into her Jetta right at 34th & Prospect and pulled a classic city-driver move: U-turn in the middle of the street, turn on turn-signal, throw car into reverse.

I think she was a little freaked out, but sometimes a girl needs to be aggressive.

I even wore my adorable-but-comfy patent shooties (props to **Anthropologie** for that name) in case I had to hoof it for several uneven-brick-sidewalk blocks.

The Halcyon House is the amazing private home/gallery/studio space that hosted the **Fibula** launch last night (I know it's the name of a bone. But it's also apparently a very gorgeous and expensive line of jewelry sold only at MaxMara). The evening was presented by the **Creative Coalition**, who will receive 15 percent of Fibula sales for December.

I've been to a few runway shows here in DC now - some of them pretty good, some of them Fisher Price My First Runway Show. This one set the current bar a good several notches higher: the show didn't go on too long, the models all looked like they knew what they were doing, and the overall staging was gorgeous. It didn't hurt, of course, that the clothes were MaxMara....and that Ayo and Adrian from **Dissident Display** DJd...

Ultimately, everyone sitting there had that aren't-I-fabulous-that-I'm-sitting here look about them. And really, isn't that the point?

Lots to look at after the jump:

Practice struts:

















Fibula's First Show in D.C.



In the name of public education, fine arts and of course, fashion--diamond jewelry designer <u>Fibula</u> hosted an exclusive runway-style show and reception Dec. 11 at the <u>Halcyon House</u> in Georgetown to celebrate its U.S. launch and D.C. coming-out party.

Live models dripping in diamonds showcased Fibula collections, which are now being carried exclusively in the states by **Max Mara boutiques** (two of which are located in <u>Chevy Chase</u> and <u>Tysons Corner</u>). <u>Fibula</u> will open its own store in the D.C. area in the spring of 2008.

Donations collected at the event and 15 percent of all sales in December will benefit <u>The Creative Coalition,</u> a nonprofit dedicated to social advocacy.

Guests included well-heeled Washingtonians **Fred Robinson, Lynda Erkiletian, Dr. Ali Ghatri** and **Yasmine and Iraklis Karabassis.**

 

SUBSCRIBE TOD
AND GET ONE ISSUE FRE

# FIBULA JEWELRY U.S. LAUNCH

Halcyon House
PHOTOS BY JONAH KOCH

THE EVENT European fi ne jeweler Fibula hosted local fashion and style mavens at a private cocktail reception and runway show to mark their U.S. debut and an exclusive charity partnership with The Creative Coalition. THE SCENE Stylists, models, retailers, artists, and shoppers mingled in the dramatic mansion, dining (fashionably lightly) on heavy hors d'oeuvres and cocktails as two guitarists took charge of the music. The downstairs was transformed into a runway worthy of Bryant Park, and MaxMara models hit the catwalk in the Spring 2008 collection, accented by Fibula diamonds, of course. The fi nal spectacle was a theatrical march by models covered in white chalk and dressed as Grecian muses.



Model in MaxMara Spring 2008 collection
and Fibula jewels at Halcyon House.



# Sneak Peek: Tonight's Fibula/MaxMara Show

Wednesday, December 12, 2007



*View from the front row*

It's 12:51 AM and I'm going a little cross-eyed, but I wanted to give you all a little sneak preview of the **Fibula**/MaxMara event held earlier tonight at the ridiculously gorgeous Halcyon House in Georgetown.

That's right dear reader, breasts with your morning coffee!

More in the morning, after I eat, have coffee, and drink my weight in pink grapefruit CVS-brand Airborne since I'm totally coming down with a cold. Dammit! You know what though? Pink grapefruit fake Airborne is kind of good. Well, in a medicine kind of way. Sweet dreams!

**CUSTOM MADE JEWELRY TRUNK SHOW**



cordially invites you to

### Custom Made Jewelry Trunk Show

**DATE:** December 15 - December 24

Sales everyday from 11 am to 9 pm

Live Music and Complimentary Turkish Cuisine (5 pm - 9 pm)



## 2. BÖLÜM:

# KLASS MAGAZİN - Röportajlar



Fibula Kültürel Takılarıyla
ABD'yi Baştanbaşa Fethetti

Yıllar öncesinde Nuruosmaniye'den her geçişimizde Anadolu
Uygarlıkları'nı vurgulayan koleksiyonlarını vitrininde
hayranlıkla izlediğimiz Fibula, bugün bir dünya markası
yolunda hızla ilerliyor. Dünyada da trend olan kültürel takı
konseptiyle dikkat çeken Fibula'nın Yönetim Kurulu Başkanı
ve ortağı Öztürk Şerefoğlu, ABD'nin dört bir yanında
Maxmara mağazalarında satılan ve büyük ilgi gören
markanın dünü, bugünü ve yarınını Klass'a anlattı.

"Fibula'nın ilk başlangıcı kültürel takılar oldu. Yani 'Bu coğrafyada yaşamış tüm uygarlıklar
bizimdir, bizlere emanettir' dedik ve 'Bunları açığa çıkaralım' dedik."

Fibula'nın mücevher sektöründeki yeri nedir?
Fibula tarihte takı kullanılmaya başlandığından bu yana
birleştirici fonksiyonu olan aksesuarlara verilen isim. Firma
olarak, trendlerin birleştiği ürünlerin sunulduğu mağazalar



k değerli arkadaşım
Mustafa Gencoğlu ile olan
yakınlığımın ticaret hayatına yansıması sonucu oluştu.
Mustafa Gencoğlu bu sektörün dâhilerindendir ve bana göre
bir numarasıdır; ama o mütevazılık göstererek iki veya üç
der. Sektörde gerçekten herkes onun başarısını kabul
etmiştir.

Mustafa Bey mücevher üretimine 1968 yılında başlamıştır
ve Efe Kuyumculuk adı altında bu işi sürdürmüştür. Efe
bildiğiniz gibi İzmir, Aydın bölgesinin çok delikanlı, yiğit bir
ismi olması nedeniyle seçilmiş bir isimdi. Ardından doksanlı yıllarda bizim arkadaşlığımız
dostluğa, 1996 yılında da iş ortaklığı ve tüzel kişiliğe doğru gitmiştir. Yani Fibula'nın
arkasındaki güç Mustafa Gencoğlu ve Öztürk Şerefoğlu'nun beraberliklerinin getirdiği Efe
Kuyumculuk'tur. Doksanlı yılların sonlarına doğru sektörde birbirine benzer ürünlerin çıkması
ve rekabet koşullarının artmasıyla farklı bir şey ortaya koymamız gerektiğini düşündük.
Burada yaşadığımız coğrafyanın değerleri ve çizgisi bizim için çok önemliydi. Bu çizgi nasıl
takıya, mücevhere dönüştürülür arayışı içindeyken Fibula markası ve takıları ortaya çıkmıştır.

Devamı ve daha fazlası Klassmagazin Kasım sayısında ...

# Amerika'da Bir Türk Mücevher Firması, Hillary Clinton'a Kolye Takmaya Çalışıyor



Resmi büyütmek için tıklayın

**Türkiye'nin önde gelen mücevher firmalarından olan Fibula, ABD'de marka olma yolunda ilerliyor. Marka olma hedefinde Amerika pazarına Fibula'nın çok önem verdiğine işaret eden Genel Müdür Cem Akın, bu bağlamda ünlü MaxMara ve Cafe Milano'nun sahibi Yunan asıllı İraklis Karabasis ile yaptıkları ortaklığa dikkat çekti.**

Türkiye'nin önde gelen mücevher firmalarından olan Fibula, ABD'de marka olma yolunda ilerliyor. Marka olma hedefinde Amerika pazarına Fibula'nın çok önem verdiğine işaret eden Genel Müdür Cem Akın, bu bağlamda ünlü MaxMara ve Cafe Milano'nun sahibi Yunan asıllı İraklis Karabasis ile yaptıkları ortaklığa dikkat çekti. Karabasis'in Amerika'da birçok ürünü markalaştırdığına değinen Akın buna örnek olarak United Colors of Benotton, Sicily gibi marka isimlerini örnek gösterdi.

Karabasis'in sahibi olduğu yüzlerce mağazasında Fibula'nın satıldığını aktaran Genel Müdür Akın, yakın planda ilk hedeflerinin 2008 yılı içinde yalnızca kendilerine ait bir mücevher dükkanı açmak olduğunu söyledi. Sadece Amerika pazarına yönelik olarak ürettikleri ürünlerin koleksiyonlarında ciddi yer tuttuğunu belirten Akın, ABD'de en çok renkli taşların tercih edildiği bilgisini verdi.

Türkiye'nin hala dünya çapında bir markaya sahip olamadığını belirten Akın, "Yakın zamanda bunu başaracağımıza inanıyorum. Türkiye çok kısa süre içinde dünya çapında bir markaya sahip olacak ve bu da büyük ihtimalle mücevher sektöründen çıkacak" şeklinde konuştu. Akın, "Amerika'daki Fibula'nın ortaklarından olan Mustafa Poyraz, Hillary Clinton'a bir kolye takma çabasında" diye konuştu.

## FİBULA'YA DTC'DEN BİRİNCİLİK ÖDÜLÜ

Dünyanın en zenginleri listesinde Türklerin bulunmasına rağmen hala bir marka çıkarılamadığını belirten Akın, Türkiye'de bu alana yönelik bir yatırım olmamasından yakındı. Akın; "Dünya pırlanta ticaretinin yüzde 70'e yakınını elinde bulunduran Diamond Trade Center'ın (DTC) yaptığı son yarışmada biz birincilik kazandık. Bu da bizim bu işte ciddiyetimizi gösteren bir delildir." dedi.

## MÜCEVHERLER TÜRK KÜLTÜR MERKEZİ'NDE SERGİLENİYOR

Kırk yıllık bir maziye sahip olan Fibula'nın mücevher koleksiyonunda oldukça çeşitli ürün yelpazesi bulunuyor. Geçtiğimiz hafta sonu Washington'da oldukça görkemli bir

defile yapan Fibula, Manhattan'daki Türk Kültür Merkezi'nde de (Turkish Cultural Center) mücevherlerini görücüye çıkardı. İstanbul'un sembolü lale'den yeryüzünde nesli tükenme tehlikesinde olan hayvanlara kadar birbirinden değişik onlarca ürünü Manhattan'da bulunan Türk Kültür Merkezi'nde sergiliyor.

Kimi mücevherlerin fiyatı 5 milyon **dolar** da fazla olan Fibula'nın koleksiyonu göz kamaştırırken bu ürünleri sergide görmek mümkün değil. Son derece az sayıdaki müşteri için üretilen servet değerindeki ürünlerin sergide olmaması gerekçesi güvenlik ve çok az sayıda talebin olması.

Washington'da düzenledikleri defileye dahi getirmedikleri pahalı ürünlerinin İstanbul'da bulunduğunu kaydeden Akın, "Buraya en pahalı mücevher olarak bir milyon değerindeki kolye idi" dedi. Kültür Merkezi'ndeki sergi 25 Aralık'a kadar devam edecek. Mücevher almak isteyenlerin kaçırmaması gereken sergide en **ucuz** ürünün yaklaşık 700 dolardan başlıyor. (Cihan Haber Ajansı) 19.12.2007 12:24

# Cafe Milano, Türk mücevher satacak

Beste Önkol



Türkiye'nin önde gelen kuyumcularından Fibula Mücevher'in sahibi Öztürk Şerefoğlu, Cumhurbaşkanı Abdullah Gül'ün ABD gezisi sırasında 'fatura krizi'yle gündeme gelen 'Cafe Milano'nun sahibiyle iş ortağı oldu.

Cumhurbaşkanı Gül'ün gezisi sırasında first lady Hayrünnisa Gül, öğle yemeği için New York'un ünlü lokantası Cafe Milano'yu tercih etmiş, ancak yemeğin faturasının Türk Büyükelçiliği'ne gönderildiğinin ortaya çıkması tartışma yaratmıştı. Bu durumu gazetecilere anlattığından şüphelenilen bir Türk garson ise Cafe Milano'daki işinden olmuştu.

## İspanyol ortak geliyor

39 yıldır kuyumculuk sektöründe faaliyet gösteren Öztürk Şerefoğlu, ABD pazarına açılmak için hem Cafe Milano'nun hem de Max Mara mağazalar zincirinin sahibi olan Yunan kökenli Iraklis Karabasis'le el sıkıştı. Şerefoğlu, "Artık koleksiyonlarımız Max Mara'larda satılacak. Müşteri zaten Max Mara'yı tanıyor. Bu sayede ABD pazarında kendimizi ispatlamak gibi bir sorunumuz kalmadı" dedi. Rusya'da 7 mağazaları bulunduğunu ve bu yıl 2 mağaza daha açacaklarını söyleyen Şerefoğlu, yurtiçinde de atılım yapmaya hazırlandıklarını anlattı. Şerefoğlu, İstanbul Nuruosmaniye'deki satış binalarına ek olarak 4 mağaza daha açacaklarını belirtti. Ayrıca Starboard Cruise Line firmasının 12 kruvaziyer gemisinde koleksiyonlarının satıldığını dile getiren Şerefoğlu, Ritz Carlton ve Çırağan otellerinde de koleksiyonlarının satıldığını söyledi. Bu yıl İspanyol bir firmayla ortaklığa gideceklerini de açıklayan Şerefoğlu, "10 yıldır mücevher ve saat üretimi yapan, 100'ün üzerinde mağazaya sahip bir firmayla anlaşma yapacağız. Bu zincirde de Max Mara'da olduğu gibi ürünlerimiz satılacak" diye konuştu.

## 'Hayrünnisa Hanım müşterimiz olur'



Esinlenmeler ve Ultimate adlı iki koleksiyonları olduğunu dile getiren Öztürk Şerefoğlu, Esinlenmeler koleksiyonunun daha çok batılı turistlerin ilgisini çektiğini belirtiyor. Turistlerin gezip gördüğü yerlere ait objeleri, özellikle mücevher olarak almak istediklerini dile getiren Şerefoğlu, "Mücevherlerimizin fiyatı 1000 ile 250 bin dolar arasında değişiyor. En çok 2 bin 500 ve 3 bin dolar civarındaki mücevherlerden satıyoruz. Cumhurbaşkanı Abdullah Gül'ün eşi Hayrünnisa Gül de müşterilerimiz arasında. Kendisi ürünlerimizden birkaç tanesini taşımıştır. Hayrünnisa Hanım meraklıdır ve kaliteyi takip eder" dedi.

EXHIBIT 11

[ No Subject ] - Yahoo! Mail    Page 1 of 1

Case 1:08-cv-01205-RJL    Document 15-3    Filed 08/01/2008    Page 83 of 104



**YAHOO!** MAIL
Classic

**[ No Subject ]**                                      Thursday, January 17, 2008 6:28 PM
  **From:** "mustafa poyraz" <mcpyrz@yahoo.com>
    **To:** "Cem Akar" <cakar@fibuladiamond.com>
        expensestotal Fibula.xls (43KB), Sales Fibula.xls (25KB)


Sevgili Cem,
Ekte, harcamalari ve satislari gonderdim.
Incelersen sevinirim.inceledikten sonra mutlaka
sorulain olacaktir.sabah erkenden konusalim,aciklayici
bazi bilgiler verebilirim.Benle konustuktan sonra
Ozturk Bey'le paylasirsan daha iyi olur.Raporu
eksiksiz vermis oluruz.
Sevgiler,basarilar,
Mustafa POYRAZ


Looking for last minute shopping deals?
Find them fast with Yahoo! Search.  http://tools.search.yahoo.com/newsearch/category.php?category=shopping

**FIBULA EXPENSES**    **GrandTotal**    **$179,195.69**

**$124,836.18 add $54,359.51(big event)**

**TRAVEL**                              $9,094.40

**SALARY/COMMISSION**                   $27,149.00
   $5,373.00  Milissa
   $2,450.00  Alita
  $13,000.00  Pia
    $900.00  Mehmet
   $2,300.00  commission N.Y
    $683.00  Latitia/commission
    $693.00  Aghi/commission
   $1,000.00  Fred Thomps·security
    $750.00  Security

**FIXTURE**                             $22,364.00

**SAFE**                                $8,545.00

**TRANSPORTATION/FIXTURE**              $4,055.00

**OFFICE**                              $1,112.63

**ADD**                                 $935.00

**PRINTING**                            $4,130.00

**GAS**                                 $1,275.00

**MISCELLANEUS**                        $576.43

| | |
|---|---|
| **PHONE** | $1,085.00 |
| **HOME** | $30,195.00 |
| **DINNER/EVENT** | $8,179.00 |
| **BUSINESS/DINNER** | $2,291.92 |
| **BROKER** | $2,780.00 |
| **MAILING** | $381.80 |
| **BANKCHARGES** | $392.00 |
| **JEWLERY/REPAIR** | $295.00 |
| **TOTAL** | **$124,836.18** |

**Fibula Expenses**

**TRAVEL**

**$9,094.40**

| | |
|---|---|
| $474.00 | United Airlines Chicago |
| $474.00 | United Airlines Chicago |
| $237.00 | United Airlines Chicago |
| $237.40 | United Airlines Chicago |
| $611.00 | Talbott Hotel Chicago |
| $1,093.00 | Talbott Hotel Chicago |
| $11.00 | Talbott Hotel Chicago |
| $38.00 | Talbott Hotel Chicago |
| $150.00 | New York Hotel |
| $155.00 | New York Hotel |
| $216.00 | New York Hotel |
| $216.00 | New York Hotel |
| $844.00 | New York Hotel-Cem |
| $275.00 | Hertz Chicago |
| $98 | Amtrak |
| $69.00 | Amtrak |
| $167.00 | Amtrak |
| $132.00 | Amtrak |
| $188.00 | Amtrak |
| $98.00 | Amtrak |
| $167.00 | Amtrak |
| $167.00 | Amtrak |
| $117.00 | Amtrak |
| $188.00 | Amtrak |
| $139.00 | Amtrak |
| $123.00 | Amtrak |
| $199.00 | Amtrak |
| $98.00 | Amtrak |
| $12.00 | AutoPark |
| $120.00 | AutoPark |

$41.00  AutoPark
$18.00  AutoPark
$38.00  AutoPark
$40.00  AutoPark
$28.00  AutoPark
$43.00  AutoPark
$61.00  AutoPark
$40.00  AutoPark
$130.00  Food-Chicago
$20.00  Food-Chicago
$80.00  Food-Chicago
$200.00  Food-NYCity
$15.00  Food-NYCity
$44.00  Food-NYCity
$31.00  Food-NYCity
$41.00  Food-NYCity
$159.00  Food-NYCity
$105.00  Food-NYCity
$49.00  Food-NYCity
$63.00  Food-NYCity
$97.00  Food-NYCity
$30.00  Food-NYCity
$21.00  Food-NYCity
$31.00  Food-NYCity
$10.00  Food-NYCity
$43.00  Food-NYCity
$49.00  Food-DC-Cem
$44.00  Food-DC-Cem
$147.00  Food-DC-Cem
$17.00  Food-DC-Cem

**SALAY/COMMISSION**
**$27,149.00**

$5,373.00  Milissa
$2,460.00  Alita
$13,000.00  Pia
$900.00  Mammel NewYork
$2,300.00  Mammel/commission NewYork
$683.00  Latila/commission
$893.00  Agni/commission
$1,000.00  Fred Thompson
$750.00  Security Big Event

**FIXTURE**
**$22,364.00**

| | |
|---|---|
| $5,000.00 | HandA Woodworking |
| $5,000.00 | HandA Woodworking |
| $5,000.00 | HandA Woodworking |
| $6,750.00 | HandA Woodworking |
| $593.00 | Mid-Atlantic Store fixture-Fixture Summer Storage |
| $21.00 | Mirror |

**SAFE**
**$8,545.00**

| | |
|---|---|
| $1,640.00 | EmpireSafe NewYork |
| $1,570.00 | EmpireSafe Chicago |
| $1,935 | EmpireSafeBoston |
| $3,000.00 | AandA Safe Movers Chevy Chase |
| $400.00 | AandASafe Movers Shorthills |

**TRASPORTATION/FIXTURE**
**$4,055.00**

| | |
|---|---|
| $946.00 | Truckrental Chicago |
| $400.00 | Driver fees Chicago |
| $509.00 | Driver expensesChicago |
| $100.00 | Electric repair Chicago |
| $50.00 | Mooversl Chicago |
| $1,050.00 | Truckrental and Driver's fees NewYork |
| $1,000.00 | Truckrental and Driver's fees for events and ChevyChase |

**OFFICESUPPLISE**
**$1,112.63**

$193.00   Deluxe Formes Invoices
$450.00   Credit Card Machine
$256.92   Staples Supplice
$58.47    Target Boxes
$59.24    Cvs Office Files
$95.00    Outlook Installation

**ADD    $935.00**

$935.00   Svet-Chicago Russian Add

**PRINTING**
**$4,130.00**

3,200.00   Sotel/Associates Printing Summer Event
$930.00    Lettercomm NewYorkTrunkshowPostcards

**DINNERR/EVENT**
**$8,179.00**

$795.00    FamosoRestaurant
$400.00    FamosoRestaurant
$1,524.00  FamosoRestaurant
$1,381.00  FamosoRestaurant
$160.00    Divan Restaurant
$700.00    Divan Restaurant
$490.00    Divan Restaurant
$126.00    Divan Restaurant
$2,603.00  NewYorkTrunkShowfood

**BROKER**
**$2,780.00**

$1,390  D2D Express
$1,390  D2D Express

**JEWLERY/REPAIR**
**$295.00**

$100.00 Risizing in NY
$125.00 Risizing in NY
$75.00 Risising in ChevyChase

**BANKINGCHARGES**
**$392.00**

**MAILING**
**$381.80**

$147.00 UPS
$21.00 UPS
$51.00 UPS
$20.00 UPS
$120.00 UPS
$22.80 Fedex

**BUSSNESS/DINNER**
**$2,291.92**

$351.00 Turkish Press Mcafe
$156.00
$71.00
$409.00
$227.00
$118.00
$62.00
$275.00
$351.00
$165.82
$106.10

GAS
$1,275.00

MISCELLANEUS
$576.43

PHONE
$1,085.00

$212.00 AT&T
$250.00 AT&T
$352.00 AT&T
$140.00 AT&T
$131.00 AT&T

HOME
$30,195.00

$5,150.00 Rent
$5,150.00 Rent
$5,150.00 Rent
$5,150.00 Rent
$5,150.00 Rent
$3,300.00 Rent
$200.00 Housekeepin
$945.00 Gregor Gardening

GRAND TOTAL    $124,836.18

# FIBULA GLOBAL LLC

| EVENT TYPE | | DATE |
|---|---|---|
| *FASHION SHOW JEWLERY PRESENTATION* | | 12/11/2007 |
| *Halcyon House 3400 Prospect St.Washington DC* | | |

**EXPENSES**

| Vendors | | Cost |
|---|---|---|
| Halcyon House | Venue | $11,000.00 |
| Shinding | Venue Cleaning Staff | $547.50 |
| The Aba Agency | Fashion Show Production-PR- | $8,000.00 |
| Lettercomm | Invitations Design and Printing | $2,077.61 |
| Elamn | Gift Bags Design and Printing | $136.00 |
| Ridgwells | Catering | $5,517.45 |
| The Artist Agency | Models | $3,888 |
| Advanced Production | Production | $14,185.95 |
| Dissident Display | Video | $750.00 |
| Volanni | Florist | $500.00 |
| Usps | Stamps | $250.00 |
| Marc Valet | Valet Parking | $1,535.00 |
| Abby Greenwalt | Photographer | $450.00 |
| Adrienne Mills | Body Painter | $2,050.00 |
| Trio Caliente | Live Music | $2,172.00 |
| Professional Technical | Plasma TV | $1,300.00 |
| | **TOTAL** | **$54,359.51** |

# EXHIBIT 12


**MAIL** Classic

**FW: ABD**           Wednesday, January 23, 2008 4:59 AM

**From:** "Cem Akar" <cakar@fibuladiamond.com>
**To:** "Mustafa Poyraz" <mpoyraz@fibuladiamond.com>, "'mustafa poyraz'" <mcpyrz@yahoo.com>
     ABD 1 ve 2 inci dönem hesap.xls (70KB)

Sevgili Mustafa Bey (Abicim), ·

Ekte ABD'nin birinci dönem - ikinci dönem gelir/giderleri ve kar/zarar analizi dikkatinize sunulmaktadır.Elde olan satış verileri ve 2008 dünya ekonomisindeki daralma göz önüne alındığında aşağıdaki önlemleri sizinle konuşmayı rica ediyorum.

1-) Event House projesinin sonlandırılması.

2-)Max Mara'ların içerisindeki sergilerimizin 2 veya 3 Max Mara ile kısıtlanması ve satış beklentisi + stok maliyetini yükseltmesinden dolayı ABD deki ürün stoklarının % 50 oranında azaltılması.

3-)Aylık event sayılarının 2 adet ile kısıtlanması.

4-) Aylık gider ve fonlama bütçesinin 7.000 USD olarak sabitlenmesi.

Yükarıda sıralanan önlemlerle ilgili görüş ve fikirlerinizi ve bu yeni oluşumun yapılandırılması üzerine konuşmak üzere.

Teşekkürler,

Cem Akar

**Fibula Global 1 İnci Dönem Kapanış**

| | |
|---|---|
| | |
| | 15,000 |
| | 30,000 |
| Fibula Türkiye Transferler | 5,000 |
| | 12,000 |
| | 8,820 |
| | 30,519 |
| | |
| Satış Tahsilat | 41,029 |
| | |
| | |
| | |
| 1.İnci dönem Topla Harcama  (Detaylar sayfa 2) | 55,098 |
| 1.İnci dönem 2 inci süreç Topla Harcama  (Detaylar sayfa 3 & 4) | 64,496 |
| | |
| | |
| | |
| | |
| Toplam Fibula Global Operasyon – Fonlama Fark | 8,076 |
| Fibula Global 2'inci Dönem Giderleri | 7,610 |
| | |
| | |
| | |
| | |
| Teşvik Geri Alınacak Yaklaşık Tutar | 75,000 |
| Fibula Global Satış Kar | 25,259 |
| | |
| | |

ocument 15-3     Filed 08/01/2008     Page 96 of 104

## Fibula Global 2 İnci Dönem Analiz

| | |
|---|---|
| Fibula Türkiye Transferler | 60,000 |
| Fibula Türkiye Transferler | 27,716 |
| İlk Dönem Sonunda Karşılanan Fibula Global 2'inci Dönem Giderleri | 7,610 |
| Satış Tahsilat (Sayfa 6) | 62,003 |
| 2.İnci dönem Toplam Harcama (Detaylar sayfa 2,3,4) | 124,591 |
| 2.İnci dönem Toplam defile (Detaylar sayfa 5) | 54,359 |
| Fibula Global Ürün Satın Alma Maliyeti | 23,977 |
| Fibula Türkiye Tarafından Yapılan Fibula Global Harcamaları | 13,194 |
| Fibula Global Ürün Satın Alma Maliyeti | 23,977 |
| Fibula Türkiye Tarafından Yapılan Fibula Global Harcamaları | 13,194 |
| Teşvik Geri Alınacak Yaklaşık Tutar | 140,000 |
| Fibula Global Satış Kar | 38,026 |

## 1 İnci ve 2 İnci Dönem

| | |
|---|---|
| Teşvik Geri Alınacak Yaklaşık Tutar | 75,000 |
| Fibula Global Satış Kar | 25,259 |

**Fibula Global 1 & 2 İnci Dönem Analiz Özet**

| | |
|---|---:|
| Toplam Fibula Türkiye Transfer | 214,055 |
| Toplam Satış Tahsilatı | 103,032 |
| Fibula Global Ürün Satın Alma Ödemesi | 19,138 |
| **Toplam Nakit Kaynak** | **297,949** |
| **İkinci Dönem Fibula Türkiye Harcamaları Karşılığı Alacak** | **37,171** |

| | |
|---|---:|
| Birinci Dönem Gider | 150,444 |
| İkinci Dönem Gider | 178,950 |

| | |
|---|---:|
| Birinci Dönem Teşvik Geri Alınacak Yaklaşık Tutar | 75,000 |
| İkinci Dönem Teşvik Geri Alınacak Yaklaşık Tutar | 140,000 |

| | |
|---:|---:|
| 450,000 | 148,500 |
| 62,003 | 23,977 |

**İkinci Dönem ABD Aylık Bütçe Talebi Kasım**

| | |
|---|---|
| Nov-07 | |
| Dec-07 | |
| Jan-08 | |

| | |
|---|---|
| Event House Deposit | |
| Kasalar | |
| Showcaseler | |
| Toplam | |

| | |
|---|---|
| Fibula Türkiye Transferler | |
| Fibula Türkiye Transferler | |
| İlk Dönem Sonunda Karşılanan Fibula Global 2'inci Dönem Giderleri | |
| Satış Tahsilat | |

| | |
|---|---|
| 189,073 | 337,573 |
| 192,144 | 216,121 |

**n,2007 - Ocak,2008**



| | |
|---|---:|
| | 36,666 |
| | 36,666 |
| | 36,666 |
| | |

| | |
|---|---:|
| | 5,150 |
| | 6,000 |
| | 20,000 |
| | **31,150** |

| | |
|---|---:|
| | 60,000 |
| | 27,716 |
| | 7,610 |
| | |
| | 62,003 |
| | |

| | |
|---|---:|
| | **112,427** |
| | **-154,118** |

# EXHIBIT 13

**ACCOUNT SUMMARY**

**Expenses for Operating Periods**

**First Period**
April 15 - August 15, 2007

| | | |
|---|---|---|
| 1. Expense list total | $55,048.00 | list with details sent to Turkey on 6/15/07 |
| 2. Expense list total | $64,486.00 | list with details sent to Turkey on 7/15/07 |
| 3. Expense list total | $7,610.00 | list with details sent to Turkey on 8/15/07 |
| | $127,144.00 | |

Wire from USA Fibula Global to Turkey
Costs of goods sold inthis first period
according to cosignment agreement        $15,928.00

TOTAL                    $143,072.00

**Second Period**
September 15 - December 31, 2007

Expense list total            $179,195.00

Expense list sent to Turkey on
Jan. 7, 2008 and we agreed on it

**Third Period**
January 1, 2008

1. Expense list total Jan. 1-April 30, 2008    $46,563.00
2. Expense list not calculated yet

**TOTAL Expenses as of April 30, 2008**    **$368,830.00**

**SALES**

| | | |
|---|---|---|
| First Period | $40,995.00 | All details, prices and code numbers |
| Second Period | $44,494.00 | sent to Turkey |
| Third Period-not calculated as of April 30, 2008 and so on | | |
| | $85,489.00 | |

**WIRE FROM TURKEY**

**First Period**

| | |
|---|---|
| April 10, 2007 | $15,000.00 |
| May 8, 2007 | $30,000.00 |
| May 22, 2007 | $5,000.00 |
| June 8, 2007 | $12,000.00 |
| August 3, 2007 | $8,820.00 |
| August 3, 2007 | $30,415.00 |

**Second Period**

| | | |
|---|---|---|
| October 2, 2007 | $40,862.00 | $60,000 -19,138.00 sent back to Turkey on 10/4/2007 upon their request = $40,862.00 |
| November 6, 2007 | $27,600.00 | |
| December 4, 2007 | $25,000.00 | |

**Third Period** — $0.00

**Total Wire from Turkey** — **$194,697.00**

| | |
|---|---|
| Sales revenue | $85,489.00 |
| Total wires | $194,697.00 |
| | **$280,186.00** |
| | |
| Total Expense | $368,830.00 |
| Total wire and sales | $280,186.00 |
| | |
| | $88,644.00 |
| Insurance | $9,250.00 |
| | |
| **TOTAL DUE** | $97,894.00 |

# EXHIBIT 14



## MAIL
### Classic

**[ No Subject ]**                                                 Wednesday, April 18, 2007 5:53 AM
**From:** "Mustafa Akar" <m.akar@efegold.com>
**To:** "Mustafa Cemil Poyraz" <mcpyrz@yahoo.com>

Sayin Poyraz,

Dun ki telefon konusmanizda Ozturk Bey'in sozunu etmis oldugu, kendisinin
hissedar oldugu ve yeni kurulacak firmanin negatif yonde etkilenmemesi icin
durumlarının Mr.Iraklis'in financial advisor'u tarafindan kontrol edilmesinin
faydali olacagi dusunulen 2 eski firma ile ilgili bilgiler :

1- FALCON JEWELRY INC.  2000 yilinda kuruldu, halen faaliyeti yok.

   8 East 48th Street Suite 2A New York, N.Y. 10017-1005

2- EFE JEWELRY LTD:  2003 yilinda kuruldu, 2005 yilinda "filed for bankruptcy"

   43 West 46th Street 4th floor New York, N.Y. 10036

Saygilar,

Mustafa Akar
Efe Jewelry