IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIBULA MUCHEVHERAT AN. TIC. A.S.,<br>Nuruosmaniye Cad. Turbedar sok.<br>No: 4-6 Eminonu<br>Istanbul, Turkey,<br><br>       Plaintiff,<br><br>       v.<br><br>FIBULA GLOBAL LLC,<br>3236 Prospect Street, NW<br>Washington, DC  20007,<br><br>IRAKLIS KARABASSIS,<br>4774 Dexter Street, NW<br>Washington, DC,<br><br>MUSTAFA POYRAZ,<br>850 N. Randolph Street<br>Arlington, VA  22203,<br><br>       Defendants. | Civil Action No. 1:08-CV-01205-RJL. |

## DEFENDANT FIBULA GLOBAL LLC'S VERIFIED ANSWER AND VERIFIED COUNTERCLAIM TO PLAINTIFF'S VERIFIED COMPLAINT

Defendant Fibula Global LC ("Fibula"), by counsel, hereby answers Plaintiff Fibula Muchevherat San. Tic. A.S.'s ("Fibula/Turkey") Verified Complaint ("Complaint") using its numbered paragraphs as follows:

    1.    Denied.

## PARTIES

2.    Admitted, upon information and belief. Mr. Ozturk Serefoglu, the President and principal owner of Fibula/Turkey, is also the largest shareholder of Fibula, holding an 85% stake therein.

3.    Admitted in part and denied in part. Fibula admits the allegations contained in the first sentence. The Operating Agreement of Fibula is a document which speaks for itself and therefore the remainder of the allegations in Paragraph 3 of the Complaint are denied.

4.    Admitted in part and denied in part. Admitted as to the first sentence. It is also admitted that Mr. Iraklis Karabassis signed the Consignment Agreement in his capacity as a Member of Fibula, and not in his individual capacity. The Consignment Agreement between Fibula and Fibula/Turkey ("The Consignment Agreement") is a document which speaks for itself and therefore the reminder of the allegations in Paragraph 4 of the Complaint are denied.

5.    Admitted in part and denied in part. Admitted as to the first sentence. It is also admitted that Mr. Iraklis Karabassis signed the Consignment Agreement in his capacity as a Member of Fibula, and not in his individual capacity. It is further admitted that Mr. Poyraz conducted business on behalf of Fibula in his capacity as a Member of Fibula in Washington D.C. Fibula's principal place of business is in Washington, D.C. The Consignment Agreement between Fibula and Fibula/Turkey is a document which speaks for itself and therefore allegations in the second sentence of Paragraph 5 of the Complaint are denied. Denied as to the remainder of the allegations in Paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.    The allegations in Paragraph 6 of the Complaint are conclusions of law for which neither an admission nor a denial is required.

7.    The allegations in Paragraph 7 of the Complaint are conclusions of law for which neither an admission nor a denial is required.  Denied as to the last sentence of Paragraph 7 of the Complaint.

8.    The allegations in Paragraph 8 of the Complaint are conclusions of law for which neither an admission nor a denial is required.  Otherwise, substantial communications forming the facts and events relevant to the dispute between Fibula and Fibula/Turkey emanated from and occurred in the Republic of Turkey.

9.    Admitted.  The Consignment Agreement is a document which speaks for itself. While this Answer pertains to only Fibula, Fibula would point out that the Consignment Agreement is only between Fibula and Fibula/Turkey, not the other Defendants.

## MATERIAL FACTS

10.    Admitted.  The Consignment Agreement is a document which speaks for itself.

11.    Denied.  The Consignment Agreement is a document which speaks for itself.

12.    Denied.  The Consignment Agreement is a document which speaks for itself.

13.    Denied.  The Consignment Agreement is a document which speaks for itself.

14.    Denied.  The Consignment Agreement is a document which speaks for itself. Denied as to the second sentence of Paragraph 14 of the Complaint.  Fibula admits that Fibula/Turkey supplied certain jewelry to Fibula for it to sell and market in the USA and to use to establish the brand "Fibula" in the USA.  Fibula denies the value of the jewelry or quantity.

15.    Admitted in part and denied in part.  Fibula admits that Fibula/Turkey undertook and agreed with Fibula to pay Fibula's expenses and costs in connection with, among other things, the marketing and sale of Fibula jewelry and Fibula's attempt to establish the Fibula brand in the USA as a premium jewelry brand.  Pursuant thereto, Fibula/Turkey agreed that it

would pay Fibula's expenses and costs in an initial amount of up to $600,000 in a Letter of Intent dated October 3, 2006 that first established the relationship. Denied as to the reminder of the allegations contained in Paragraph 15 of the Complaint.

16.    Denied.

17.    Denied.

18.    Denied. The Consignment Agreement and Plaintiff's April 12, 2008 letter are documents which speak for themselves.

19.    Denied.

20.    Admitted in part and denied in part. Fibula admits that Mr. Serefoglu is a Member of Fibula/Global. Fibula denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.    Denied. The Consignment Agreement and Plaintiff's May 12, 2008 letter are documents which speak for themselves.

22.    Denied.

23.    Denied. Fibula further states that the $25,000 loan Mr. Poyraz obtained was not a personal loan, but rather obtained in his capacity as a Member and Director of Fibula to cover expenses Fibula had incurred in connection with the Consignment Agreement for which Fibula was not reimbursed by Fibula/Turkey, and for which Fibula/Turkey was obligated to pay.

24.    Denied and admitted in part. Fibula understands that Fibula/Turkey purchased the jewelry from the New York dealer for the sum of $25,000. This sum was thereafter taken into account by Fibula to reduce the expenses and costs owed it by Fibula/Turkey for Fibula's provision of marketing, branding and jewelry sales service to Fibula/Turkey.

25.    Admitted in part and denied in part. Exhibit G is a document which speaks for itself and therefore allegations contained in the first sentence of Paragraph 25 of the Complaint are denied. Fibula admits that it has possession of the jewelry, which it is holding pursuant to a possessory lien arising out of Plaintiff's failure to pay fibula for work performed for Fibula/Turkey. Fibula denies the remaining allegations contained in Paragraph 25 of the Complaint.

26.    Admitted in part and denied in part. Fibula denies the allegations contained in the first sentence of Paragraph 26 of the Complaint relating to an audit and inspection. Fibula admits that its previous counsel did provide a listing of jewelry in Fibula's possession, but denies the reminder of the allegations contained in Paragraph 26 of the Complaint. Fibula admits that it has refused to return the jewelry to Fibula/Turkey as Fibula holds a possessory lien over the jewelry and this lien remains in place until Fibula/Turkey pays to Fibula the costs and expenses incurred by Fibula in providing jewelry marketing sales and the establishment of the Fibula brand in the USA.

27.    Denied. Throughout the parties relationship, Fibula submitted regular accounts and budgets to Fibula/Turkey and Fibula/Turkey accepted this practice without objection as to either the timing of when such information was provided on the substance thereof.

28.    Denied.

## COUNT I: REPLEVIN

29.    Fibula incorporates by reference, as if set forth in full, its responses to Paragraphs 1 through 28 of the Complaint.

30.    Denied. The allegations in Paragraph 30 of the Complaint are prayers for relief by the Plaintiff for which neither an admission nor a denial is required. To the extent that the

allegations can be deemed factual with respect to Fibula, they are denied. Fibula further states that the Plaintiff is not entitled to the prayer for relief it seeks in Paragraph 30 of the Complaint.

31.    Denied. Fibula/Turkey's ownership of the jewelry is subject to Fibula's possessory lien rights. The Consignment Agreement is a document which speaks for itself.

32.    Denied. Fibula/Turkey's ownership of the jewelry is subject to Fibula's possessory lien rights. The Consignment Agreement is a document which speaks for itself.

33.    Denied. Fibula/Turkey's ownership of the jewelry is subject to Fibula's possessory lien rights.

34.    Admitted in part and denied in part. Fibula admits that it has in its possession jewelry consigned to it by Fibula/Turkey under the Consignment Agreement. Fibula denies the remainder of the allegations in Paragraph 34 of the Complaint.

35.    Denied. Fibula further refers to its response to Paragraph 26 above which it incorporates herein.

36.    Denied.

37.    Denied. Fibula further states that it possesses a lien right over the jewelry mentioned in Paragraph 37 of the Complaint.

38.    Denied. As stated previously, Fibula retains possession of the jewelry in its safe. Fibula has no intention either now or previously to "remove or hide" the jewelry, nor has Plaintiff pled any facts of any such thing. This contention is baseless, irrelevant and should be stricken.

39.    Denied.

40.    Denied.

41.    Denied.

42.    Denied.

## COUNT II:  BREACH OF CONTRACT

43.    Fibula incorporates by reference, as if set forth in full, its responses to Paragraphs 1 through 42 of the Complaint.

44.    Admitted in part and denied in part.  The Consignment Agreement is a document which speaks for itself.  Denied to the extent that the parties course of dealing and agreements both oral and written did not follow precisely the Consignment Agreement.

45.    Denied.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Denied.

## COUNT III:  CONVERSION

50.    Fibula incorporates by reference, as if set forth in full, its responses to Paragraphs 1 through 49 of the Complaint.

51.    Denied.  The Consignment Agreement is a document which speaks for itself. Fibula holds a possessory lien right over the jewelry as a consequence of Fibula/Turkey's failure to reimburse Fibula for expenses and costs it agreed and undertook to reimburse.

52.    Admitted.

53.    Denied.

54.    Denied.

55.    Denied.  Fibula repeats that it holds a possessory lien over the jewelry.

56.    Denied.

## AFFIRMATIVE DEFENSES

1.     Fibula/Turkey's claims are barred by the doctrine of accord and satisfaction.

2.     Fibula/Turkey's claims are barred because Fibula owns a possessory lien over the jewelry which was consigned to it by Fibula/Turkey under the Consignment Agreement.

3.     Fibula/Turkey's claims are barred by the doctrine of waiver.

4.     Fibula has been discharged of any obligations under the Consignment Agreement as Fibula/Turkey has materially varied the terms of the Consignment Agreement by failing to reimburse Fibula for costs it incurred in connection to it.

5.     Fibula/Turkey's claims are barred by estoppel.

6.     Fibula/Turkey's claims have been eliminated by offset.

7.     Fibula/Turkey has failed to satisfy all conditions precedent to its right to bring a claim under the Consignment Agreement and the parties' course of dealings.

8.     Fibula/Turkey's claims are barred by the doctrine of indemnification.

9.     Fibula/Turkey's claims are barred by the doctrine of unclean hands.

10.    Fibula intends to rely on all other provable defenses as may appear through discovery or at trial.

## VERIFIED COUNTERCLAIM OF
## DEFENDANT FIBULA GLOBAL LLC

1.     Defendant Fibula, previously known as Efe Global LLC, is a Delaware limited liability corporation operating in Washington, D.C. with its principal place of business at 3236 Prospect Street, N.W., Washington, D.C.  Defendants Iraklis Karabassis and Mustafa Poyraz and Fibula/Turkey's owner, Ozturk Serefoglu, are Members of Fibula.

2.     Upon information and belief, Fibula/Turkey, previously known as Efe Kuyumculuk Ltd. Sti, is an entity organized under the laws of the Republic of Turkey, with its

principal place of business in Istanbul, Turkey.  Upon information and belief, Fibula/Turkey has

no assets or business activities in the USA, except the ones at issue in this dispute.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)

because this is a civil action wherein the matter in controversy exceeds the sum or value of

$75,000.00, exclusive of interest and costs, and is between citizens of different states.

4.      This Court has personal jurisdiction over Fibula/Turkey because it transacts

substantial business in the District of Columbia, contracts to supply services in the District of

Columbia and has subjected itself to the jurisdiction of this Court by filing a lawsuit against

Fibula.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because

Fibula/Turkey is subject to personal jurisdiction in this district and a substantial part of the

events and omissions giving rise to the claims occurred in this district.

6.      Fibula/Turkey has contractually selected and consented to the jurisdiction in the

Courts of the District of Columbia to resolve disputes arising out of its contract with Fibula.

## MATERIAL FACTS

7.      Upon information and belief Fibula/Turkey is in the business of manufacturing

and distributing jewelry in Turkey.

8.      Ozturk Serefoglu is the owner of Fibula/Turkey.

9.      On or about July, 2006, Mr. Mustafa Poyraz, a member and a director for Fibula

and a named Defendant in this lawsuit, first met Mr. Serefoglu in Istanbul, Turkey.

10.      Throughout the next three months, Mr. Serefoglu inquired from Mr. Poyraz about

the possibility of developing his company, which at that time was named Efe Kuyumculuk, Ltd.,

9

in the United States as well as marketing and selling his jewelry products as premium jewelry in the United States.

11.     Mr. Poyraz and Mr. Serefoglu executed a Letter of Intent on or around October 3, 2006. The letter of intent, attached as Exhibit 1, was between Efe Kuyumculuk, Ltd., the predecessor of Plaintiff Fibula/Turkey and P&A America LLC, a company owned in part by Mr. Poyraz. In the Letter of Intent, Efe Kuyumculuk Ltd. agreed to make an investment of $600,000 to open a jewelry store in order to market and sell its jewelry in the USA.

12.     In or around February, 2007, Mr. Poyraz introduced Mr. Serefoglu to Defendant Iraklis Karabassis, who is a well-known businessman in the Washington, D.C. area and owns among other businesses, a number of Max Mara fashion retail stores as franchises. Very impressed with Mr. Karabassis' connections in the retail industry, Mr. Serefoglu requested Mr. Poyraz to convince Mr. Karabassis to sell Fibula/Turkey's jewelry in Max Mara stores owned by Mr. Karabassis, which Mr. Poyraz was able to do.

13.     On or around April 10, 2007, Mr. Karabassis, Mr. Serefoglu and Mr. Poyraz formed Fibula, a limited liability company incorporated in Delaware. The Operating Agreement for Fibula is attached hereto as Exhibit 2. Efe Global LLC is the predecessor of Fibula. Prior to the formation of Fibula, Fibula/Turkey's predecessor, Efe Kuyumculuk, Ltd., passed a resolution agreeing to the formation of Fibula.

14.     Fibula was formed with the purpose of establishing Fibula/Turkey jewelry's brand recognition and marketing the brand as a premium jewelry brand in the United States by initially selling the products at Max Mara stores before opening a "Fibula" jewelry store. Mr. Serefoglu assured both Mr. Poyraz and Mr. Karabassis that Fibula/Turkey would cover the costs associated with these purposes. Mr. Serefoglu had committed to Messrs. Poyraz and Karabassis to finance

this endeavor up to $600,000 USD and it was considered and decided jointly that the best and most effective way of establishing the Fibula/Turkey brand was not to immediately open a store, with all its attendant costs, as had been contemplated originally. But this was the ultimate goal.

15.    Based on the understanding that Fibula/Turkey's jewelry would be sold at Max Mara stores as well as trunk show events and at a separate store called Event House in Georgetown in Washington, D.C., Fibula entered into a Consignment Agreement with Fibula/Turkey on or about May 13, 2007. A copy of the Consignment Agreement is attached hereto as Exhibit 3. The Consignment Agreement was drafted by Fibula/Turkey's representatives.

16.    Fibula/Turkey agreed that it would reimburse Fibula's expenses associated with the sale and marketing of Fibula/Turkey's jewelry and Fibula's efforts in connection with the development, and recognition of, the Fibula/Turkey jewelry brand name and the sale of its jewelry as premium jewelry in the USA. The Consignment Agreement recognized that the business would not run at a profit initially for Fibula/Turkey. Clause 3.3 of the Consignment Agreement provides that "[Fibula/Turkey] will sell [the jewelry] to [Fibula] by reducing the original market (label) price of Products to 33% of the original label price. Considering manufacturing costs, general costs and financial costs [Fibula/Turkey's] profit will only be enough to cover his total cost."

17.    Starting on or about May 15, 2007, Fibula began marketing and selling Fibula/Turkey jewelry in various Max Mara stores in the Washington, D.C. area. Fibula continued the marketing and sale of Fibula/Turkey jewelry until on or about July 15, 2007. Fibula's expenses during this period were reimbursed out of its sales of the jewelry as well as the funds remitted by Fibula/Turkey. In this period, Fibula/Turkey remitted $62,000 to Fibula to

11

cover Fibula's expenses. Fibula/Turkey wired some of the anticipated expenses up front to Fibula and then Fibula submitted to Fibula/Turkey details of its expenses incurred in its performance under the Consignment Agreement and the course of dealings established by the parties. Fibula/Turkey then sent to Fibula via bank wire transfer money for the remaining expenses.

18.    In this time period (May to July 2007), a meeting occurred in Turkey between Messrs. Serefoglu, Karabassis and Poyraz. At this meeting, consistent with the ultimate goal established in the Letter of Intent, Mr. Serefoglu promised Messrs. Karabassis and Poyraz that Fibula/Turkey would finance the opening of a store for Fibula to sell its jewelry under the Consignment Agreement by September 2008, and requested that Max Mara stores continue to sell of Fibula/Turkey jewelry until that date, with Fibula/Turkey paying Fibula's expenses incurred. Fibula/Turkey proceeded accordingly.

19.    On or about August 5, 2007, Fibula and Fibula/Turkey agreed to suspend the marketing and sale operation for two months during the summer period in Washington, D.C., it being considered that the summer was a slow buying time with people being away from Washington D.C. on vacation. All of the jewelry in Fibula's possession at this time was temporarily taken back by Fibula/Turkey to Turkey. Fibula did not object to the jewelry being given back to Fibula/Turkey because Fibula/Turkey did not owe any monies to Fibula for Fibula's expenses at that time.

20.    On or about September 25, 2007, Fibula sent a three-month budget for expected expenses for Fibula between October and December 2007 to Fibula/Turkey. The expected expenses for this three-month period was $141,000 plus variable costs. Fibula/Turkey accepted this budget, modifying it to a five-month budget with a value of $ 214,483 plus variable costs.

Fibula/Turkey sent a payment to Fibula in advance to cover, in part, these costs with the understanding that it would cover the remaining amounts as well.

21.    This three-month budget was formally approved by Fibula/Turkey on or about September 30, 2007.

22.    Fibula/Turkey then sent certain jewelry to Fibula, which was to be sold in Max Mara stores and the Event House and other outlets.  Fibula commenced the marketing and sale of that jewelry.  In accordance with Fibula's objective to create a brand name for Fibula/Turkey jewelry in the United States, and to enhance its ability to sell the jewelry, Fibula organized a number of sales events, including such things as, dinners, fashion shows and exhibitions.  Fibula was successful in publicizing and marketing Fibula/Turkey's jewelry products and selling some jewelry at these events.

23.    At the end of the three-month period to December 2007, Fibula sent to Fibula/Turkey an accounting of Fibula's expenses.  Fibula/Turkey raised no issue with the timing or substance of this accounting.

24.    Prior to the transmittal of the accounting mentioned above, Fibula/Turkey had reimbursed Fibula in the amount of $25,000, in part, for its previous expenses on December 4, 2007. This was the last time Fibula received any monies from Fibula/Turkey.

25.    Fibula/Turkey approved Fibula's expenses through the end of 2007 in an email communication to Fibula dated January 23, 2008.  In that email Fibula/Turkey also requested that Fibula try to limit its going forward expenses to $7,000 per month.  Prior to this approval, Fibula sent half of Fibula/Turkey's inventory back to Fibula/Turkey upon request. The attachment to this e-mail stated that Fibula/Turkey was to recoup a portion of the expenses

Fibula had incurred on Fibula/Turkey's behalf under the Consignment Agreement as an export credit from the government of Turkey.

26.    Fibula communicated to Fibula/Turkey that the $7,000 per month expense goal would be difficult to achieve as Fibula had obligations with respect to a leasing agreement for Event House, salaries and other marketing expenses. Fibula/Turkey stated that Mr. Serefoglu would be visiting the United States in March, 2008, and would discuss the issue of limiting future expenses to $7,000 per month with Fibula representatives. In anticipation of the meeting, and in accordance with the general direction to reduce expenses, Fibula discontinued Fibula's lease with Event House and reduced marketing expenses.

27.    As of February 2008, Fibula had $51,000 in expenses for 2007 that remained unpaid by Fibula/Turkey as well as continuing to incur expenses in 2008. This information was provided to Fibula/Turkey. Fibula/Turkey raised no objection to or issue with these expenses.

28.    Between January 2008 and end of February 2008, Fibula contacted Fibula/Turkey numerous times by telephone to request reimbursement for Fibula's outstanding unpaid 2007 expenses, but were told by Fibula/Turkey representatives that Fibula/Turkey was not in a financially sound condition at that time, but would be reimbursing Fibula as soon as its financial situation improved. Based on these conversations, Fibula reduced its expenses significantly but, without funds coming from Fibula/Turkey, Fibula had to borrow money in order to cover its incurred and ongoing expenses that Fibula/Turkey had agreed to reimburse, but which it had not done. This included borrowing $25,000 from a New York City jeweler, Ara Malkasyan, in February of 2008 (with Fibula/Turkey jewelry as collateral) to pay for expenses Fibula had and was continuing to incur. This loan was not for a personal loan for Mr. Poyraz. Mr. Malkasyan

was unaware of these Fibula expenses or that this was the reason for the loan. Fibula made Fibula/Turkey aware of its borrowing from Ara Malkasyan.

29.    In March 2008, Mr. Serefoglu communicated to Mr. Poyraz and Mr. Karabassis that he wanted to end the Consignment Agreement. Until this time, Fibula's expectation, based on Fibula/Turkey's representations, as was that Fibula/Turkey's interest was to create a long term business relationship with Fibula/Turkey and develop a brand and premium jewelry business in the USA. In this regard, Fibula had advised Fibula/Turkey that to create a premium jewelry brand for Fibula/Turkey would involve a financial commitment and in the short term a net loss situation. Fibula/Turkey understood and accepted this situation. In reliance on the representations of Fibula/Turkey and in performing under the Consignment Agreement and the parties established course of dealings, Messrs. Poyraz and Karabassis on behalf of Fibula/Turkey had spent monies out-of-pocket above and beyond Fibula's incurred hard costs and expended significant time and provided value to Fibula/Turkey to market Fibula/Turkey's products and develop brand awareness.

30.    Upon Mr. Serefoglu's statement that he wished to end the Consignment Agreement, Fibula presented him with an account of its unpaid expenses in the amount of $97,894, $72,894 of which was for Fibula and $25,000 for the loan Fibula had borrowed from Ara Malkasyan in February, 2008.

31.    Mr. Serefoglu agreed that Fibula/Turkey would reimburse Fibula for the entire amount due to Fibula. He stated that Fibula/Turkey would remit half of the amount due to Fibula immediately and the remaining half in two weeks. He also requested that the jewelry be sent back to Turkey.

32.    Despite Mr. Serefoglu's representations, Fibula/Turkey never reimbursed Fibula for any of the outstanding $97,894.

33.    Subsequent to Mr. Serefoglu's statement, Fibula continued to incur expenses in the approximate amount of $5,000 for rent, insurance, taxes and jewelry showcases. This amount, along with the $97,894 was never remitted to Fibula by Fibula/Turkey.

34.    Fibula held and continues to hold the jewelry as security for its unpaid expenses and due to the fact that Fibula/Turkey is a foreign company with no assets in the United States. If Fibula returned the jewelry to Fibula/Turkey, the jewelry would be taken back to Turkey and Fibula would have no recourse against Fibula/Turkey in the United States. This decision was also supported by Fibula's discovery that Mr. Serefoglu had owned a company that had filed for bankruptcy in the United States named Efe Jewelry, Ltd.

35.    Until the filing of this lawsuit by Fibula/Turkey, Fibula continued to sell the jewelry to pay off the expenses it had incurred and for which Fibula had not been reimbursed by Fibula/Turkey.

36.    Between May of 2007 and July of 2008, Fibula engaged in activities and incurred other out-of-pocket expenses that it had incurred in marketing and branding Fibula/Turkey's jewelry in the USA. Fibula has not been compensated for these expenses it has incurred. These expenses include, but are not limited to, the organization of several marketing events, operating expenses for Fibula, rent for Max Mara space, travel expenses to and from marketing events and in the course of seeking to sell the jewelry as well as compensation for Mr. Poyraz's time and efforts dedicated to marketing and selling Fibula/Turkey jewelry for that time period. This value is approximately $280,000.

37.    While Fibula/Turkey contends that the value of the jewelry is $1,606,737.66 (with

a wholesale value of $521,643.41), *see*, Fibula/Turkey's Verified Complaint, Exhibit H, based on

Fibula's sales report from January 2, 2008 until June 24, 2008, the correct wholesale value of the

jewelry is $378,260.  Additional pieces of jewelry were sold by Fibula from June 24, 2008 until

the filing of the lawsuit by Fibula/Turkey against Fibula, Mr. Poyraz and Mr. Karabassis.

## COUNT I
## (BREACH OF CONTRACT)

38.    Fibula repeats and incorporates by reference the allegations of Paragraphs 1

through 37 as if fully set forth herein.

39.    Fibula entered into a valid and enforceable contract with Fibula/Turkey.

40.    Pursuant to the contract between Fibula and Fibula/Turkey, Fibula/Turkey was

obligated, among other things, to pay for all of Fibula's expenses associated with the

development of the Fibula/Turkey brand as well as the marketing and sale of Fibula/Turkey's

jewelry in the United States.

41.    By failing to pay for such expenses incurred by Fibula, Fibula/Turkey materially

breached the contract between Fibula and Fibula/Turkey.

42.    Fibula has fulfilled all of the duties and obligations imposed on it by the contract

between Fibula and Fibula/Turkey.

43.    Fibula/Turkey's breach has directly and proximately caused Fibula to incur

damages in excess of Three Hundred and Fifty Five Thousand Dollars ($355,000) for which

Fibula/Turkey is liable.

## COUNT II
## (UNJUST ENRICHMENT)

44.     Fibula repeats and incorporates by reference the allegations of Paragraphs 1 through 43 as if fully set forth herein.

45.     Fibula/Turkey undertook to pay the expenses and costs of Fibula to develop Fibula's jewelry as a premium jewelry brand in the USA and to market and sell Fibula/Turkey's jewelry in the USA.  Pursuant to that agreement and undertaking, Fibula engaged in activities to develop the Fibula/Turkey brand name and market and sell Fibula/Turkey jewelry in the United States and Fibula incurred expenses.

46.     These expenses and activities included, but were not limited to, the organization of several marketing events, operating expenses for Fibula, rent for Max Mara space, travel expenses to and from marketing events and compensation for Mr. Poyraz's time and efforts dedicated to marketing and selling Fibula/Turkey jewelry.

47.     Fibula conferred a benefit on and enriched Fibula/Turkey for which both Fibula and Fibula/Turkey intended that Fibula would receive compensation.  The work was not performed gratuitously.  Fibula/Turkey knowingly accepted the benefit conferred by Fibula's performance.

48.     Fibula/Turkey has been unjustly enriched by the benefit conferred on it by Fibula, but has failed to pay for the reasonable value of the services provided by Fibula.

49.     The reasonable value of the services provided by Fibula to Fibula/Turkey was in excess of Two Hundred and Eighty Thousand Dollars ($280,000).  Accordingly, the amount due and owing by Fibula/Turkey is in excess of Two-Hundred and Eighty Thousand Dollars ($280,000).

## COUNT III
## (INDEMNIFICATION)

50.    Fibula repeats and incorporates by reference the allegations of Paragraphs 1 through 49 as if fully set forth herein.

51.    Fibula/Turkey is required to indemnify and hold harmless Fibula for losses or expenses at common law resulting from the fault of Fibula/Turkey without active fault on the part of Fibula.

52.    Several vendors and creditors have made claims against Fibula for expenses associated with the development of the Fibula/Turkey brand name and the marketing and selling of Fibula/Turkey jewelry.

53.    Fibula has paid these vendors and creditors, including out-of-pocket expenses, in excess of Seventy Five Thousand Dollars ($75,000). These expenses and costs are ongoing.

54.    Through numerous communications, Fibula has tendered the claims of vendors and creditors to Fibula/Turkey and Fibula/Turkey has rejected all tenders made by Fibula.

55.    The failure of Fibula/Turkey to indemnify Fibula has directly and approximately caused Fibula to incur damages in excess of Seventy Five Thousand Dollars ($75,000). .

## COUNT IV
## (ATTACHMENT OF JEWELRY/POSSESSORY LIEN)

56.    Fibula repeats and incorporates by reference the allegations of Paragraphs 1 through 55 as if fully set forth herein.

57.    Fibula is currently in possession of the jewelry sent to it by Fibula/Turkey.

58.    Fibula rendered services to Fibula/Turkey to market and sell Fibula/Turkey jewelry and develop the Fibula/Turkey brand name, thereby conferring a benefit on Fibula/Turkey as well as adding value to the jewelry.

59.    Fibula/Turkey undertook and agreed with Fibula to reimburse Fibula for its expenses and costs incurred in the marketing, sale and establishment of a premium jewelry brand for Fibula/Turkey in the United States.

60.    Fibula/Turkey owes monies to Fibula in excess of $355,000 in part as a result of Fibula/Turkey's breach of its obligations imposed by the contract between Fibula and Fibula/Turkey.

61.    Fibula is thereby entitled to assert a possessory lien over the jewelry.

## COUNT V
## (NEGLIGENT MISREPRESENTATION)

62.    Fibula repeats and incorporates by reference the allegations of Paragraphs 1 through 61 as if fully set forth herein.

63.    Fibula/Turkey represented to Fibula that it would cover Fibula's costs associated with promoting the Fibula/Turkey brand and selling and marketing Fibula/Turkey jewelry. Fibula/Turkey further represented to Fibula that the two parties' business relationship would lead to the opening of a store in the United States. Further, Fibula/Turkey represented to Fibula in March 2008 that all of the outstanding expenses Fibula incurred would be paid by Fibula/Turkey.

64.    Fibula/Turkey made these representations in the course of its business and in a transaction in which it had a pecuniary interest.

65.    Fibula/Turkey supplied faulty representations meant to guide Fibula in its business transaction with Fibula.

66.    Fibula/Turkey failed to exercise reasonable care in communications of these representations and Fibula justifiably relied on the communications provided by Fibula/Turkey expending effort and incurring costs and expenses based upon those representations.

67.     As a proximate consequence of Fibula/Turkey's representations, Fibula incurred damages in excess of Three Hundred Fifty Five Thousand Dollars ($355,000) for which Fibula/Turkey is liable.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Fibula prays that this Honorable Court will grant the following relief.

1.     With regard to Plaintiff's Complaint, Defendant Fibula demands judgment in its favor and against Plaintiff Fibula/Turkey, together with an award of fees, costs and such other relief that the Court deems appropriate.

2.     Damages resulting from the breach of Fibula/Turkey's breach of the contract between Fibula and Fibula/Turkey in the amount of Three Hundred and Fifty Five Thousand Dollars ($355,000) or such greater amount as may be proven at trial, together with interest, costs and attorneys' fees and such other further relief as the Court deems just and appropriate.

3.     Damages resulting from Fibula/Turkey's failure to pay Fibula for fair value of services rendered in the amount of Two-Hundred and Eighty Thousand Dollars ($280,000), or such greater amount as may be proven at trial, together with interest, costs and attorneys' fees and such other further relief as the Court deems just and appropriate.

4.     Damages resulting from Fibula/Turkey's failure to indemnify Fibula against vendor and creditor claims which Fibula had to pay out in the amount of Seventy Five Thousand Dollars ($75,000), or such greater amount as may be proven at trial, together with interest, costs and attorneys' fees and such other further relief as the Court deems just and appropriate.

5.     Entry of a judgment declaring that Fibula is entitled to a possessory lien over the jewelry and that Fibula is entitled to retain possession over the jewelry.

6.    Damages resulting from Fibula/Turkey's negligent misrepresentations to Fibula in the amount of Three Hundred and Fifty Five Thousand Dollars ($355,000) or such greater amount as may be proven at trial, together with interest, costs and attorneys' fees and such other further relief as the Court deems just and appropriate.

Defendant Fibula demands judgment in its favor and against Plaintiff Fibula/Turkey, together with an award of fees, costs and such other relief that the Court deems appropriate.

Dated: August 22, 2008                    Respectfully submitted,

                                          By: _____
                                             Ronan J. McHugh (DC Bar No. 468231)
                                             Akin Alcitepe (DC Bar No. 481389)
                                             Thelen Reid Brown Raysman & Steiner LLC
                                             701 Eighth Street, N.W., Suite 800
                                             Washington, D.C. 20001
                                             202-508-4000

                                             *Counsel for Defendants*

22

## VERIFICATION

I, Mustafa Poyraz, a Member and Director of Fibula Global LLC, verify under the penalty of perjury of the laws of the United States of America that the Verified Answers to Fibula/ Turkey's Verified Complaint and the allegations contained in the foregoing Verified Counterclaim are true and accurate, to the best of my knowledge, information and belief.

Dated: August 22, 2008

Mustafa Poyraz

**CERTIFICATE OF SERVICE**

On August 22, 2008, I caused the foregoing, Verified Counterclaim of Defendant Fibula

Global, LLC, to be delivered via electronic mail to the following:

> Lawrence S. Sher
> Andrew C. Bernasconi
> Reed Smith LLP
> 1301 K Street, NW
> Suite 1100, East Tower
> Washington, DC 20005
>
> *Counsel for Plaintiff*

Ronan J. McHugh

# EXHIBIT 1

October 3rd, 2006

# LETTER OF INTEND

Efe Kuyumculuk Ltd. (Mr.Ozturk Serefoglu) and P&A America LLC., represented by Mr.Mustafa Cemil Poyraz have agreed on the marketing and establishing a "BRAND" by opening a retail shop in the USA market, within the conditions and responsibilities stipulated below.

In this respect, Mr.Mustafa Cemil Poyraz will,

- Investigate the relevant ABD laws and regulations,

- Find out the conditions and necessary applications to establish a company,

- Investigate the format of transfer and formation of capital of the company,

- Look for and find, a shop to rent, with alternatives, at a prestigious area of Washington D.C.,

- Prepare a detailed budget, for the transform of the rented space to a fine jewelry shop, including decoration, security, computer system and etc.,

- Learn all the necessary license(s) and the amount of license fees, if any,

- After the evaluation of the above mentioned information, if it is decided by Mr.Ozturk Serefoglu to open the shop; then a partner competent for Marketing, PR, Media Promotions and who can constitute a Jewelry sales team, be introduced to Mr.Serefoglu and a visit by the Manager of the Jewelry sales team be organized to Turkey to see Efe Jewelry facilities and full product range, in Istanbul,

- Organize the introduction of the competent partner to O.Serefoglu latest by December 15th 2006,

- All the data collected during the project investigation, be faxed or e-mailed to Mr.Serefoglu periodically as a written report,

- During his trip to USA, Mr.Serefoglu be introduced by the relevant politicians and businessman by visits and/or "luncheon meeting" organizations,

Mr.Ozturk Serefoglu will,

- Work on the periodical reports and send his evaluation to Mr.Poyraz ASAP,

- Plan his trip to USA in a reasonable short time, for his own on-site evaluation; if his final evaluation on the reports received, convinces him that the budget and conditions are within the predicted limits,

- Arrange transfer of maximum 600.000.-US$ to USA after the final decision on opening the shop,

- Give 35-40% of the shares of the company to be established, to Mr.Poyraz and to the other partner, to be approved, with the condition of repayment by their annual profit shares,

- After being introduced to the competant partner, provide maximum 60.000.-US$ to Mr.Poyraz, in instalments, when required, apart from the company capital to be transferred, to be used for the period before the opening of the shop, with repayment condition of an agreed due date or from his annual profit share,

Both parties believe in mutual goodwill and fully agree on the benefit of establishing a "BRAND" in USA and to establish similar jewelry retail shops in other states with the profit of this first shop.

Both parties declare their intention of being sincere and clear for the project and as well be quick in their decisions to minimize the project period.

They also agree on making all the reports, demands and requests in written form.

Efe Kuyumculuk Ltd.                              P&A America LLC
represented by                                   represented by

# EXHIBIT 2



## LIMITED LIABILITY COMPANY
### OPERATING AGREEMENT

### EFE GLOBAL LLC

A Delaware Limited Liability Company
(Member-Managed)
### OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is made and entered into effective April 10, 2007, by and among: Ozturk Serefoglu , Iraklis Karabassis and Mustafa Poyraz (collectively referred to in this agreement as the "Members").

### SECTION 1.   THE LIMITED LIABILITY COMPANY.

    1.1    *Formation.* Effective April 10, 2007, the Members form a limited liability company under the name **EFE GLOBAL LLC** (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Limited Liability Company Act of the State of Delaware (the "Act"). The Members agree to file with the appropriate agency within the State of Delaware charged with processing and maintaining such records all documentation required for the formation of the Company. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement.

    1.2    *Name.* The business of the Company will be conducted under the name EFE GLOBAL LLC, or such other name upon which the Members may unanimously may agree.

    1.3    *Purpose.* The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed within the State of Delaware.

    1.4    *Office.* The Company will maintain its principal business office within the Commonwealth of Virginia at the following address: 3236 Prospect Street, N.W. , Washington, D.C. 20007.

    1.5    *Registered Agent.* The Company Corporation: is the Company's initial registered agent in the State of Delaware, and the registered office is 2711 Centreville Road Suite 400, Wilmington, DE 19808 .

    1.6    *Term.* The term of the Company commences on April 10, 2007 and shall continue perpetually unless sooner terminated as provided in this Agreement.

    1.7    *Names and Addresses of Members.* The Members' names and addresses are attached as Schedule 1 to this Agreement.

    1.8    *Admission of Additional Members.* Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

2005/.... ....
hükümleri ... ..........

T.C. Vasla...... ..yük..liği
Ticaret Müşaviri

18/05/.... .al SARKÇIN
........ Başmüşaviri

Case 1:08-cv-01205-RJL     Document 1-2     Filed 07/15/2008     Page 3 of 11

## SECTION 2.   CAPITAL CONTRIBUTIONS

2.1     *Initial Contributions.* The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

2.2     *Additional Contributions.* No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3     *No Interest on Capital Contributions.* Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

## SECTION 3.   ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1     *Profits/Losses.* For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation 1.704-1.

3.2     *Distributions.* The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(d).

3.3     *No Right to Demand Return of Capital.* No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## SECTION 4.   INDEMNIFICATION

The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

## SECTION 5.  POWERS AND DUTIES OF MANAGERS

5.1    *Management of Company.*

5.1.1    The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2    Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed jointly by Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii) Mustafa Poyraz.

5.1.3    Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a Iraklis Karabassis and either (i) Ozturk Serefoglu , (ii) Mustafa Poyraz to manage and operate the business and affairs of the Company.

5.2    *Decisions by Members.* Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall require the joint approval of Iraklis Karabassis and either Ozturk Serefoglu , Mustafa Poyraz.

5.3    *Withdrawal by a Member.* A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6.  SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1    *Organization Expenses.* All expenses incurred in connection with organization of the Company will be paid by the Company.

6.2    *Salary.* No salary will be paid to a Member for the performance of his or her duties under this Agreement unless the salary has been approved in writing by a Majority of the Members.

6.3    *Legal and Accounting Services.* The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## SECTION 7.  BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING

7.1    *Method of Accounting.* The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

7.2    *Fiscal Year; Taxable Year.* The fiscal year and the taxable year of the Company is the calendar year.

7.3    *Capital Accounts.* The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4    *Banking.* All funds of the Company will be deposited in a separate bank account or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an

institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government.

## SECTION 8.     TRANSFER OF MEMBERSHIP INTEREST.

8.1     *Sale or Encumbrance Prohibited.* Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other nontransferring Members determined on a per capita basis.

8.2     *Right of First Refusal.* Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1     The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2     For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3     Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4     If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5     Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3     *Substituted Parties.* Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

(1)    The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

(2)    The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4    *Death, Incompetency, or Bankruptcy of Member.* On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1    Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5    *Death Buy Out.* Notwithstanding the foregoing provision of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1    The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2    If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent

would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3    Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4    At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1)    $1,000.00 in cash, bank cashier's check, or certified funds;

(2)    The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5    At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6    On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

## SECTION 9.    DISSOLUTION AND WINDING UP OF THE COMPANY

9.1    *Dissolution.* The Company will be dissolved on the happening of any of the following events:

9.1.1    Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2    The agreement of all of the Members;

9.1.3    By operation of law; or

9.1.4    The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2    *Winding Up.* On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 3 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1    To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members;

9.2.2    To the payment and discharge of any Company debts and liabilities owed to Members; and

9.2.3    To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then-outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member pursuant to Section 9.2.3.

## SECTION 10.    GENERAL PROVISIONS

10.1    *Amendments.* Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all of the Members.

10.2    *Governing Law.* This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Delaware (without regard to principles of conflicts of law).

10.3    *Entire Agreement; Modification.* This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist

between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4    *Attorney Fees.* In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5    *Further Effect.* The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6    *Severability.* If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7    *Captions.* The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8    *Notices.* All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Ozturk Serefoglu
_____
Name

_____
Signature

Iraklis Karabassis
_____
Name

_____
Signature

By: Mustafa Poyraz
Printed/Typed Name
Title: Managing Member

_____
Signature

Listing of Members – Schedule I

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR EFE GLOBAL LLC**

**LISTING OF MEMBERS**

As of the ____ day of April , 20007, the following is a list of Members of the Company:

| NAME: | ADDRESS: |
|---|---|
| Ozturk Serefoglu | Istanbul, Turkey |
| Iraklis Karabassis | 3236 Prospect Street, N.W. Washington, DC 20007 |
| Mustafa Poyraz | 3236 Prospect Street, N.W. Washington, DC 20007 |

Authorized by Member(s) to provide Member Listing as of this ____ day of April  20007.

Ozturk Serefoglu
_____
Name

Iraklis Karabassis
_____
Name

Mustafa Poyraz
_____
Printed/Typed Name
Title: Managing Member

Listing of Capital Contributions – Schedule 2

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**FOR EFE GLOBAL LLC**
**CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be $ 300.00. The description and each individual portion of this initial contribution is as follows:

| NAME: | CONTRIBUTION: | % OWNERSHIP: |
|---|---|---|
| Ozturk Serefoglu | $ 100 | 85.0% |
| Iraklis Karabassis | 100 | 10.0% |
| Mustafa Poyraz | 100 | 5.0% |
| | $ 300 | 100 % |

SIGNED AND AGREED this _10_ day of _April_ 20 _01_.

By: Ozturk Serefoglu
    Name                                     Signature

By: Iraklis Karabassis
    Name                                     Signature

Mustafa Poyraz
By: _____
Name                                         Signature
Title: Member

# EXHIBIT 3

**CONSIGNMENT AGREEMENT**

This agreement is entered into by and between;

**CONSIGNEE**

TITLE        : EFE GLOBAL LLC

ADDRESS  : 3236 – 3238 Prospect Street, NW Washington DC, 20007 USA

TELEPHONE: +1. 202.333 97 92

FAX          : +1. 202.357 64 07

**CONSIGNOR**

TITLE        : EFE KUYUMCULUK LTD. ŞTİ.

ADDRESS  : Nuruosmaniye Cad. Turbedar sok. No:4-6 Eminonu Istanbul Turkey

TELEPHONE: +90.212.5209505

FAX          : +90.212.5280496

**ARTICLE I**

**DEFINITIONS**

1.1  "Consignee" refers to the customer who receives the Consignment Stock subject to the terms of the Consignment Agreement .

1.2  "Agreement" refers to the CONSIGMENT Agreement which regulates conditions of sale of consignment goods and entered into by and between contractual parties mentioned above.

1.3  "PRODUCTS" refers to the CONSIGNOR'S (manufacturer's) jewelers that are the subject of the "CONSIGNMENT AGREEMENT"

1.4  "Consignor" refers to the manufacturer whose Products are the subject of the "CONSIGNMENT AGREEMENT".

**ARTICLE II**

**SUBJECT**

CONSIGNOR agrees on to sell Products by consigning the said Products to exclusively CONSIGNEE, due to the rapidly flourished mutual trust between Mr.Karabassis, Mr.Poyraz and Mr.Serefoglu, at all MAX MARA Stores, at Events and Trunk Shows organized by CONSIGNEE, in USA.

The CONSIGNEE will make every attempt to sell the goods with label prices; any discount to be made, from the label prices, will be as per the joint approval of the partners of the CONSIGNEE.

The Parties believe in a mutual goodwill and trust and look forward for this agreement to be the milestone for further joint cooperations and in consideration of the mutual promises, covenants and agreements as set forth herein, the CONSIGNOR and the CONSIGNEE agree as follows:

**ARTICLE III**
**RIGHTS AND OBLIGATIONS OF CONSIGNOR**

3.1    The Consignor hereby grants the CONSIGNEE the right of sale of the Consignor's Products and authorizes the CONSIGNEE to sell the Products by retail sale specifically at Max Mara Stores, Events and Truck Shows under the terms and conditions as set forth herein. The photo and price lists of the Products attached are subject of this agreement.

3.2    The Consignor warrants and represents to the CONSIGNEE that the CONSIGNOR's title to the Products is marketable and insurable, that the CONSIGNOR has the full power and authority to enter into this Agreement, that the CONSIGNOR has the full right and authority to convey title to the Products to any duly authorized CONSIGNEE (buyer). The CONSIGNOR indemnifies the CONSIGNEE for any claims brought by third parties based on the CONSIGNOR's failure to disclose the existence of any security agreements or secured claims against the Products, such indemnity to include reimbursement for any attorney's fees and cost incurred by the CONSIGNEE in defense of any such claim.

3.3    The CONSIGNOR will sell Products to CONSIGNEE by reducing the original market (label) price of Products to 33 % of the original label price. Considering manufacturing costs, general costs and financial costs CONSIGNOR's profit will only be enough to cover his total cost. The CONSIGNOR preserves its rights to recollect Products at its own discretion, if the sales be less than his expectations.

**ARTICLE IV**

**RIGHTS AND OBLIGATIONS OF CONSIGNEE**

4.1   The CONSIGNEE warrants and ensures that it has relevant and adequate connections and profession in the sector to sell Products and pay purchase price to the CONSIGNOR at an agreed time.

4.2   The CONSIGNEE warrants that Products of CONSIGNOR will be sold at all Max Mara Stores, Events and Truck Shows in USA.

4.3   The CONSIGNEE agrees that the CONSIGNOR is the sole owner of all Products and accepts that all rights of Products are reserved by CONSIGNOR. The CONSIGNEE will do its best to protect trademark rights of Products.

4.4   The CONSIGNEE will make every reasonable effort to collect the payment from the purchaser(s) of the Products. The Seller will not release the Property to the purchaser(s) until the CONSIGNEE has complete payment on the Property. The CONSIGNOR agrees that should a purchaser(s) fail to remit payment on Products sold then the CONSIGNOR will collect price for Products directly from CONSIGNEE.

4.5   Initially, but to be revised by the CONSIGNOR depending on the result of the operation, CONSIGNEE will settle the Consignor's account on a monthly basis and will effect the payment to the following bank account of the CONSIGNOR.

Name of the beneficiary company: EFE Kuyumculuk San ve Tic. Ltd. Sti.
Name of the bank  : YAPI KREDI Nuruosmaniye Branch
Address of the bank: Nuruosmaniye Cad. No:82 Cagaloglu Istanbul
Account Number    : 4243458      Swift Code : YAPITRIS
Phone : +90.212.5133388        Fax: +90.212. 5129484

4.6   The CONSIGNEE will provide a relevant insurance policy for the Products and deliver a copy of such insurance policy to the CONSIGNOR.

4.7   The CONSIGNEE has no right to transfer any of its rights or obligations arising from this agreement.

4.8   The CONSIGNEE shall allow representatives of CONSIGNOR to inspect and audit all data and records of CONSIGNEE relating sale of Products.

**ARTICLE V**

**NOTICES**

5.1   The parties hereby confirmed that above mentioned addresses are their registered business addresses and all correspondences and notices delivered to those addresses will be valid and binding.

5.2   Notices and other communication required or permitted hereunder shall be delivered in person or sent by registered or certified mail, confirmed fax messege, to the respective addressee at its address set forth above in the recitals of this Agreement or to such other address or number as shall be furnished in writing by any such Party, provided however, that notices or communications regarding default, termination or rescission shall be sufficiently given only if delivered via Postal Office or a prime courier delivery service , by confirmed fax messege and registered mail, return receipt requested.

**ARTICLE VI**

**AMENDMENTS**

The CONSIGNOR and the CONSIGNEE agree that this contract shall be binding on their heirs, personal representatives, successors and/or assigns and that any amendments to this Agreement, in order to be effective, shall be in writing and mutually signed and approved by parties.

**ARTICLE VII**

**CONFIDENTIALITY**

The representations, warranties, covenants and agreements made in this Agreement or in any certificate or instrument delivered in connection herewith are confidential and shall be in full force and effect notwithstanding any investigation made by or disclosure made to any party hereto, whether before or after the date hereof, shall survive and shall continue to be applicable and binding thereafter.

**ARTICLE VIII**

**APPLICABLE LAW**

Parties hereby warrant and agree that they will do their best to solve all disputes arising out of this agreement in good will by mutual negotiations first. If they fail to do so, this Agreement will be interpreted according to USA Law, and Regulations

and all disputes arising out of this agreement will be solved at Washington D.C.courts and execution offices.

**ARTICLE IX**

**TERM AND TERMINATION**

9.1  This Agreement will be in effect from May 15th, 2007 and be in force until the unsold Products send back to the CONGIGNOR's premises.

9.2  Either party may terminate this agreement upon 60 days prior written notice.

9.3  In case of termination, parties preserve their rights to collect due amounts.

9.4  In case of termination by CONSIGNOR, the CONSIGNEE is obliged to re-deliver all Products under its possession immediately.

9.5  In case of termination by CONSIGNOR, the CONSIGNEE, if any, preserves its rights to collect due payments from CONSIGNOR regarding sale of Products.

IN WITNESS whereof the Parties here to have executed this Agreement in a manner binding upon them on the day as of May 13th, 2007.

This agreement is signed in 2 copies by the parties' lawful representatives as follows:


**CONSIGNEE**

Representatives of  EFE GLOBAL LLC

Mr.Iraklis Karabassis      Mr.Öztürk Şerefoğlu      M.Mustafa Poyraz


**CONSIGNOR**

Representative of  EFE KUYUMCULUK LTD. ŞTİ.

Mr.Öztürk Şerefoğlu